Comstock, J.
It will be convenient to approach the questions in this case, having first an accurate notion of the *43 rights and powers of the appellant as receiver of the North American Trust and Banking Company. His counsel have been understood to argue, in effect, that all possible objections to the million and first half million trusts are centred in him, constituting in the sum total a simple power to repudiate them, if repudiation were possible at any time, under any circumstances, and for the benefit of any parties —a power to be exercised without regard to the elements of which it is composed, and without inquiry whether the parties who will receive the fruits of its exercise could, in their own peculiar right, assert the particular objection which may be held fatal to those trusts. It is claimed that the receiver represents both creditors and stockholders, and so all objections derived from either and both of these sources are put together and urged with united force, although it may happen that one of these classes will take the entire benefit of objections which only the other class can make. Views of this sort are perhaps slightly encouraged by a generality of expression, in adjudged cases, which did not, in their circumstances, call for precision and accuracy.
The receivership in question was constituted under sections thirty-nine, forty and forty-one of the Revised Statutes, concerning “ Proceedings against corporations in equity.” (2 R. S., 463,464.) Under those statutes, any creditor or stockholder of a banking corporation may commence a suit in equity for the causes therein enumerated, and the court may issue an injunction, and “ appoint one or more receivers to take charge of the property and effects of the corporation,” with authority to recover the debts due to it, and “ the property that may belong” to it. The next section declares that “ such receiver shall possess all the powers and authority” conferred by article third of the same title'upon receivers appointed in case of the voluntary dissolution of a corporation. According to art. 3, secs. 67, 68, receivers appointed om voluntary dissolution “ are vested with all the estate, *44 real and personal, of such corporation” — “as trustees for the benefit of creditors and stockholders,” and they are declared to.have all the power and authority conferred by law upon trustees of the estates of insolvent debtors, under the provisions of part 2, chap. 5, of the Revised Statutes. According to those provisions (2 R. S., 41, §§ 6, 7), trustees of insolvent debtors are “ deemed vested with all the real and personal estate of the debtor,” and they have “ power to sue, in their own names or otherwise, and recover all the estate, debts and things in action belonging or due to such debtor, in the same manner and with the like effect as such debtor might or could have done, if no attachment had been issued or trustees appointed.”
The appellant, as receiver, has no interest in or power-over the property affected by the trusts in question, except such as he derives under the statutes which have been mentioned. It has been said in this, as in other cases, that he represents the creditors and the stockholders, but for all the purposes of inquiry into his title, he really represents the corporation. He is by law vested with the estate of the corporate body, and takes his title under and through it. It is true, indeed, that he is declared to be a trustee for creditors and stockholders; but this only proves that they are the beneficiaries of the fund in his hands, without indicating the sources of his title or the extent of his powers. If, then, in a controversy between the receiver and third parties, in respect to the corporate estate, it is possible to form a conception of rights, legal or equitable, belonging to the shareholders as individuals, which the corporation itself could not assert in its own name, the receiver does not represent those rights. So far as shareholders are concerned, he can litigate respecting the fund upon precisely the grounds which would be available to the corporation, if it were still in existence, solvent, and no receivership had been constituted. In regard to creditors, I should certainly incline to take the same view of his rights and powers *45 ruder the statutes referred to. It has, however, been uniformly assumed, and was not denied on the argument, that he succeeds to the rights of creditors, and takes his title under them, where conveyances have been made in fraud of their rights, but otherwise valid. In such cases, he holds adversely to the debtor corporation. For all the purposes of the present controversy, I shall proceed upon this assumption.
In general, then, a receiver of this description takes merely the rights of the corporation, such as could be asserted in its own name, and on that basis only can he litigate for the benefit of either stockholders or creditors, except when acts have been done in fraud of the rights of the latter, but valid as to the corporation itself. In this particular case, it will readily be seen that the controversy is still further reduced, in respect of parties interested, to a mere question between the Palmers and others, holding the bonds secured by the two trusts, and the general creditors, claiming to annul those trusts and to share in the property embraced therein. On the part of the receiver, it has been strenuously argued that the corporation was insolvent when the trusts were created. If not, then its insolvency afterwards and at the present time has not been denied. If by repudiating the debts, or the greater portion thereof, something might be left for the shareholders, the decision which we pronounce in another branch of the case renders that result impossible. Following the principles laid down in the case of the State of Indiana ( Tracy v. Talmage, 4 Kern., 162), and applying them to this controversy, we determine that the debts of the corporation cannot be repudiated upon any of the grounds which have been urged. It becomes absolutely certain, therefore, that the claims of creditors, including the bondholders, greatly exceed the entire value of the corporate effects. For this reason, if no other, the shareholders or individuals may be regarded as strangers to the controversy. The rights of creditors only are really in question.
*46 The observations, so far made, lead not inappropriately to a general classification of the objections urged by the receiver against the validity of the million and first half million trusts. They are : 1. Those which assume that the trust conveyances are null and void to all intents, so that the corporation itself could at any time repudiate them ; 2. Those which assume them to be void only as to creditors, on the grounds of fraud or illegal preference. Among these-I include, conventionally, the objection that they were made for the “ use of the grantor.” In respect to the first class, the claim of the creditors, and consequently of the receiver, is under and through the corporation, and it rests on no other basis. In respect to the second, their claim 'is adverse, because it overreaches transactions valid against the corporation itself. I will now consider the several objections, proceeding according to the classification here suggested.
I. And first, then, it is claimed that both of the trusts are void, under section eight of the statute “to prevent the insolvency of moneyed corporations” (1 R. S., 588), because they were not authorized by any previous resolution of the board of directors. That statute declares that no conveyance, &c., not authorized by such a resolution, “ shall be made by any such corporation, of any of its real estate or of any of its effects exceeding the value of one thousand dollars.” The next clause in the section makes certain exceptions not material to the question; and the concluding one declares that the conveyances, &c., shall not be rendered “ void in the hands of a purchaser, for a valuable consideration and without notice.” Conceding that no previous resolution of the directors was in fact adopted, sufficient in its terms to authorize either of the trusts, some of my brethren are of opinion that they can be sustained on the ground that the holders of the trust bonds are bona fide purchasers, and so within the protection afforded by the last clause of this statute. While I do not dissent from *47 their views in this respect, I shall place my own conclusion mainly upon another ground, and three of my brethren concur with me in so doing.
In accordance with what seems to have been the opinion of one of the judges in this court, in Gillett v. Moody (3 Comst., 486), opposed to his well considered decision in another tribunal (Gillett v. Campbell, 1 Denio, 520); in accordance, also, with a resolution concurred in by a majority of the judges, in Tulmage v. Pell (3 Seld., 328), after that case had been disposed of on other grounds ; and with a decision somewhat more directly involving the question, in a case quite recent ( Gillett v. Phillips, 3 Kern., 114), where the point was neither argued by counsel nor considered by the court, I shall assume that banking associations, organized under the general act of 1838, are brought within the statute under consideration and within other provisions of the same title. I must observe, however, in passing, that this is an assumption opposed to the clearest convictions of my own mind; and that, if it were necessary in the determination of a controversy so important as the present, I should feel bound to inquire whether a doctrine which appears to me so plainly erroneous is irreversibly settled.
The objection we are now considering does not deny that the corporation had power to create the trusts. It only insists they were created in the corporate name and under the corporate seal by certain subordinate agents, who acted without due authority from their principal, and hence that they are void. If we may apply to the question the most familiar of all the doctrines of agency, such an objection cannot prevail, provided the principal at the time approved or afterwards ratified the act of its agent. The ratification need not be declared in express terms. Mere silence and acquiescence will in many cases be sufficient So it may be inferred from the acts and proceedings of the principal in pais When he receives and. appropriates the *48 proceeds of a transaction done in his name and by his assumed authority, there exists the highest possible evidence of his approval. These rules are elementary, and are founded on the simplest ideas of justice in the dealings of men. They are also as plainly applicable to corporate as to other transactions, where the dealing is within the powers of the corporation. In such a case, no possible reason can be suggested why a corporate, as well as a private, principal is not bound by the dealings of its agent, which it has approved, and the benefit of which it has received and appropriated.
To these principles, so simple and so just, the receiver’ counsel oppose the peculiar language of the statute. The requires, as they argue, a previous resolution of the directors and they insist that the assent of the corporation to tho trust conveyances could not be given at any other time or manifested in any other manner; and the conclusion from this argument is, that the trusts must be annulled, however formally assented to at the time or afterwards, and even although the corporation actually received the proceeds thereof, amounting to over a million of dollars, and applied the moneys to its use in the payment of its debts and otherwise. If these views are justified by the statute, then, as to all the moneyed corporations of this state, principles of hitherto universal application, and founded in the plainest justice, are no longer in force. I cannot bring my mind to the conclusion that such was the intention of the legislature.
The precise object of the statute was to prevent fraudulent and improper transfers of the corporate effects by officers of the corporation acting without the sanction of the board of directors. It was simply in restraint of their authority and of their acts that the statute was enacted. It was not intended in any wise to abridge or restrain the power of the corporations themselves, as represented by their directors, over their effects, or to confine them to any special mode or particular time of manifesting their will in *49 the disposition of their property. The officer or particular agent who undertakes to dispose of the corporate estate, or any part of it exceeding one thousand dollars in value, must take his authority under a previous resolution of the directors. If he has no such authority, his act, standing alone and unsupported by any sanction, is void: just as the unauthorized act of any other agent is void as against his principal. But the corporations themselves, like other principals, may, nevertheless, act and be bound in any of the modes not opposed to the general rules of law applicable to such bodies. They may previously resolve; they may subsequently acquiesce; they may expressly ratify; they may intentionally receive and appropriate the proceeds of the unauthorized transaction, and so put it out of their power to dispute its validity. It is true the literal reading of the statute is, that no conveyance, &c., “ shall be made” without a previous resolution of the directors. But supply the words, “ by particular officers or agents of the corporation,” evidently implied in the whole scope and meaning of the section, and irresistibly suggested by the object the legislature had in view, and the whole difficulty disappears. Primarily, no doubt, the meaning of a statute is to be sought for in the language used, but that must be' read with a due attention to the subject matter of the enactment, and to the general or particular end to be attained or mischief to be remedied. More than all, we ought not, unless compelled, to adopt a construction which would impute to the legislature an extreme and absurd intention, such as would be a design contrary to principles universally received in any other "dealings, to take from corporations the power of giving effect in any possible mode of conduct to acts lawful in themselves and within their charters, but defective only because they were not within the authority of the particular agent who assumed to perform them.
Very different, I am pursuaded, were the intentions ,of the legislature. At the time this statute was passed, it was *50 well known that moneyed corporations, besides their boards of directors, had presidents, cashiers and committees. It was also well known that these officers or particular agents might assume, and in fact that they did sometimes assume, to transfer the corporate effects, without any authority derived from the boards of directors. The power thus exercised was liable to great abuses, and experience had already exhibited such abuses. The legislature, therefore, struck directly at the power, and declared that it should not be exercised at all. The statute should therefore be interpreted, not as designed to abridge a single power which the corporations would possess if it had not been enacted, or to cripple them, and through them their creditors, in any of the modes of action by which they could bind themselves, but simply to protect them against the acts of their officers or agents, done without their authority. Quite consistently with this intention, they can bind themselves by approval and confirmation, expressly declared or implied from their conduct, although the previous authority was wanting. No one surely will contend that, upon general - principles, a corporation cannot confirm any dealing or transaction which is within the reach of its powers, and which, therefore, it can originally authorize. A different doctrine would be a singular anomaly, which I do not think this statute has introduced.
Upon these views I prefer to rest my conclusion on this branch of the case. The North American Trust and Banking Company never questioned the validity of these trusts; on the contrary, we have the very highest evidence that it approved them. The deeds were executed in the name and under the seal of the corporation. Regarded as the acts simply of the officer who signed them, they were void (so I assume) under the statute; but, almost contemporaneously with the execution of the deeds, the company itself sold and pledged the bonds which the conveyances were made to secure, received the proceeds and used the *51 same in its dealings. These bonds were taken by parties who, it is not denied, acted in ignorance that the trusts were not authorized by a previous resolution, and who, as subjects of a foreign country, are not even chargeable with notice of the statute which it is supposed required such a resolution. I do not by any means say that a foreigner, any more than a citizen, can enforce in our courts a title to property here, acquired in contravention of our laws. The contrary is plainly true. But when the question is one of fair and honest dealing, our statutes are usually to be regarded as facts of which the foreigner is presumed to have no knowledge. I am not, however, seeking to introduce here the doctrine of equitable estoppel, but put my conclusion, as before stated, on the competency of the corporation to confirm the trusts in any effectual mode of corporate action, a competency which this statute was never intended to destroy; and I refer to the good faith of those dealing in the bonds, in reliance upon the trusts, for the purpose of showing what great injustice would result if we were to adopt the opposite view.
The trusts being valid as against the corporation, so far as the objection considered is concerned, the receiver cannot repudiate them for the benefit of creditors. In the absence of fraud, a creditor holds under and through his debtor, and is concluded by all the valid acts and assurances of the latter. (Candee v. Lord,, 2 Comst., 275.) This principle is just as applicable to a corporate as any other debtor. Whether the trusts were fraudulent as to creditors is a distinct question, having no connection with the one which has been examined.
II. I come next to the objection that banking associations formed under the general law of 1838, have no power to borrow money, and hence that this corporation could not issue its bonds, create the trusts, or give any valid assurance for a loan. This is a very grave proposition, opposed to the known practice of probably every banking institution in *52 the state. It should, therefore, be well considered before it is received as the law. The question, it should be observed, in the form now presented, is one of simple capacity to borrow at all, and not whether the power was abused or even transcended by the North American Trust and Banking Company. If the power is found to exist, the question whether this' company went beyond it in the particular scheme of which these trusts formed a part, and what are the consequences of such excess, might form a distinct branch of inquiry. It is proper also to observe, in this connection, that the authority to receive deposits, specially enumerated among the powers of these institutions, is not the one of which I am speaking. A general deposit in a bank, in its exact legal result, is a loan of money (Chapman v. White, 2 Seld., 412); yet it may be true, as my learned associate, Judge Selden, thinks, that a power to receive deposits is not a power to borrow money in the more general and appropriate sense of those words. I proceed, now, to some examination of this objection to the trusts in question. •
Banking is not in its nature a corporate franchise. In the absence of legislative restraints, it may be carried on by individuals and partnerships in all its departments of issuing, lending, receiving deposits, discounting, dealing in exchange, bullion, &c.; and in examining the powers of banking corporations, the nature and incidents of banking as a business, when not under special legal restraints, are in the highest degree important. It is true the question will always be one of corporate power rather than of the rules and principles of banking; but those rules and principles may have a decisive influence in the construction of charters which profess to confer powers of this description. And this leads me to observe that banking, regarded as á business and not as a franchise, includes the borrowing of money as one of its features or incidents. As no one-denies-this proposition, I will not dwell upon it further than to *53 quote the remarks of an eminent English judge, Hr. Pemberton Leigh, Chancellor of the Duchy of Cornwall, in a late case in the privy council ( The Bank of Australasia v. Breillat, 6 Moore’s P. C., 152, 194). He observed: “ The nature of a banker’s business, especially if the bank be one both of issue and deposit, necessarily exposes him to sudden and immediate demands, which may be to the extent of a large portion of his debts, while his profits are to be made in employing his own moneys and those intrusted to Mm in discounting bills, in loans and other modes of investment. It is impossible that he should always have his assets in such a state as to be applicable immediately to the payment of all demands that may be made upon him ; and if a partner has no power, under such circumstances, to borrow money for the partnership, either the assent of each individual must be obtained, which is impractible, or the concern must be ruined. We have no doubt at all, therefore, that in ordinary banking partnerships such power exists, and that the. directors, by the terms of their appointment, have all the general powers, and, among the rest, the power of borrowing, unless such power is excluded by other provisions of the deed.” It may be quite material, when we come to examine the general banking act of 1838, to observe now, in passing, that in these observations, so just and forcible, the borrowing of money is spoken of, not as a distinct department or branch in the business of banking, but is asserted as the incident and result of two of its most important operations: those of issuing and receiving deposits. The opposite idea, I think, will presently appear to be a source of error in conclusions on this subject.
If, then, a number of persons should associate themselves together as bankers, in the recognized modes of carrying on that business, it will be, and, as I understand, it is admitted that the managing partner or partners, or any general and unrestricted agent, could bind the firm by engagements contracted for moneys loaned, without a specification of the *54 power in the partnership deed. I consider it, moreover, to be plain, that an association which has filed the proper certificate, under the law of 1838, and so become incorporated. has precisely the powers, direct and incidental, which a mere partnership would have if all the provisions of that act, supposed to confer powers or to restrict them, were inserted in the articles of agreement, and providing there were no other restraining laws. I have, indeed, no hesitation in calling these associations partnerships, although they have also so many of the peculiarities of corporations that the courts of this state have quite uniformly held them to be such, upon most questions which have arisen concerning them. I broadly admit them to be corporations, but they are also associations or partnerships. I admit, also, that they take their powers under the organic act, but so do partnerships under their articles. What I assert is, that the measure of power would be the same in both cases, if conferred in the same terms. Corporations, I .admit also, can only exercise the powers expressly or incidentally conferred. It scarcely needed a statute of this state to declare a principle of the common law so familiar; and there is nothing in the terms of the statute (1 JR. 5., 600, §3), quoted with so much emphasis, to give greater intensity to the doctrine.
Let us then suppose all statutes prior to 1838, in restraint of banking, to be done away, and a mere partnership formed under articles, reciting an intention to pursue “ the business of banking,” and declaring that the associates would, under a certain name, carry on that business in or by the issuing of circulating notes, receiving deposits, discounting bills, dealing in exchange, bullion and coin, and loaning money on real or personal security. I know of no broader terms in the English language to define “ the business of banking;” and would any one, who admits that the borrowing of money is included in that business, deny that the power would be embraced as the incident of some or all of the operations *55 enumerated ? And yet, in this supposed language of a partnership agreement, we have the organic law of 1838. In the title of the act the intention is declared “ to authorize the business of banking.” In the first fourteen sections the issuing power is granted without limit, but under very peculiar and exact regulations, framed to protect the currency and afford to the billholder, in the securities provided, an absolute certainty of ultimate redemption. In the 18th section, all the remaining banking powers of which I have ever heard are conferred. It declares that “ such association shall have power to carry on the business of banking, by discounting bills, &c., by receiving deposits, by buying and selling bullion, coin and exchange, by loaning money on real and personal estate, “ and by exercising such incidental powers as shall be necessary to carry on such business.” Now, if a mere partnership, such as I have supposed, could borrow money, and the act would not be ultra vires if done by those in the direction of the business, how, it may well be asked, would the same association lose that power by merely making and filing a certificate according to the 16th section of the banking law, but without any other change in its organization? It is not the banking powers, let it be remembered, which turn the association into a corporation. The capacity of perpetual succession, the power of suing and being sued, of contracting in the particular name selected, of having, a common seal, of making by-laws, &c., are the incidents which, in the judgment of the courts of this state, have invested these associations with a corporate character. ( Thomas v. Daken, 22 Wend., 9; Warner v. Beers, 23 id., 3 03.) The banking powers conferred are not, either in their nature or extent, changed or affected by this conclusion of the courts, the soundness of which I do not question.
If, so far, I have differed from those who deny the power in question, I think the difference is in the mode of statement rather than in principle. The objection to the power is, after all, really made to turn on the terms of the banking *56 law itself; and many of the preceding observations have been made in order to approach the construction of those terms through the usages and necessities of banking as well as that through the technical law of corporations in general.
We come then to the question of construction, which to my own mind presents no difficulty. The argument on the other side urges that “ the business of banking” is authorized by the 18th section, only according to the specifications therein contained, among which the power to borrow is not found. To this the answer is, that these specifications, with the issuing power granted in the previous sections, cover the whole ground of banking. If the statute had omitted the general terms “business of banking,” and had merely enumerated the power of issuing, and all the others named in the 18th section, that would have been a general grant of banking powers, including, as their incident, the right to borrow money when a necessity may arise in the exercise of those powers.
To deny this conclusion is necessarily to assume (and it seems to be assumed, perhaps unconsciously) that borrowing is an independent operation in the business of banking; in other words, that it is banking in one of its branches, and hence that the power cannot exist without a particular specification. This is, I think, plainly an error; and yet it appears to lie at the foundation of the opposing view of the present question. Now, in a very simple and elementary view of the subject, borrowing is not banking, nor is it in a just and proper sense any other kind of business. It is the incident and auxiliary of various kinds. Let us test this. If a person should open and keep an office for receiving deposits payable on demand, he would carry on a well known branch of banking business, although he might use the deposits in speculation or other modes totally unconnected with banking. He would be a banker. So if he were to keep an office for issuing his own circulating notes, or for dealing in exchange, or for discounting bills, and should *57 actually carry on either of those operations without the others, he would exercise a banking power, although confined to a single one. But suppose he keeps an office and habitually borrows money on time, which he uses in manufacturing or some other branch of industry: was it ever-supposed that such a practice made a man a banker ? In truth he performs neither a banking nor a manufacturing operation, but one which is simply auxiliary to the business in which he is engaged. A banking corporation, therefore, when it borrows money, exercises an incidental and auxiliary power, not expressed, but implied from those which are expressed. On this ground the English Privy Council proceeded in the case of the Bank of Australasia v. Breillat (sufra), as will be seen in the extract quoted above from the opinion in that case. The right to borrow was not among the specifications in the deed, but was referred to the powers of issuing and of receiving deposits, which were specified. If these views are correct, they would seem to be decisive, for in the act of 1838 all known express banking powers are enumerated.
The course of bank legislation in this state leads to the same conclusion. In the charters prior to 1825 there was no enumeration of the banking powers, but in that year the Commercial Bank of Albany was chartered, “ with all incidental and necessary powers to carry on the business of banking, by discounting bills, &c.,” proceeding with the same specifications as in the act of 1838, now under consideration. This was the model of a vast number of charters down to and including the year 1836, when special legislation of this kind ceased. Now, it is a fact not at all remarkable, but very pertinent to the present question, that in no special bank charter ever granted in this state was it thought of to specify the borrowing of money as one of the substantive and express banking powers. Yet I am not aware that it was ever before suggested that the right to borrow was excluded by the enumeration of those powers.
*58 Those specifications were evidently intended not to restrict the appropriate business of banking, but as a mere legislative definition of that business; a definition not indispensable, perhaps, but eminently useful, because it left nothing to construction or in doubt. Even the restraining laws may be referred to in corroboration of these views. Corporations, not expressly incorporated for banking purposes, were prohibited from exercising banking powers under a specification precisely like that found in all the special bank charters and in the general charter of 1838. (1 R. S., 712, §§3, 6.) Indeed, it would be difficult to conceive a greater absurdity than a prohibition against borrowing money in a statute intended merely to restrain unauthorized banking.
Again, suppose a corporation were chartered under a special or general law for manufacturing purposes, with a particular authority to borrow money whenever deemed necessary in the business: would that be considered a grant of one of the banking powers ? Plainly not; and quite as plainly it would be, if the authority were to receive deposits or discount bills, or issue circulating notes.
Under these views, it is not very important to answer the question, Why did the legislature of 1838 specify the express powers which it was intended to confer, instead of leaving them to be derived from the general grant to carry on “ the business of banking?” That legislature surely might copy the language of its predecessors since the year 1825, without affording any occasion for imputing to it the special intention of excluding a well known incident of that business. Still the question is not difficult to answer. In the restraining law of 1830 (1 R. S., 712, §6), it was declared to be unlawful, without express legislative authority, to keep offices of deposit, discount, &c. The act of 1837 (Suit., p. 14) removed this restraint only in favor of persons and associations not incorporated. In order, therefore, to confer upon associations; under the act of 1838, the *59 powers of discount and deposit, it was necessary to specify them. This, it is true, is a reason which does not apply to the other powers enumerated. But a specification of these two only would have furnished pretty strong ground for the very inconvenient inference that the others were intended to be excluded. If the statute had read : “ Such association shall have power to carry on the business of banking, by discounting bills and receiving deposits,” the rule “ expressio unius exclusio alterius ” would have been of very dangerous import to the right of dealing in exchange, bullion and coin. In short, the existing state of the restraining laws rendered it necessary to specify some of the express powers intended to be granted, and those alone could not be specified and the others safely omitted.
We arrive then at the conclusion that the North American Trust and Banking Company had capacity to borrow money as incidental to the banking business and the powers expressly granted. But the objection takes another form. It has been urged that these associations cannot borrow money as a substitute for capital. If by this proposition it is only meant that these institutions, having no capital subscribed at all, cannot lawfully procure it upon loan and so make a total substitution of credit for capital, the doctrine has no precise application to the present case; for this company had an actual capital of some $3,000,000 subscribed and paid, and it is not denied that the subscriptions were paid in a manner which the law permitted. It is remarkable, however, that there is no provision in the law requiring a single dollar to be paid by the shareholders. The association must, in some way, whether upon credit or with capital, procure mortgages and stocks, and deposit them with the comptroller of the state, in order to secure the ultimate payment of its circulating notes, if it issues any. But it is not compelled to exercise the issuing power at all; and if it chooses not to do so, then it has no occasion to procure or deposit the securities, and it will have no circulation to *60 redeem in cash. It may confine itself exclusively to the banking operations of deposits, of discount, &c., specified in the 18th section; and there is certainly nothing in the act which prohibits carrying them on with borrowed capital. An individual banker can certainly do this. So can a partnership which has no corporate privileges. And why then cannot a partnership which has power to incorporate itself and does so under a general law? Corporations, it is said, can act only in accordance with the law which creates them. But if the law authorizes them to do acts specifically, and is silent as to the manner and means of doing those acts, where is the restriction, except such as the nature of the business implies ? Banking, I repeat, is a business and not a franchise. The public have a special concern in the circulation only, and that is guarded in the act of 1838 by a series of very peculiar and exact provisions. Beyond that, I have no doubt the legislature intended to leave the business essentially free. It allowed all persons to associate, to become incorporated by their own act, and it conferred the most ample banking powers, without a single restriction in the use of those powers. And this view derives additional strength when we consider that by a legislative act in the previous year all restraints upon banking, except those intended to protect the currency, had been abolished in favor of all persons and mere associations, and the business thrown open to them without restriction. ( Slat, of 1837, j>. 14.) Now it may be true that, in point of public policy, associations in the banking business which have filed a certain certificate, and so incorporated themselves, ought to be under some legislative restraint in the power to borrow money in that business; but whatever argument can be adduced to prove this, the same argument will establish incontrovertibly that banking should be altogether prohibited to individuals and mere partnerships, for in them the power to borrow is confessedly unrestrained. Such I say may or may not be sound public policy, but these were not the views which *61 prevailed in 1837 and 1838, or since that time, nor was it the policy of the legislature of those years. For proof of this we need only to look at their acts. The statutes of 1837 removed the restraints upon banking (of course I do not speak of issuing bills for circulation), and thus by necessity connected it with the most unlimited power of borrowing by individuals and associated bankers. Such became from that time the policy of the state, whether wise or unwise is not the question. The act of 1838, so far from interfering with this policy, carried it still further into the issuing department, requiring only that the associated bankers should incorporate themselves in the manner provided, as the condition of exercising that power also, and that both individuals and associations should deposit a perfect security and receive from the comptroller their circulating notes. In those conditions, I confidently affirm, are to be found the only remaining restraints upon the business of banking left by the act of 1838. Whoever, therefore, invokes public policy for the purpose of finding a restriction of the right to borrow in the course of that business, in order to render himself intelligible, should refer to his own private views,
< and not to the actual policy of this state.
If we admit, then, that these associations can borrow, and I trust this has been shown, I do not see in what quarter we are to find restraints upon the power, so long as it is exercised in the course of that business. The right exists as the incident of banking, and beyond that it cannot be exercised without transcending the limit of corporate power. The act of borrowing for objects not within the general scope of that business would be ultra vires. But if the power exists, we cannot say that the lending contract is void, because the occasion for the loan arises out of a course of merely imprudent and hazardous dealing. This particular company, no doubt, carried its credit to extraordinary lengths, and it may even be true that its embarrassments arose out of speculations in stocks or other *62 transactions not within its powers. But its debts, in the forms they had assumed when the million and half million trusts were created, so far as they have come under our consideration, and particularly its great debt to the Palmers, were legal and valid. So we adjudge in that branch of the controversy. The necessity of paying these debts was therefore a banking necessity. Without going back to original transactions in this country, which may have been ultra vires or illegal, the creditors of this company, and chiefly the Palmers, had advanced immense sums upon its bills of exchange, and in redeeming its certificates of deposit and debentures ; and these advances, as we determine, constitute legal and just debts. Those the company were bound to pay. Even if we admit that a large amount of outstanding obligations, not yet due, were illegal or prohibited in their form, still the holders who had advanced money thereon were entitled to recover it. This was determined in the Indiana case. How, if a bank may not borrow money when it cannot otherwise meet its pressing engagements, and must go into insolvency if it does not meet them, I know not what exigency will justify a resort to the borrowing power.
The conclusions at which we arrive, affirming the right of banking institutions to borrow money, and sustaining its exercise in the case before us, do not necessarily result in the doctrine laid down by a very able judge, assistant Vice-Chancellor Sandford, in the case of Barry v. The Merchants' Exchange Company (1 Sand. Ch. R., 280, 289). That case, however, should not be overlooked in this discussion, because it asserts a principle which more than covers the ground now in controversy, and because the same question afterwards arose in this court. The Merchants’ Exchange Company was chartered with a capital of SI ,000,000, for the purpose of building an exchange in the city of Hew-York. After the first erection was destroyed by fire, the corporation purchased more land and rebuilt on a larger *63 scale, at a total cost of over $2,000,000, but without any increase of the capital. There was no authority to borrow money expressed in the charter, but the entire expense, over and above the amount of the capital, was defrayed by means of loans procured upon the corporation bonds, secured by one or more mortgages executed in trust to Mr. King. The great question in the case was upon the power of the company to contract the loans and to secure them by the bonds and the trust mortgages, and the power was affirmed. The precise doctrine of the case is stated in the following language of the assistant vice-chancellor: “A corporation, in order to attain its legitimate objects, may deal precisely as an individual may who seeks to accomplish the same ends. If chartered for the purpose of building a bridge, it may contract a debt for labor, the materials, or the land upon which the bridge is abutted. If more advantageous, it may borrow money to purchase such land or materials, or to pay for such labor; and, as the evidence of the indebtedness, it may execute to the creditors a note, a bond or a mortgage, whether the debt be for the money borrowed, or the work, materials or land.” The question was also before this court, in the case of King v. The same Corporation, upon the very same exercise of power (1 Seld., 547); and the objection, that the company had no authority to borrow money, was distinctly presented on the argument. The point seems also to have been necessarily involved in the case. The decree of the supreme court of the city of New-York was affirmed, thus establishing the validity of the trust mortgages made to secure the loans. In the opinion of the court, the objection made to them under the statute of uses and trusts is .the only one discussed; but the one which alleged the want of power to borrow money was equally involved. It must have been disposed of by including it among what are called, in the opinion, “ various minor objections, which did not require a particular notice.” I do not regard such a decision as conclusive upon us *64 when it can be shown to be wrong. It would not, however, be respectful to those who -were then members of this court to suppose that this question escaped their notice, for it was distinctly involved in the case, and was called to their attention on the argument. The decision is, therefore, at least high evidence of what they understood and assumed the law to be.
But can these decisions be shown to be wrong upon principle or authority ? I confess my own inability to refute the doctrine so perspicuously laid down by Assistant Vice-Chancellor Sandford. I am not aware that it comes in conflict with any known distinction between private person i and corporations. It is true that the latter take all then powers, direct and incidental, under their charters; but when the direct power is granted in terms, they take it, as natural person enjoys it, with all its incidents and acces series. A simple association of merchants to build an exchange, could, if they so agreed with each other, very appropriately borrow money in furtherance of the object; and why can they not, if they take the principal power under a charter from the government, which enables them to act as a single person and with a collective will ?
It is truly said that corporations can only exercise such incidental powers as are necessary to carry into effect the express objects of their charters. But necessity is a word of flexible meaning. There may be an absolute necessity, a great necessity, and a small necessity; and between these degrees there may be many others depending on the ever varying exigencies of human affairs. It is plain that corporations, in executing their express powers, are not confined to means of such indispensable necessity that without them there could be no execution at all. The contrary doctrine would lead at once to a very great absurdity; for if there are several modes of accomplishing the end, neither one is indispensable, and each would exclude all the others. And thus, by inevitable logic, an express grant of power *65 would lie forever dormant, because there are more modes than one of carrying it into execution.
It is almost as difficult to say that the incidental power depends for its existence on the degree of necessity which connects it with the power in chief. Such a doctrine would impose upon courts a never ending difficulty, for the inquiry would always be whether the chosen instrumentality is the very best that could be selected; and if not the very best, however minute the difference may be, then the inevitable decision must follow that the choice was fatally bad, although strictly adapted to the end in view and made in the utmost good faith.
These demonstrations, for such they appear to me, would seem to leave but one other conclusion, which is, that corporations, along with their specific powers, take all the reasonable means of execution, all that are convenient and adapted to the end in view, although not the very best by many degrees of comparison. And this'is a doctrine which must necessarily result in the liberty of choice amongst those means. The choice may be wise or unwise. If made in the exercise of an intelligent good faith, the wisdom of the selection may be called in question, but the power to make it cannot be.
T can therefore see no room for the distinction which admits the power of a corporation to contract a debt for labor and materials to be used in building an exchange, or a bridge, or a turnpike road, or in manufacturing, those being in each case the specified object of the charter, but denies the right to borrow money to be used in the purchase of the same labor and materials. If there be any reason for a distinction, resting on a comparison of benefit to the corporation, the advantages of borrowing would in most cases be undeniable. So, in point of public policy, the reason for that preference would appear to be still stronger, for while the industrial classes would require no protection, the money lenders could safely be left to guard their own interests. I *66 believe the distinction referred to is not recognized by any adjudged case.
If these views in regard to trading corporations in general are sound, then our conclusion, which affirms the power of incorporated banks to borrow money, when not specially restrained, rests not only upon the peculiar nature and necessities of banking business, but upon a principle somewhat more comprehensive.
III. The trusts are also objected to on the ground that the power to borrow money could not be exercised in the particular mode of issuing the so-called million and half million trust bonds as assurances for the moneys advanced, and this point is next to be examined. This objection raises the following questions: 1. Is it within the power of corporations generally to issue instruments of this kind, when no prohibitory or restraining statute is violated, and the purpose or occasion of making them is lawful ? 2., Is there any express or implied prohibition, contained in the act of 1838 or in any antecedent statute, by which this company was bound ? There are no other aspects in which this objection can be presented, provided the bonds were issued prior to June 3, 1840, when another statute took effect. The time of their issue will be hereafter noticed.
The first of these inquiries can be briefly answered. The right of corporations in general to give a note, bond or other engagement to pay a debt is so nearly identical or so inseparably connected with the right to contract the debt that no doubt upon the question ought to be admitted. When a corporatioti can lawfully purchase property or procure money on loan in the course of its business, the seller or the lender may exact, and the purchaser or borrower must have the power to give, any known assurance which does not fall within the prohibition, express or implied, of some statute. The particular restriction must be sought for in the charter of the corporation, or in some other statute binding upon it; but if not found in that *67 examination, we may safely affirm that it has no existence This doctrine would seem to be clear in principle, and it is well settled in this state. (Mott v. Hicks, 1 Cow., 513; Barber v. Mechanics' Ins. Co., 3 Wend-., 96; Jackson v. Brown, 5 id., 596 ; Moss v. Oakley, 2 Hill, 265; Attorney-Gcneral v. The Life and Fire Ins. Co., 9 Paige, 470; Safford v. Wykoff, 4 Hill, 442; Barry v. Merchants' Exchange Co., 1 Sandf. Ch. It., 280.) It would be a very illogical conclusion to hold that an indefinite number of corporations, authorized by a general law, do not possess the same right in this respect which they would have if the express powers of each were derived from a special charter.
In the second place, if there are any special legislative restraints, which in their terms or policy condemn the trust bonds, they are to be found in the safety fund act of 1829, or in the statutes against unauthorized banking, called the restraining laws, or in the organic act of 1838, from which this corporation derived its powers. There is no other particular legislation supposed to have any bearing on the question.
The argument of the receiver’s counsel, so far as it is derived from the safety fund act (Laws of 1829, ch. 94, p. 167; 1 R. S., 737, 3d ed.), turns wholly upon the thirty-fifth section of that statute, and may also be answered in few words. This was an act, applicable only to future banks and those whose charters should be renewed in future, requiring them to contribute annually, for six years, one-half of one per cent upon their capital to a fund specially pledged for the redemption of the circulating notes of insolvent institutions. The thirty-fifth section contains a prohibition against the “ issuing of notes and bills,” unless payable on demand and without interest. The evil intended to be suppressed by this prohibition was undoubtedly the practice of issuing post notes, designed and calculated to circulate as money. The provision is, however, broad enough in its terms to include all bills and notes payable at *68 a future day, and so it has generally been construed. It is, however, in its very language, confined to banks “ subject to the provisions” of that act; in other words, liable to contribute to the safety fund thereby created. These trust bonds were issued by an association which, as we know, was not subject to the provisions of that act, and was therefore exempt from the operation of this particular section. This is a decisive answer to the objection in this form, and no discussion can make the argument plainer. I will add, however, iii this connection, that in enacting the general banking law of 1838, the legislature had this statute before them and refused to adopt it into their work. They refused not only to adopt this restriction, but any other indicating the same policy. The reason for this refusal, I think, we shall see when we come to look once more at the structure and policy of the system which they did adopt, and compare them with previous systems.
In further discussing the objection to these bonds we are to consider the restraining laws and the general act of 1838, and these matters are so connected that they must in some degree be examined together.
The statute of 1829 against unauthorized banking (1 R. S., 712), known as the restraining act, declares (§6) that “no person, association or body corporate, except such bodies corporate as are expressly authorized by law, shall keep any office for the purpose of receiving deposits or discounting notes or bills, or issuing any evidences of debt, to be loaned or put in circulation as money, nor shall they issue any bills or promissory notes or other evidence of debt as private bankers, for the purpose of loaning them or putting them in, circulation as money, unless thereto specially authorized by law.” Some of the other sections in the same act are intended to promote the same policy, but they need not be referred to. It cannot fail to be noticed that this statute does not forbid either natural or artificial persons from entering into written engagements of any description, provided they *69 are not issued to be loaned or put in circulation as money Indeed, the inference is almost irresistible that corporations, whether banking or not, as well as individuals, might, at least in the opinion of the legislature, create evidences of debt which do not fall within the particular class condemned. Such a statute is not, however, the source from which to derive that power. It is simply a prohibitory statute, which appears to assume that the power exists. The particular object of the act, it is well known, was to restrain all unincorporated persons and all corporations which had not' a special authority of law from exercising banking powers.
The most delicate and dangerous by far of all these powers was that of creating a paper currency, to be loaned and put in circulation as money, for the use of the community. While, therefore, all other restraints were removed, by the act of 1837, already cited for another purpose, so far as unincorporated persons are concerned, this particular one was kept in full force precisely as it stood in the act of 1829, binding both upon persons and corporations of every description. It may be useful to add, that the restraining act of 1829 contained nothing new which is material to the present purpose. The policy began in the year 1804, was continued in the acts of 1813, 1818, 1829, down to the year 1837, and even in the statute of that year it was maintained, as we have just seen, so far as the power of creating currency is concerned. It was thus that banking in general became with us a franchise at an early day; but it has never been held, and I think never suggested, that there was anything in the restraining statutes, or in the policy they indicated, to deprive corporations of any kind of the incidental power to contract debts and make their written engagements therefor in any form not coming within the particular condemnation of these statutes. Banking only was restrained, one of the distinct operations of that business being the issuing upon loan of a paper currency; but the incidental *70 power of corporations, whether belonging to that class or not, to become a debtor as well as a creditor, and to create their obligations not intended or calculated to mingle in the currency, never came within the prohibition.
We come then to the general act of 1838, which I am sure can now be intelligibly examined with reference to this question. The restraints upon issuing notes, bills, &c., upon loan or for circulation as money, as we have seen, were still in force; and it is now very pertinent to observe, that this act did not repeal them. They are in full forcu at this day. The statute, however, did authorize the creation of an indefinite number of associated banks, which we call banking corporations, and gave them the issuing power upon the precise conditions therein contained; and it gave the same power to private individuals also, under the same exact conditions. Those conditions required thai the notes intended to be loaned and issued as currency should be payable on demand, should be countersigned and registered in one of the departments of the state government, and should be secured by a pledge of bonds and mortgages and stocks. This, I repeat, was not a repeal of the restraining acts, but it was the “ special authority of law” required by the very language of those acts, in order to exercise the business of banking in the particular department of creating and issuing a paper currency. It is, therefore, beyond all question, true that this power cannot be exercised under the act of 1838, except upon the precise conditions named; and if the trust bonds of the North American Trust and Banking Company were an exercise of that independent banking power, the conclusion would certainly follow that they were unauthorized. They would be ultra vires, because no “ express authority” to issue them can be found in that statute, and expressly prohibited by the restraining act.
But it is just as plain .that this “ special authority of law,’ which conditionally relieved, and which was necessary *71 to relieve, associated banks and private persons from the operation of the restraining laws, was not in any sense a prohibitory, statute. On the contrary, it was plainly an enabling statute. It prohibited, neither expressly nor impliedly, anything previously lawful; but it simply enabled that to be done, under particular conditions, which was before unlawful. The legislature of 1829, and its predecessors since 1804, had declared that no banking powers should be exercised without special authority of law, and that authority was contained in a great number of special bank charters. The legislature of 1837 declared that individuals and associations might exercise those powers without restraint, except the one of creating currency. The legislature of 1838 said to them: “ You shall have that power also, provided you associate in a certain manner if you act as associations; and provided, further, whether you act as individuals or association's, that you procure your circulation and secure its redemption in the manner we have pointed out.”
These views of the act of 1838, and of antecedent legislation, if they are correct, meet with directness and force the argument so much urged by the receiver’s counsel, that out of the express provisions contained in that act, allowing circulating notes of a particular kind to be issued, payable on demand, there arises an implied prohibition against all other written engagements, and especially against all time paper. We are enabled to see distinctly that, without the express authority of law contained in those provisions, neither associations nor individuals could lawfully issue notes for circulation or upon loan, payable on demand. That banking power was sealed up as a franchise by the previous legislation and policy of the state. It was opened only on the performance of the conditions precedent which have been named. To all persons and associations not performing those conditions it remains sealed as before. But it would be absurd to hold that, in thus opening the fran *72 chise and laying down those conditions, the legislature intended anything more ; and especially it would be absurd to say that out of such a statute there springs a condemnation of that which was antecedently lawful. How it is that an act of legislation, extending a particular franchise to new classes of individuals and associations, and so removing from them one restriction, engenders another and a new one, has certainly not been explained.
The objection to the bonds as time paper, when urged under the act of 1838, not only overlooks the restraining laws, as indispensable to a correct-view of that act, but also the distinction between the express and the implied powers of banking and other corporations. The argument assumes that when one of these associations gives a written obligation for money borrowed or stocks purchased, payable at a future day, it exercises a distinct and express banking power not granted in the statute. This is not true: the right thus exercised is incidental and accessory to those banking powers which are expressly given. This distinction has already been considered at large in discussing the power to contract a debt, inseparably connected with which must be the ability to promise, in any form not expressly forbidden, to pay such debt. Indeed, the necessity of creating time paper, for money borrowed to redeem circulating notes payable on demand, often arises out of the particular franchise of issuing such notes, and that necessity results in the right to enter into such engagements. In this view, the grant of the franchise in express terms, instead of excluding the power now in question, may become the very source from which it springs.
There is, then, in the language of the general banking law, no implied force to invalidate the trust bonds. It is next to be observed that the ac b contains no express prohibition. Its provisions will be examined in vain for a single clause to which such an interpretation can be given. On the contrary, we shall find language which plainly recognizes *73 a distinction between the special issues for circulation, countersigned and secured in the manner provided, and other contracts and engagements of the associated banks. But I do not rest the right to issue these bonds upon that foundation. Its source must be found, both theoretically and practically, in the incidental power of corporations, and especially in the nature of banking, and the accidents and necessities which attend that business.
We are brought, then, to an inquiry which belongs essentially to the facts of the case: What was the character of these instruments? Were they in the nature of currency ? Were they issued to be loaned, or for circulation as money ? If they were, then their issue and sale amounted to the usurpation of a banking franchise not granted in the general charter and prohibited by the restraining laws. Here, I apprehend, is the turning point on which the validity or invalidity of the bonds must depend, and on this subject, it seems to me, there is no room for reasonable doubt. They were not issued “ to be loaned.” The banking association was not creditor in these transactions, nor did the dealer become a debtor. The relation was exactly reversed. The association was the borrower and the debtor in respect to each bond, and the dealer became the lender and creditor. They were not issued for “ circulation as money.” Without examining the question whether, in strict law, they were perfect as sealed instruments, they had impressed upon them the corporate seal, were intended to be and in all their appearances were sealed. They were eminently special, also, in the language which expressed the obligation. Still, in their legal effect, they might be promissory notes if the seal be entirely rejected ; but it is certain they could not be accepted and received as such in any community. They were moreover payable in large sums, at distant periods of time and in the coin of a foreign country to which they were transmitted, and where they were sold or pledged. They were, in short, wholly unadapted to circulation as *74 money ; they were not designed to be circulated, and in fact they never were. We must therefore hold that these obli gations were not issued in a course of unauthorized banking, and hence that they do not fall under the condemnation of the restraining statutes.
We find, then, in all the legislation of this state, antecedent to the issuing of these bonds, nothing", either in the direct or implied force of language, which pronounces against their validity. On the other hand it cannot be pretended that there was any express authority. The question therefore turns upon the incidental power of corporations, and particularly of banking corporations, when not specially restrained, to contract a debt for money borrowed upon a lawful occasion, and to execute an appropriate assurance for the payment of such debt at a future day. That question has already been examined, and the power asserted upon grounds which are to me satisfactory. Something however remains to be observed, which I think will place the subject in a still clearer light.
In the argument upon this branch of the case, much was said concerning the general intention of the legislature and the supposed policy of the state. These matters I will now briefly examine, endeavoring to show why, in the free banking system of 1838, the legislature omitted to impose restraints upon the business of banking, except in the particular department of issuing bills to circulate as money. That system has been undoubtedly in some degree misunderstood.
In the year 1791 an act was passed “to incorporate the stockholders of the Bank of New-York,” which became the model of some forty other institutions specially chartered prior" to the year 1825. These banks were authorized to carry on the “business” of banking, in general terms, without specification of the power to issue bills or any other banking power. They were unrestricted in the exercise of any of their powers except' that of contracting debt, which, over *75 and above the specie in their vaults, was not to exceed three times the capital subscribed and actually paid in. The debt might be contracted in the issue of currency for circulation, or otherwise, the amount only being limited. There was a prohibition, also, against trading in merchandize and stocks, which was designed of course to confine these institutions to the business for which they were chartered. The solvency of banks was only guarded by these two provisions ; but what is chiefly'to be observed is, that the currency was not in any other manner protected. Such was banking prior to 1825. It was a most imperfect system, not for the particular reason that a bank might become insolvent in the exercise of the debt-creating power, whether by issues payable on demand or by time engagements, but because in the event of insolvency the currency circulating through the community would not be redeemed. No distinction was made between the billholder and other creditors. The duty of government to protect the public against a debased currency, and the wisdom of not interfering with banking in its other operations, were not yet understood. (For an example of these charters, see the act to incorporate the Mechanics and Farmers’ Bank of Albany, Laws of 1811, ch. 64.) Under this system I suppose it will not be doubted that banks could borrow money to pay their debts and execute time obligations to the lender. The precise evil of the system was the excessive issue of a paper currency with no security for its redemption. ( Message of Gov. Clinton, in 1827.)
In the year 1825 two bank charters were granted, and no others until 1829. In these, the business of banking was defined, as we have already seen, but the definition included all known powers belonging to that business, and therefore, in this respect, those charters instituted no new policy or restraint. In other respects, some new provisions were introduced, one of which required that fifty per cent of the capital stock should be actually paid in. But the system remained unchanged. The debt-creating power remained *76 as before, it being declared that the total amount of debt, whether “ by bond, bill, or other contract,” should not exceed, &c. This language was certainly anything but a restriction confining the banks to issues of currency payable on demand. Another clause declared the assignability of sealed obligations, thus distinctly implying that such might be created. ( Charter of the Commercial Bank of Albany, Laws of 1825, p. 198.)
In the year 1827 a general act was passed, which took effect in January, 1828, and became incorporated in the Revised Statutes (1 R. S., 601), applicable only to existing banks. In this statute are some new regulations concerning the management of banking corporations, directed to special abuses, but no change in the system. It was thought no important change could be made in respect to preexisting charters. The power of creating debt remained as before, and was limited, as before, to three times the amount of capital paid in, whether created by “bond, bill, note or other contract ” (§ 3); and thus the legislature, so far from restricting the right, again justifies the inference that time engagements might be issued. The issues for currency were still blended with other modes of creating debt and still the community was unprotected.
The evils and abuses of such a system gave rise also to another code of regulations, elaborately prepared, which took effect at the same time (1828), applicable to future charters and charters which should be renewed in future. This was the act to prevent the insolvency of moneyed corporations, (lit S., 589.) This code, as well as the one applicable to existing banks, recognized in very unambiguous language a distinction between bills and notes for circulation, payable on demand without interest, and demands of a different character and bearing interest. (§ 20, subs. 5, 8 ; id. 2, sub. 2.) It. omitted the provision limiting the amount of debt, but required the whole capital to be paid. Reports were required to be made to the comptroller *77 and a series of new and stringent regulations were laid down. The principles of bank legislation, however, remained unchanged. The great vice of the system was untouched. There was no limit to the power of creating debt. Excessive issues of currency might be made, and there was as yet no specific provision for the billholder.
The safety fund act of 1829 took a feeble step in the right direction by establishing a specific fund for the redemption of the circulating notes of insolvent institutions. This, it is true, was a fund of very minute proportions, but, so far as it went, it provided a special security for the billholder, and tended, no doubt, in some degree, to impart stability and soundness to the currency. This act limited the issues for circulation to twice the amount of capital paid in, and, for the first time in the legislation of this state, it prohibited the issue of bills and notes unless payable on demand. The act was only applicable to future charters, or previous ones to be renewed. Between the years 1829 and 1836, inclusive, many bank charters were granted, subject to the code of regulations and the safety fund law. But fundamental principles underwent no change, and the system was soon after exploded by its own inherent vices.
Thus far, since 1804, banking in this state had been a monopoly by force of the restraining laws. In the year 1837 these monopolies had become intensely odious, and no more special charter's were then or ever afterwards granted. The legislature, moreover, as we have before seen, by a change in those laws in the year 1837, reduced banking to a private business, except in the department of creating a circulating medium, and, as a private business, left it absolutely without restraint or control. Any person or association could deal in bullion, could habitually lend money, could receive deposits, discount notes and bills, and with these banking powers could run in debt, borrow money and execute every species of obligation, except circulating notes, just as a private person in any other business could do.
*78 The wisdom of this policy has never been denied; but it remained for the legislature of 1838 to complete the work thus begun. Circulating notes could still be issued only by chartered banks, and no plan had yet been adopted which would both secure their redemption and open the franchise of issuing them. That was the work to which the legislature of 1838 addressed itself. This could only be done by special legislation. The rest had been essentially accomplished by a simple repeal of preexisting restraints.
At that period (1838) the principles of banking had undergone a thorough discussion both in this country and England. The ablest theorists and writers had asserted the duty of government to exact absolute security for the redemption of the circulating medium, and the policy of leaving banking, in all its other operations, like merchandize a private business. These views prevailed with the legislature of Mew-York. The preexisting system, so often amended without any change in its fundamental principles, had fallen in the crisis of 1837. All the forms of special charter, and all the codes and regulations which made up that system, were before the legislature and received a most careful consideration. They were all discarded, and a policy entirely new was adopted. The cardinal point was to render the circulation absolutely secure. This was accomplished by providing for a deposit of mortgages and stocks, dollar for dollar, and by leaving the restraining laws in force as to all issues for currency not thus secured. Connected with this fundamental measure was the policy, adopted by the legislature of 1837, as to other modes of banking, of permitting individuals and associations to issue their notes on giving the required security. This was also done. The next grand idea was to leave banking, in all its other operations, with the fewest possible restraints, and to permit it to be carried on like other branches of business. This too was accomplished. These were the great features of the organic act of 1838, and they were wide departures from all legislation prior to *79 1837. The currency was wisely guarded with tenfold strictness; and with equal wisdom, in my judgment, banking, in all its other relations to community, was left without a single regulation in the case of individuals, and with scarcely one in the case of associations, except such as belong to the.mere mechanism of their formation. Let us look at the frame-work of this act. First we have, in fourteen sections, a system of banking in the particular department of issuing for currency; a system so rounded and complete in itself as to exclude all reference to antecedent legislation. I do not see the possibility of incorporating into it either the provisions or policy of the codes of 1828 or 1829, i elating to a system fundamentally different. The residue of the act is summed up in the rules laid down for forming associations; in giving to them certain peculiarities which the courts, and not the legislature, have said transform them into corporations; in granting to them the right, which every individual enjoyed without restraint, of carrying on the “ business of banking ” by receiving deposits, discounting notes, &c.; iii limiting the acquisition of real estate, in providing for an examination into their affairs upon cause being shown, and for a periodical statement to be made public for the information merely of all concerned to know their condition. In this grant of power it should be observed that the legislature speak of banking as a business, without including in the definition the power of issuing circulating notes. It is material also to observe that" as the law then stood, and was suffered to remain, banking associations (I mean now simple partnerships) might be formed without filing a certificate or following a single provision of this statute, and they could carry on the “ business of banking,” in all the modes specified, without being subject to a single restriction or regulation. It was necessary to associate in the peculiar manner specified only for the purpose of receiving, from the comptroller, and issuing circulating notes. The government would allow the countersigned *80 currency only to individuals and to associations which had made and filed their certificate as the act required. But there was no restraint upon the “business of banking,” as the legislature defined it, because it could be carried on by private persons and partnerships, as at common law.
Thus, in the simple contrivance of exacting security to be deposited with the government for all circulating notes, and causing them to be issued with the government stamp, we have a paper currency which has been favorably tested now for nearly twenty years. How, it may well be asked, is this contrivance, so simple and efficacious, improved by judicially attaching to it either the provisions or policy of the exploded system? A code of regulations, like the ac" which took effect in 1828, “ to prevent the insolvency of moneyed incorporations,” ineffectual as it proved to be, was nevertheless appropriate in a banking system which gave to the circulation no other protection than the solvency of the chartered banks. Such a system could not be too watchfully guarded, for the currency and the bank must go down together. But such regulations are inappropriate to the free banking system, because principles entirely new lie at its foundation. Persons who are not bankers at all may-have circulating notes if they will go and deposit the required security for their redemption. So may associations which will do the same, and file a certificate as the evidence of their organization. Private individuals and associations O may also, if they choose, carry on the general business of banking in the departments of discount, deposit, &c. They may discount with their circulation, or with other capital at their command. If they circulate, they must secure one hundred cents on the dollar; but the idea of preventing the banker’s insolvency, which’ had proved so fallacious, was wholly abandoned. The private banker or the association might be solvent or insolvent—might deal with actual or borrowed capital; but the currency, which is the life-blood of commercial and industrial communities, was rendered *81 safe. That object being accomplished, the legislature saw no more reason for preventing the insolvency of a banker than of a merchant or manufacturer. We accordingly find, in the new system, no provision requiring the actual payment of capital, none limiting the power of creating debt, none limiting the issues, providing they are secured, none against post notes or time paper, which cannot enter into circulation, and none against contracting in any form in which individuals and corporations may contract. The legislature justly considered it a duty to protect the masses of the community against a debased currency, and there, it was wisely thought, the office of government, in the regulation of banking, essentially ended. That duty was discharged, not. by regulations to prevent insolvency, but by securing every dollar of the issues.
Upon this subject views to which I cannot assent have made some progress. The courts began, at an early day, by declaring associations, which had filed a certificate, to be corporations. This was a simple common law necessity, resulting from the peculiarities of a common seal, perpetual succession, &c. But this doctrine surely did not, by any legal or logical sequence, draw after it, and incorporate into the banking law of 1838, all or any of the complex machinery of an exploded system. Yet it is true, starting at that point, that, by a mere logic of words, we can, if we will, take in both the act of 1828, to prevent insolvency, and the safety fund law of 1829, and annex them as adjuncts to the system of 1838. I say the safety fund law, for it begins by declaring that “ every moneyed corporation, having banking powers, hereafter to be created in this state, shall be subject to the provisions of this act.” Associations under the general law, we admit, are corporations, and clearly they have banking powers. We find here a perfect adaptation of words to a result, and that result is, that every free bank in the state must contribute its. one-half per cent annually, for six years, to the safety fund; and, by the same reasoning, we car. *82 adopt the prohibition against post notes, which is one of the provisions of that law. This, I repeat, is a logic of words, but not of ideas. It has never received a judicial sanction, and has never convinced a single mind. We have had the free banks for nearly twenty years, but the safety fund has never received from them any contributions. It has been admitted,' without a single exception so far, that the legislature of 1838, in authorizing associations to carry on the business of banking, did not intend to subject them to any one of the provisions of the safety fund act. In the rejection of them all, I find, although some others have not found, conclusive evidence that the policy of each one of those provisions was also rejected.
It is by following, in the same way, mere verbal sequences, that efforts have been made with some success to bring into the free banking system the elaborate act of 1828, to prevent insolvency. But we shall find the difficulties still greater. Some of the provisions of that act are absolutely incongruous and cannot by any ingenuity be made to harmonize with the law of 1838. We have been told by a resolution that we may take them so far as “ not inconsistent.” ( Talmage v. Pell, supra.) What is to be the degree of consistency or inconsistency, and how much ingenuity must be exercised upon each question as it arises, we have not been informed. If we are to take them when not absolutely repugnant, then we must adopt the entire safety fund act also. If this is not the rule, then must we adopt them when they are only slightly repugnant ? Even in that case, we must take in also the safety fund statute. I repeat, the difficulties are still greater; for aside from the admitted impossibility of receiving into the system of 1838 many of the provisions of the act to prevent insolvency, &c., we shall find that some of them, deemed useful in the working of the free banking associations, were adopted verbatim, and one or two others with modifications. This I hold to be unanswerable proof that the legislature care *83 fully consulted that statute, adopted all that was thought desirable or useful, and deliberately rejected the residue. This subject might be pursued at greater length, but enough has been said for' the present purpose. In the provisions of the Code of 1828, whether we adopt or reject them, it is not pretended that time engagements for the payment of money are prohibited.
IV. If the trust bonds had not been issued before the 3d of June, 1840, when the act of May 14th took effect, which made it unlawful to “issue or put in circulation any bill or note, unless payable on demand and without interest,” some questions would arise which have not been discussed. But the evidence shows, beyond any reasonable doubt, that they were issued before that day. [The learned judge here stated the facts in regard to the negotiation of the trust bonds; the pledge of such bonds to the Palmers; the alterations in the form of the deeds, and the substitution of sets of bonds, substantially as stated on pp. 27, and 33-38, ante, and then proceeded. ]
Upon these facts, the counsel for the receiver have insisted that all the so-called bonds, which they claim were unsealed instruments, and, therefore, in legal effect, promissory notes, except the one hundred and eighty-seven sold before June 3d, 1840, fall under the condemnation of the statute which took effect on that day. It has also been urged that no more than the four hundred and ninety-nine bonds were ever negotiated or sold in pursuance of the trusts, and therefore that the trusts, if not illegal or void in their creation, never became operative as to all the residue of the bonds. It will be seen that both of these propositions are refuted, if the pledge to the Palmers was effectual, according to the intention of the parties, so as to give them a right to hold the bonds until they could be sold; and if they could not be sold at all, then still to hold them and take the benefit of the trusts.
*84 On this subject we do not entertain any doubt. An individual, compelled to raise money to meet his engagements, may execute his negotiable obligation and a trust deed or mortgage to secure its payment. If a lender comes forward who will advance the money for the time the obligation has to run, and take it as absolute owner, the transaction is closed. But if temporary advances are required, before the dealing can be consummated, we see no reason to question the right of the debtor to pledge the instrument, with a power to negotiate and sell it pursuant to the original design, or the right of the pledgee to the benefit of the security. This appears to be precisely the character of the transaction with the Palmers. The bonds had five and seven years to run. They could not be sold fast enough or soon enough to meet the necessities of the bank. The company must have money immediately, and must have it from the Palmers, who were already very largely creditors. In this exigency the bonds created for sale were pledged to that house, with authority to sell and apply the proceeds to the payment of their debt, and especially the new advances. The proceeds of other securities released by them and sold, appear to have been sufficient to liquidate the preexisting debt, so that they may be regarded as now holding the bonds which remain in their hands in pledge for advances made on the faith of these -very transactions. In this branch of the case, therefore, we reach the following conclusions: First. All the bonds having been executed and pledged to the Palmers before June 3,1840, so that the company could not recall them, were not issued in violation of the statute which on that day became the law of the state, whatever may be the legal character of those instruments. Second. The holders of the four hundred and ninety-nine bonds hold their title under the pledge and the execution by the Palmers of the power to sell. They are therefore entitled to come in under the trusts and share in their benefits, without discrimination between such as purchased before and such as *85 purchased after the 3d of June. Third. The Palmers, still holding five hundred and fifty-seven bonds under pledges anterior to that day, have the same rights as any other holders, to the extent of their demands. The claims of the Philadelphia banks, or their assignees, holding two hundred and seventy of the half million, and of the Holfords & Co., holding twenty-four of the million trust bonds, will be hereafter considered.
Y. But the receiver insists that the four hundred, and ninety-nine bonds, part of those in the million trust, were negotiated in England, at a usurious rate of interest, and on this ground it is claimed that the trust is void, so far at least as the bonds thus usuriously sold are concerned. This part of the case will now be examined. These bonds, like all the others, bore interest at the rate of six per cent; were negotiated at ninety per cent on their par value; and I assume that, when paid, the lenders will receive a higher rate of •interest than is allowed by the usury laws of this state or of England, and therefore that the bonds are void, unless by recent legislation, both here and in that country, the case is withdrawn from the operation of those laws. The statute of this state, passed April 6, 1850 (Session Laws, 334), declares that “ no corporation shall hereafter interpose the defence of usuryand the term corporation is defined in the same act so as to include banking associations. If these bonds are to be regarded as New-York contracts, I am inclined to chink that this statute would be decisive against the right of the receiver to allege usury in any stage of these causes, either as a defence to the original bill or as a foundation for his cross bill.. My impression is that the act must be construed as a repeal of the statutes of usury as to all contracts of corporations stipulating to pay interest, thus leaving the contracts in full force according to their terms, and that such an act is liable to no constitutional objection.
But however this maybe—and the subject is not free from doubt in some of its aspects—it is clear that the Legis *86 lature did not intend to repeal, nor could it repeal; the usury laws of England. If these bonds were English contracts, and as such were usurious, it is certain, - I think, that our act of 1850 has not relieved them from the taint. The utmost effect we can give to the enactment in that view is, to consider it a simple prohibition upon corporations against interposing the allegation of usury to invalidate contracts governed by the laws of a foreign country. Whether the prohibition could be extended so as to include creditors of corporations in all situations, and all other parties claiming in hostility to the usurious contract or incumbrance, is another question not free from difficulty. The receiver, however, as I have shown in another place, is the immediate representative of the corporation, and as such I incline to think that he is affected by the prohibition to the same extent as the corporation itself. But I propose now to inquire: First. Are these bonds English contracts? and, Second. Are they free from usury by the law of that country ? If these questions are answered in the affirmative, then we have no more to do with the statute of New-York.
We are of the opinion that they are English contracts. The circumstances which are decisive upon this point may be briefly stated as follows: The bonds were not intended to be negotiated in this country. This is conclusively shown by the million trust deed, which recites that they were intended to be sold in England. Having been transmitted for that purpose, they were actually sold and the money advanced upon them there. They were made payable in the currency of England and not of New-York. Before they were sold, the parties who actually took them entered into a written agreement with the agent of the company to take, each,- a certain number, amounting in all to four hundred and ninety-nine. This agreement was made, in London. The interest, semi-annually, during the period they had to run, was, by the terms of the bonds, payable at the house of the Palmers, in London. The place where *87 the principal was to he paid, I think, cannot be considered as specified, on a strict grammatical construction of the language used, but it certainly was not in New-York; and the legal result is, that the debtor bank must seek the creditor in England, and would be in default if it did not do so at the maturity of the obligation. The holder of each bond had a right, by its terms, to convert it into the stock of the bank on giving notice of his intention at the Palmers’ place of business in London, and on surrendering the bond there. In the final trust deed, moreover, we find introduced three trustees residing in England, to whom the three in New-York covenant, on default in payment of principal and interest due upon the bonds, to pay over for the benefit of the bondholders the moneys to be received under the trust. The property embraced in the trust consists of bonds of private persons, secured by mortgages upon lands situated in this state.
These are the essential facts on which the question must turn, and they lead to the plain conclusion that the several contracts of loan, into which the four hundred and ninety-nine bonds enter as a part, are English contracts, and I think this would be so even if the facts tending to that result were less decisive. We may take the single circumstance that the interest is payable in London. The question here is one of interest, solely, and if the rate had not been specified at all, that allowed by the laws of England, in cases where there is no specification, would, most clearly, be deemed, the one in reference to which the parties contracted. If, therefore, the actual rate agreed upon will amount in the result to eight or ten per cent, and that is not unlawful there upon contracts of this particular character, but would be, as it plainly was, by the statutes of New-York in force at the time of these transactions, then it is still more plain that the English laws must govern. The lawfulness or unlawfulness of the contract, as determined by the statutes and policy of the country to which we assign the dealing, very commonly
*88 affords a conclusive test in cases of this kind. So, also, we may take the circumstance that the moneys to be received upon the securities held in trust were to be paid over to the three trustees in London, to be received at their hands by the English bondholders. Although the bonds themselves do not appear to specify the place where the principal is payable, yet when we look at this provision of the trust deed, which is a part of the same transactions, and consider, also, that the interest is payable in London, and both principal and interest in sterling money, I think we must hold that England is the place of final payment according to the true construction of the whole contract. So, also, we may rest our conclusion upon the fact that all the negotiations were conducted and the transactions closed in England.¿In general, the rule is, that if no place of performance is stated, or the contract may be indifferently performed anywhere, it must be referred to the lex loci contractus. If this rule will not always hold, when both the parties, being residents of one country, are temporarily sojourning in another where they contract, it admits, I think, of no qualification when the contract is made in the country where one of the dealers resides, and the - other goes there, either personally or by his agent, and there negotiates or concludes the dealing Without discussing this subject more at large, the following authorities may be referred to as decisive: Story on Conflict of Loros, 280, 282, 284, 287, and cases cited in notes; Albion Assurance Co. v. Mills (3 Wilson & Shaw, 218, 233); S. C. Pattison v. Mills (1 Dow & Clark, 342, 362); De Wolf v. Johnson (10 Wheat., 367); Malpica v. McKown, (1 Louis., 249); Blanchard v. Russell, (13 Mass., 1); 2 Kent’s Corn., 457, 458, 460, and notes; Fanning v. Consequa (17 John., 511); Scofield v. Day (20 John., 102). It is proper to add, however, that the case of Chapman v. Robertson (6 Paige, 627), decided by Chancellor Walworth, has not been overlooked. That decision may perhaps be sustained upon several circumstances which distinguish it from the *89 present case. The reasoning of the learned Chancellor has, however, been questioned by high authority. (Story’s Con. of Laws, § 293, c, and note.) Whether the case was well decided or not, the conclusion to which we come, upon the facts of the one before us, is in accordance with principles entirely settled.
Were the loans, then, upon the four hundred and ninety-nine bonds, usurious by the laws of England ? They certainly were, until the statute of 2d and 3d Victoria, ch. 37, enacted in 1839. This act provided that “ from and after the passing thereof, no bill of exchange or promissory note, made payable at or within twelve months from the date, or not having more than twelve months to run, nor any contract for the loan or forbearance of money above the sum of ten pounds sterling,” should be void by reason of any rate of interest taken or agreed to be taken. Loans of money upon the “ security of any lands, tenements or hereditaments, or any interest therein,” are expressly excepted from the operation of the act; and there is another provision limiting the rate of interest to five per cent, as it stood before, in all cases where the parties did not otherwise agree. The statute was to continue in force only until January 1, 1842, a period which included the transactions now in question. The argument on the part of the receiver is, that the four hundred and ninety-nine so-called bonds, in consequence of the imperfect sealing, were, in legal effect, promissory notes having more than twelve months to run, and therefore that they do not come within this statute. If they are not held to be promissory notes, then it is further insisted that the loans were secured upon lands, and so were excepted from the operation of the act.
We here reach the inquiry whether the bonds were sealed instruments, and as we hold them to be English contracts, that question also must be determined by the law of England. The validity of the seal goes. directly to the obligation of the contracts, and, like any other question *90 of obligation or construction, it belongs to the lex loci contractus and not the lex fori. What, then, is the rule in England on this subject? Lord Coke defined a seal thus : “ Sigillum est cera impressa; quia cera :,ine impressione non es: sigillum.” If, in his time, mechanical contrivances had come into use, distinctly impressing corporate and official seals upon paper, I think, in the spirit of that definition, he would have held it sufficient; for clearly the impression, and not the wax, according to him, was the fundamental requisite. He did not say “impressio sine cera,” but “ cera sine impressione,” &c. In this state it is said there must be wax or some tenacious substance, and we are referred to adjudged cases on the subject. (2 Hill, 227 ; 3 id., 493; 5 John., 238; 4 Cow., 508; 1 Denio, 376.) To meet the doubts suggested by these cases, or to change the rule which, it may be, they affirm long after all reason for the rule had ceased, the legislature, in 1848, passed a statute declaring the impression of a corporate seal upon paper to be sufficient. But the inquiry here is, what was and is the rule in England ? and it is thus laid down by Sir Edward Sugden (Sugden on Powers, It Am. ed., 236): “It is not necessary,” he says, “ that an impression should be made with wax or with wafer. If the seal, stick or instrument used, be impressed by the party on the plain parchment or paper, with an intent to seal, it is clearly sufficient.” This authority was referred to and approved in the queen’s bench, in the case of The Queen v. The Inhabitants of St. Paul's, &c. (7 Adol. & Ellis., N. S., 232), Lord Denman observing, “ we do not wish to encourage the slightest doubt on this point.” (Mathews on Presumptive Ev., 36; 2 Brown, C. C., 585.) The corporate seal was plainly impressed on the bonds. They are declared on their face to be sealed ; they were so intended, so far as we know; they were so accepted by the English holders who advanced their money upon them, and. so we must hold them to be. Being each of them for more than £10, it follows that they came within *91 the statute 2 and 3 Victoria, unless their payment is secured upon lands. The security, as we know, consisted of bonds and mortgages upon lands in this state, assigned, by the million trust deed, to the three trustees in New-York. Now those mortgages were all New-York contracts, having no connection with the transactions in question, until so assigned, and by the settled law of this state they were chattel interests merely. For this reason, if for no other, the four hundred and ninety-nine trust bonds were not secured upon lands, and we hence come to the conclusion that, falling within the protection of the statute of Victoria, they are free from the taint of usury. This objection to the million trust deed, therefore, falls to the ground.
VI. The claim of the Philadelphia banks, or their assignees, to the benefits of the half million trust as pledgees of the two hundred and seventy bonds, part of the four hundred and fifty issued under that trust, presents not only the question of usury, but some others of considerable importance.
[The learned judge here stated the facts substantial, as stated at pp. 28-32, ante, and then proceeded. ]
Upon these facts the receiver insists, in the first place, that the rate of interest on the loan of $250,000, although in terms six per cent, will amount, when the certificates of deposit are paid, to more than seven per cent on the sum actually received in cash, and therefore that the contract was usurious and void by the laws of New-York. Without examining the question in that light, we hold that the contract must be governed by the laws of Pennsylvania. In all the negotiations, a Pennsylvania loan was evidently, in the contemplation of the parties, to be made in the currency of the Philadelphia banks, and at the rate of interest which prevails in that state. But a more controlling circumstance is, that the contract was to be performed by the' company in Pennsylvania, by the payment there of the money loaned. The authorities do not leave this question in doubt. (Story’s Con. of Laws, §§ 242, 242 a, 285—7, &c.; Dewolf v. Johnson, *92 10 Wheat., 367 ; Andrews v. Pond, 13 Peters, 65, 77; Poden v. Sharp, 4 John., 183.) It appears, from, the evidence in the case, that the only statute in Pennsylvania establishing the rate of interest, is a colonial act passed in March, 1723, which fixed it at six per cent, and that by a long and well settled course of decision in the courts of that state, a stipulation to pay a higher rate does not invalidate the contract of loan, nor prevent the lender from recovering the principal and lawful interest. Without examining further, this would seem to dispose of the question of usury. The objection on this ground to the half million trust, or rather to the claims of the Philadelphia banks or their assignees, in respect to the two hundred and seventy bonds, is therefore untenable.
But the receiver also insists that the twelve certificates of deposit were promissory notes, and being issued by the banking association after the act of May 14, 1840, took effect, are illegal and void, because expressly prohibited by that act. If this position is sound, and I do not stop to question it, the consequences upon the contract of loan, in part evidenced by those certificates, and upon the half million trust, are to be carefully considered.
It is well to observe, in the first place, that, prior to the Philadelphia loan, this trust had an independent, valid existence. This has already been shown. The four hundred and fifty trust bonds were placed in the hands of the Palmers, as pledgees, in May, 1840, and the trust itself had therefore fully taken effect as the security for those bonds. Now, it is plain that the dealing with the Philadelphia banks, in whatever light we may regard it, did not and could not invalidate the trust. The Palmers, although they parted with two hundred and seventy of the bonds, still retained, and they now hold, the remaining one hundred and eighty. If the pledge of the two hundred and seventy is void for any cause, and the receiver is in a position to assert the voidness, the result is, not that the trust is gone, *93 but the banks cannot hold the bonds and so share in its benefits. Whether they are to be returned to the receiver, as the immediate representative of the banking association, to be canceled, or revert to the Palmers, as the original pledgees, is another question. If they are to be returned to the receiver and canceled, the trust nevertheless remains until the Palmers are fully paid as the holders of the one hundred and eighty still in their hands ; and if the property included in the trust will no more than pay those bonds, it must all be exhausted for that purpose. The trust is a unit. Each bond is secured by all the property placed in trust, and there can be no apportionment so long as the fund is not sufficient to pay all that are outstanding.
The simple inquiry then is, can the Philadelphia banks or their assignees, now in possession of the two hundred and seventy bonds, hold them as security for the moneys loaned to this company, according to the pledge under which they were delivered ? If they can, then they are ccstuis que trust in respect to the half million trust. If they cannot, then the Palmers are the only ccstuis que trust, either as holders of the other one hundred and eighty or of the whole four hundred and fifty. The solution of this question must depend, in the first place, on the general validity of the contract of loan, notwithstanding the alleged illegality and voidness of the twelve certificates of deposit or written promises to repay the money. It was lawful for the banks to lend the money, and for this company to borrow it, and engage, either verbally or in writing, to repay it at the times agreed on. The only thing unlawful, then, about the transaction was the particular form in which the engagement was given. Can the corporation, on this ground, repudiate the whole contract, keep the money, and recover back the pledge? Or, if it cannot do all this, then can it annul the pledge on the faith of which the loan was made and recover the thing, pledged ? These are very grave inquiries.
*94 In the recent case of the claim of Indiana against this same company (4 Kern., 162), where post notes were issued for the price of stocks purchased, we held, upon the fullest consideration, that there was no delictum, on the part of the vendor of the stocks, although we assumed that the post notes might be illegal; and we also held that the vendor was entitled to recover the value of the stocks sold. That doctrine disposes of one of the difficulties here. The Philadelphia banks are not to be deemed participants in the offence of issuing a prohibited form of security. There is an especial force in this conclusion, because these banks, as foreign corporations, are not chargeable even, with knowledge of the statute on which the alleged illegality depends. Our decision in the case mentioned, it is true, proceeded on the idea of disaffirming the contract of sale, leaving the vendor to recover a quantum valebant, or what the stocks were worth at the time of the sale. The difference between the value and the price agreed on was not material. The price was presumed to be the value. We did not say that the seller was obliged to disaffirm the whole contract in order to recover at all. In that case it was most strenuously argued, in opposition to the claim of Indiana, that the post notes were illegal and the whole contract there^ fore void. Without considering whether that position was sound, we held the innocent party was entitled to the value he had parted with, even upon that theory. We certainly did not say that the guilty violator of the law could take advantage of his own wrong, and disaffirm, at his election, not only the notes but the contract in all its parts. In that case, disaffirmance accomplished exact justice, because there was no special security for the demand. If this case is determined upon the same theory, we not only permit the wrong-doer to elect to disaffirm, but the pledge, on the faith of which the money was loaned, must fall with the contract j and although an implied assumpsit may remain to *95 restore the money, the debt, now amounting to a half million of dollars, is of very trifling value.
There are in the books many cases which assert the right of the more innocent party to disaffirm an illegal contract, and so recover back, on an implied assumpsit, the money or value advanced. These were relied on in the Indiana case for the particular purpose of showing that the claimant was not within the influence of the maxim “ in pari delicto,” &c. His right to relief was contested upon the force of that maxim; but principle and authority, as we said, agreed in denying its application to such a case. Now, those cases are liable to mislead us here unless we discriminate with some care. The distinction will.be seen at a single glance. They are all cases where the plaintiff had no title to-the money if the contracts were allowed to stand, and where the defendant had a right to hold it by the very terms of the contract. Hence, there was no possibility of relief except through an unqualified disaffirmance. For example, in the earliest of those cases (Smith v. Bromley, Doug., 696), the plaintiff had paid to the defendant £40, to induce him to sign a bankrupt’s certificate, and the action was brought to recover the money back. Clearly the plaintiff could have no title to the money except through the absolute invalidity and a disaffirmance of the whole contract, because, by the very terms of that contract, the defendant was entitled to retain it. So in Jaques v. Golightly (2 W. Bl, 1073), the action was brought to recover money paid for illegally insuring lottery tickets; and there, too, relief was, in the very nature of the case, impossible until the contract was wholly disaffirmed. This precise principle runs through all the cases where illegal transactions have been disaffirmed. It will be found that in all of them the contracts themselves if lawful and valid, stood directly in the way of the action. But here the broad difference is, that the Philadelphia banks can recover, and seek to recover, the money lent without a disaffirmance, and upon the very terms of the *96 lending contract. The alleged illegality of one of its parts is the objection to their claim, and not, as in the cases referred to, the very foundation on which it rests. They do not seek to disaffirm, because they need not do it in order to recover. If the contract is void in all its parts, then it is true there is nothing but an implied assumpsit left; but even then they will recover, not through the illegality but in spite of it. In this case, in short, the claim is resisted on the voidness of the contract, while in those which have been mentioned, it was asserted on that very ground.
What, then, is the precise question now before us? It is. I apprehend, whether the contract of loan made between this company and the Philadelphia banks is void, for the particular reason that in one of its incidents the company r exceeded its powers or violated the statute, the lending parties being innocent both in fact and in judgment of law What was the contract ? On the part of the banks it was to loan $250,000, and on the part of the borrower to repay the money at certain periods, and to secure the debt by a pledge of certain securities. This is' exactly what was agreed on, but, as the evidence of the promise to pay at the times specified, post notes were issued in a form prohibited by law. There was no other illegality in the transaction, and, as far as the lenders are concerned, even the notes were not illegal. As to them, they were merely worthless and void. I assume such to be the logical result of the prohibition upon the borrower against issuing them, but there is no other result. It is a mere voidness, and not a contamination which spreads itself over the whole contract.
How, a doctrine which is expressed in the words “ void I in part, void in toto,” has often found its way into books ) and judicial opinions as descriptive of the effect which a statute may have upon deeds and other instruments which have in them some forbidden vice. ’ There is, however, no such general principle of law as the maxim would seem to ’ indicate. On the contrary, the general rule is, that if the *97 good be mixed with the bad it shall nevertheless stand, provided a separation can be made. The exceptions are First. Where a statute, by its express terms, declares the whole deed or contract void on account of some provision which is unlawful; and, Second. Where there is some all-pervading vice, such as fraud, for example, which is condemned by the common law, and avoids all parts of the transaction because all are alike infected. The alleged invalidity of the contract, now under consideration, depends wholly upon the statute of May 14, 1840, but that prohibits the post notes only and not the contract itself. The legislature did not even declare the notes to be void, but only forbid banks to issue them under a penalty.
The principle which upholds this contract is powerfully supported by a series of decisions in this state, known as the Utica insurance cases. (Utica Insurance Co. v. Scott, 19 John., 1; Same v. Kipp, 8 Cow., 20; Same v. Cadwell, 3 Wend., 296; Same v. Kipp, id., 369; Same v. Bloodgood, 4 Wend., 652.) In all these cases the Utica Insurance Company had taken notes in a course of unauthorized banking. The restraining act then in force (2 R. L., 234) declared that all notes and securities for the payment of money, made to any association, institution or company not authorized as aforesaid, should be null and void. It was held that the corporation, having violated the statute-and transcended its powers, could not recover on the notes it had discounted, but could recover on the contract of loan, being authorized by its charter to lend its surplus funds. The court, in each of the cases, affirmed the distinction between the lending contract and the security which the statute had declared void. In one of them (8 Cow., 20), the supreme court said : “It was unnecessary for the act (the restraining law) to go further than to avoid the security taken, thereby depriving the association of the means of effectual operation. True, it was competent for the legislature to have avoided the contract also. But they have not done so.” And again it was observed : “ This *98 suit cannot be said to arise out of an illegal contract which defeats a recovery. The illegal contract, if any, was not the loan, for the plaintiffs had the right to loan money to the defendant, but it was the agreement to secure the loan by a note discounted. Avoiding what was illegal does not avoid what was lawful.” In what was also observed' concerning a disaffirmance of the illegal contract, the illegal security was plainly intended. Now these cases have been questioned in the court which pronounced them, and it seems to me there is great difficulty in sustaining them, for the particular reason that the violator of the law was allowed to recover upon the very contract in which the violation consisted. The restraining act not only declared the notes void, but in terms made it unlawful to discount them; in other words, to lend money in that particular mode. Nevertheless, the distinction between the loan and the security taken therefor was drawn with great perspicuity, and in that respect I am not aware that those cases have ever been questioned. Indeed, the distinction had been settled long before in England, in Robinson v. Bland (2 Burr, 1077). The action was for money lent, and on a bill of exchange. The plaintiff had won money from the defendant at play, and had also lent, him another sum at the time and place of play, and the bill was drawn by the defendant to include.both sums. The statute on the subject declared that all notes, bills, bonds, Sfc., or other security for money lost or money lent at play, should be absolutely void, but did not forbid the lending. The case was elaborately consid ered by Lord Mansfield and his associates in the court of king’s bench. It was held, that although the statute declared the security void, there was nothing unlawful in the loan, and therefore the money lent might be recovered. The legislature, it was said, intended to avoid the security merely, but not the contract? of loan. Mr. Justice Dennison observed: “ There is a distinction between the contract and- the security.'' Justice Wilmot said: “As to contracts *99 being good and the security void, the contract may certainly be good though the security be void by the statute.”
There is another class of cases, arising under the British stamp acts, which seems to me entirely in point. In Cundy v. Marriott (I B. & Adol., 696), the action was on a bill of exchange, and for goods sold. The defendant bought goods of the plaintiff, and gave in payment an unstamped bill. The instrument was not only void, but by the stamp act it was a penal offence to issue it. But the plaintiff recovered on the contract of sale. (Wilson v. Vysar, 4 Taunt., 288; Chitty on Bills, 12th Am. ed., 144, 145, and notes.) Many other views of this question might be urged, but in further illustration I will only refer to the familiar doctrine that the lending banks might bring their action for money lent without noticing the securities, even if they were of unquestioned validity. The contract could be proved without the notes. If it appeared that they had been given, it would only be necessary to produce and cancel them at the trial. A fortiori, could this be done if the notes are simply void, and they are at most only void as to the innocent lenders ? In that view, it would not even be necessary to produce them at all.
VII. I come, then, to the conclusion that the loan of the . Philadelphia banks to this company, was, in all respects, a valid contract, to be performed according to its terms. The question now to be considered is, whether the pledge of the two hundred and seventy half million bonds is also valid as a special security for such loan. On this point I do not entertain a doubt. If we uphold the contract we must uphold the pledge also. The only argument tending to a different conclusion is derived from the written agreement, executed contemporaneously with the loan, which.declares, as we have seen, that the two hundred and seventy bonds are to be held as collateral to the twelve certificates of deposit. The certificates being illegal and void, it has been urged that, the pledge must fall with them. The answer is *100 that the loan, of which the certificates were intended as in part the evidence, being a legal and valid contract, sustains and upholds the pledge. The very agreement in writing, on which the whole argument is based, shows, with the utmost clearness, the fact of the loan, the terms of the contract, and that the certificates were given to secure the repayment of the money at the times specified. The extrinsic evidence also establishes the fact that the loan was made in special reliance upon the two hundred and seventy bonds as collateral, and I am confident there is no principle or authority which can disturb the security, unless we also annul the whole contract.
To what, it may be asked, does the law'annex this pledge? Is it to the debt for the money lent, or to the particular form of the instrument which is the evidence of such debt ? Most clearly to the former. Such is the just construction of the agreement, and such is the judgment of the law upon the nature of the transaction. This may be tested by rules and analogies which are quite familiar. No one will doubt that á release of the debt would extinguish the post notes and the pledge also, although not mentioned in the instrument. It is just as clear that the post notes may be lost, destroyed or surrendered without affecting the debt or the security therefor. So, if the two banks should make a written assignment, reciting the loan and transferring their demands, it is plain that the certificates and all the securities held would pass without specification. A mortgage may be given, conditioned in its terms, to pay a note or a bond. The note or bond may be canceled without impairing the lien. So the lien would hold if the note or bond recited were in fact not executed, the intention being to secure an actual debt. In this very, case, if, by accident or mistake, the post notes had not been delivered, is it possible to doubt that the pledge would, nevertheless, be good? and if it would be, can the result be different if the notes are simply void? I have before shown that it is their voidness onlv *101 which can affect the rights of these unoffending parties. Their illegality concerns only the corporation which issued them and violated the law in so doing.
There is no occasion here to reform the -written instrument which expresses the terms and object of the pledge. It only is necessary to consider the nature of the transaction and fairly interpret the language of the contract. If we do this, it is impossible not to see that the end which all the parties had in view was to secure the debt for the money lent. The amount of the debt and the times of payment were expressed in the post notes. It was convenient language, therefore, to say that the two hundred and seventy bonds should be held as collateral to those notes. But in the same instrument the existence and cause of the debt were disclosed. The notes were merely the representatives of the debt, and no pledge could be possibly given to secure the one without securing the other also. If it were true that the terms of the pledge confined it to the notes, the law, nevertheless, instantly annexed it to the debt. I think these principles are elementary.
This question, although it would seem a very plain one, is nevertheless supposed to be embarrassed by the decision of this court in Leavitt v. Palmer (3 Comst., 19). That decision, very probably, proceded in part upon views of illegality, and its consequences as affecting the entire transaction, somewhat stronger than we might now feel inclined to sanction. But the cases differ widely. If they did not differ, we might be led to believe that principles quite familiar had somehow been overlooked. Let us note some of the points of distinction. In that case, this same company had issued to the Palmers, after the prohibitory act of May 14, 1840, forty-eight promissory notes, and created a trust to secure their payment. In the present case, on the contrary, although the notes may be void, the trust is not collateral to them and does not fall with them. The two hundred and seventy bonds were valid (that has already been shown), *102 and the trust is collateral to them. Both had a valid existence prior to this transaction. So that the only question here is, whether the bonds were effectually pledged to the banks, entitling them to share in the trust fund. This is one distinction;. another is, that in Leavitt v. Palmer, the forty-eight notes and the trust deed were, essentially, the whole transaction. There was no loan or advance of any kind on the faith of the trust. The transaction might be annulled, and the parties would be, as in fact they were, left in exactly their previous relations to each other. The intention of the notes was to assume an antecedent liability of a third person to the Palmers, and to convert the contingent liability of the company into an absolute one. The trust was declared to be collateral to the notes, but if those were void there was no debt to feed and sustain it. Here, on the contrary, was a loan predicated on the very pledge itself. The bonds were agreed to be delivered for the purpose of obtaining the loan The certificates were the most unimportant part of the transaction. Whatever may be their fate, the contract stands according to its terms, and that, is what the parties intended to secure by the pledge. There is still another and marked difference. In the case cited, the notes were intended to have a circulation and to pass into other hands than the Palmers; and one of the objects of the trust was to promote such circulation, instead of simply securing the Palmers’ debt. This was evident from a memorandum at the foot of the notes, and from the provisions of the trust deed. As Judge Bronsor remarked, “ the trust was not created for the security of the Palmers alone, but after default in payment (of the notes), the trustees were to stand seized of the. assigned securities in trust for the holders, and were to pay over the moneys unto the Palmers or any other parties who may be holders,” Sc. He added, “ other parts of the instrument show that the certificates were intended to pass beyond the hands of the payees.” In such a case there were reasons for saying that the trust deed, intended expressly to give
*103 “ credit and circulation ” to the illegal notes, must share the same fate with them, which have no application to the question before us. Such was not the design of the pledge of the two hundred and seventy bonds. The contrary will very clearly appear on inspecting the agreement which has been referred to. We find, on the whole, nothing in the case of Leavitt v. Palmer to prevent the conclusion that the Philadelphia banks, or their assignees,' are entitled to hold the two hundred and seventy bonds, and consequently to come in under the half million trust, and we accordingly adopt that conclusion as the only one which reason or authority will justify.
. VIII. In respect to the claims of the Holfords & Co., as holders of twenty-four of the million trust bonds, it has already been observed that in May, 1840, they took them by transfer from the Palmers, who held them in pledge. They therefore have the Palmers’ rights. It appears to be well settled that a pledgee may transfer his interest in the things pledged, even without the consent of the pledgor, and for his own debt. (Story on Bailments, 214, 218.) I suppose the title of the transferee or second pledgee cannot be any weaker if the transfer is made with the consent of the original pledgor, and the consideration is a debt due from him. If this is not a satisfactory view on the subject, the alternative is that the Palmers virtually surrendered their own claim upon the bonds,' and that the company repledged them to the Holfords. In this alternative, I think the result is the same in regard to the rights of the receiver. Although the bonds were made for sale, and although the trust deed declared that to be the object in view, I see no reason why they could not be temporarily deposited with a creditor as security until a sale could be made. The pledge implies a power to sell and receive the money in satisfaction of the debt. In so pledging them there is certainly nothing which contradicts the terms of the trust or defeats its object. A sale was the ultimate purpose of the whole scheme. A pledge until that should *104 be effected, so far as I can see, is no diversion of the trust for a different object, nor does it even delay the attainment of that purpose.
It has been suggested, however, that, inasmuch as these twenty-four bonds were pledged to the Holfords to secure a preexisting debt, they are not purchasers for a valuable consideration, and so not within the saving clause of the 8th section of the statute to prevent the insolvency of moneyed corporations. If the trust deeds could be sustained only on the ground that the holders of the bonds purchased them for a valuable consideration and without notice, within that clause of the statute, then there might be a question on the rights of these men. But it has already been shown that the validity of the trust deeds rests firmly upon another ground : I mean the express sanction and authority of the corporation.
The point was made upon the argument, that the Holfords suffered the cross bill to be taken as confessed, and hence that they are entitled to no relief. The fact is true as stated. But the allegation of the cross bill, so far as they are separately concerned, is merely that the twenty-four bonds were delivered to them as security for an “ alleged preexisting indebtedness,” and this they confessed by not answering. Their debt, it will be seen, is not controverted; and its preexistence, as we have shown, is no impeachment of their title. The trustees representing all the bondholders have answered, and all the questions which go to the general validity of the trusts and of the bonds are controverted and must be determined between them and the receiver. If the special allegation, directed against the particular claim of. the Holfords, is in law no impeachment of their rights, they have lost nothing by not answering it.
There is one other suggestion which may be due to this comparatively unimportant branch of the case. If the title of the Holfords to the twenty-four bonds fails, the result is, either that the bonds revert to the Palmers from whom they *105 received them, or that they must be surrendered to the receiver to be canceled. In the first alternative, the trust itself- will not be affected in the slightest degree. In the second, it will fail as to these particular bonds, but will stand entire as to the remaining eight hundred and seventy-six of the original nine hundred.
The payment or cancellation of a portion of the bonds will not subtract from the fund until all the residue are paid. Now, as I understand the evidence produced by the receiver in endeavoring to make out the insolvency of this company, the effects held under the trusts are somewhat less than sufficient to pay the bonds after withdrawing the twenty-four in the hands of the Holfords. In this view, the general creditors can in no event receive anything out of this fund, and the question as to the Holfords’ title, therefore, concerns the other bondholders only.
The point was taken by the receiver’s counsel, although but very little discussed, that the Philadelphia loan was “ illegal as to the Bank of the United States, that institution being expressly forbidden, by its charter, to take more than six per cent.” Without suggesting other answers to this point, it will be sufficient, I think, to observe that no such objection is taken in the receiver’s bill. If it were intended to raise such a question, the charter of the bank, being a statute of another state, should have been set forth as a fact, and then that it had been violated in the transaction. Not having done so, this question cannot now be raised. It appears to be raised now for the very first time. I do not find any such point among the very great number which were presented on the hearing in the court below.
It appears that one hundred and thirty-five of the two hundred and seventy bonds delivered to the Philadelphia banks, are held by the defendants, the Morrisons, by transfer from the Bank of the United States, which, jointly with the Girard Bank, made the loan of $250,000. The Morrisons, therefore, are the claimants under the half million trust in *106 respect to so many bonds as they hold; but their claim is objected to on the ground that they do not appear to be assignees of any portion of the loan or debt to secure which the two hundred and seventy bonds were pledged. If the fact be so, we think the objection is unsound in law. A pledgee may transfer his interest in the subject of the pledge without assigning the debt. The alienee will take such interest'and no more, subject of course to the pledgor’s right of redemption. (Story on Bailments, 214, 218, and cases cited.) If this were otherwise, the one hundred and thirty-five bonds would revert to the Bank of the United States, and in that case it would be material to inquire whether the rights of that bank are cut off by failing to answer the cross bill. But, in the view, we take, such an inquiry is unnecessary.
I have so far considered all the objections which this corporation, if no receiver had been appointed, could urge against the validity of the two trusts or the title of the various parties who hold the trust bonds. In respect to all these grounds of objection, the general creditors are in no better situation than the corporation would be if it had not been dissolved. If the receiver can repudiate the trusts, as the immediate representative of the corporation, of course the creditors will take the fruits of such repudiation; but if it has been shown that he cannot repudiate them in that character, then they have no ground to stand upon until we come to objections of another class.
But suppose these trusts were void for any one of the reasons which have been considered. If we had come to such a conclusion, we should meet another question which appears to me to be one of very great importance. The receiver, it is to be remembered, thus far stands in the shoes of the North American Trust and Banking Company. Can, then, that corporation allege the invalidity of its own acts, and annul these trusts, after receiving a full consideration therefor, without restitution to the bondholders who acted *107 solely in reliance upon the securities pledged ? The principle of equity, which requires such restitution as the condition of relief, is of almost universal application. Can, then, a corporation come into a court of equity, alleging that in a conveyance of its property it has exceeded its powers and violated the law, and so repudiate the. transaction and recover the fund, without restoring the consideration it has received ? If it can do so where both parties are equally guilty, and that may well be denied, can it where those with whom it has dealt are both in fact and in judgment of law innocent. These are inquiries which were suggested on the argument, and it seems to me that they deserved an answer, if any could be given. But no answer was attempted, and with what reflection I have given to them, I confess that none has occurred to me. In respect to one of the questions which have been considered, I mean that of usury, if we held that the bonds, or any portion of them, were New-York contracts, and" usurious under our statutes, it is true the corporation, as the “borrower” might, under the peculiar provisions of the act of 1837, obtain relief without the equitable terms of paying the lawful debt and interest. But in respect to this particular question, the receiver has even less than the rights of the corporation. e Creditors have no such unconditional right to relief, under the act of 1837 (Rexford v. Widger, 2 Comst., 131; Post v. Bank of Utica, 7 Hill, 391), and the rights of creditors alone are to be considered, because their claims, as we have seen, will exhaust the entire estate, whether it be more or less. In respect to all the questions so far examined, except that of usury, they have no greater rights than their debtor. In reference to that, they have less: and such is the situation of the receiver in both respects. In virtue of his office he has the title of the corporation, but as trustee of that title for creditors only, he can assert it only upon conditions by which creditors would be bound. The peculiar rights of the “ borrower” upon usury, are given to him in the statute of 1837, for his *108 own benefit, and no court can allow them to Ire asserted, contrary as they are to the settled maxims of equity, by a party in succession to him, when it is clearly seen that such party holds the title for the benefit of others.
It only remains now to consider a different class of objections to the two trusts proceeding, on the grounds of fraud upon the rights of creditors, or of illegal preference between them. These are unavailable to the corporation, but it has been conceded that the creditors may, through the receiver, invalidate the trusts, if the objections are well taken. They are three in number: First. That the trusts were created by the corporation, “ when insolvent, or in contemplation of insolvency, and with intent to give a preference to a particular creditor over other creditors,” in violation of section nine of the “ act to prevent the insolvency of moneyed corporations;” Second. That they were made “in trust for the use of the company,” and so are void as to creditors, under 2 R. S., 135, § 1; Third. That they were made with intent to hinder, delay or defraud creditors. These will now be examined in the order stated.
I. It has already, for other purposes, been assumed that banking associations are subjected to so many of the provisions of the statute referred to, concerning moneyed corporations, as are “not inconsistent” with the general law of 1838. I have pointed out, in another place in this discussion, the utter inconsistency of the two systems of banking, but if they can be united anywhere, it can quite as easily be done upon the ninth section, against preferences, as any other. I shall not, therefore, change the assumption on which we have so far proceeded.
The language of the statute is “No such conveyance, transfer, payment, &c., by any such corporation, when insolvent or in contemplation of insolvency, with the intent to give a preference to any particular creditor over other creditors of the company, shall be valid in law.” It is obvious, and is not denied, that to bring a transaction within *109 the statute, the intent to give a preference is a fundamental requisite. This is a fact to be alleged and proved like any other fact, which lies at the foundation of the relief sought f and from this it must follow, that so long as the debtor corporation, notwithstanding the pressure of great embarrassments, entertains an honest expectation, in the exercise of a reasonable intelligence, of going On with its business and paying all its debts, its acts cannot be brought within the operation of this statute. While this expectation is entertained in sincerity and good faith, it may lawfully secure a particular creditor, or sell or pledge a portion of its assets to raise money to meet its necessities.
Provisions similar to this one have existed in the English and United States bankrupt laws, and in the insolvent laws of various states, and they have often come under the consideration of the courts. There is, therefore, in the books, no want of adjudged cases bearing with much directness upon this question. I shall not go over these cases. A few citations will be sufficient for the present purpose. In Fidgeon v. Sharpe (5 Taunt., 544), arising under the English bankrupt act, this doctrine was laid down as the test by which the acts of one becoming a bankrupt must be adjudged: “ It must be an act, then, not only that in effect contravenes the bankrupt laws, but it must be done with intent to contravene them, and in contemplation of bankruptcy. The innocence or guilt of the act depends on the mind of him who did it, and it cannot be in fraud of the bankrupt laws, unless the actor meant it should be so.” In Crosby y. Crouch (11 East, 261) Lord Ellenborough observed: “ Two things are necessary to concur, in order to avoid a delivery of the goods, namely, the purpose of a voluntary preference in respect to such delivery, and the contemplation of bank ruptcy at the time the goods were delivered.”
In Exerett v. Stone (3 Story, 453), Mr. Justice Story observed: “In short, contemplation of bankruptcy means a contemplation of becoming a broken up and ruined trader
*110 according to the original signification of the term; a person whose table or counter of business is broken up, bancus ruptiis. In such a case, if the bankrupt makes a conveyance giving a preference to certain creditors, that is the very thing which the bankrupt act denounces and declares a fraud,” &c. In Arnold v. Maynard (2 Story, 354), the same judge, while condemning a mortgage as given to prefer a creditor in violation of the United States bankrupt law, said: “ I agree that the mere fact of a man’s being insolvent does not necessarily establish that he means to stop business and break up his establishment; for he may hope and believe that he can still carry it on and perhaps redeem himself from insolvency. But when he is deeply in debt, and intending to fail and break up his whole business at once, he makes a conveyance to a particular creditor to give him a preference over all the rest, it seems to me irresistible evidence that he does the act in contemplation of bankruptcy.” In Jones v. Howland (8 Mete., 377), a case which underwent a careful consideration, the decision of the supreme court of Massachusetts is fairly stated in the reporter’s head note, which is as follows: “If a party who fears or believes himself insolvent, but does not contemplate stoppage or failure, and intends to keep on and make his payments and transact his business, hoping that his affairs may thereafter be retrieved, and in that state of mind makes a sale or payment without intending to give a preference, and as a measure connected with going on in his business, and not as a measure preparatory to or connected with a stoppage in business, such sale or payment is not void as made in contemplation of bankruptcy, within the meaning of the second section of the United States bankrupt act of 1841, though he immediately afterwards becomes bankrupt.” The doctrine to be derived from the authorities cited is sustained by many, other casess (Ashby v. Steere, 2 Woodbury & Minot, 354; in, re Pearce, 21 Verm., 611; Jones v. Sleeper, 2 N. Y. Leg. Obs., 134; Freeman v. Deming, 3 Sandf. Ch. R., 332; Taylor v Blackmore, 5 Humph.,342: Wilkinson's appeal, 4 Penn. *111 288; Mitchell v. Gossam, 12 Ohio, 335; Crawfords v. Taylor. 6 Gill & John., 330, 333.)
Now, it has been strenuously urged that when these trusts were created the banking company was insolvent, within some definition of that term, or, at all events, that insolvency was feared and contemplated. But the true question is one of intention and motive. Was it the design of the trusts to make a partial distribution of assets amongst the creditors, or was the expedient of creating them resorted to for the purpose of raising money to pay debts, and with the bona fide expectation of removing difficulties and averting insolvency? I have looked with some attention into the evidence in the case, and can come to only one conclusion. This company was certainly under very great and alarming embarrassments for want of cash means to meet its rapidly maturing engagements, but its officers did not believe, and I think then had no reason to believe, that its resources were not amply sufficient for the ultimate payment of all creditors. They also believed, so I feel compelled to say upon the evidence, that the moneys to be raised by the successful negotiation of the trust bonds would relieve their institution and enable them to meet all demands upon it. If these are correct conclusions of fact, then the trust conveyances do not fall within the condemnation of the statute. It is an important fact that the company did go on paying its debts, as they matured, for many months after these trusts were created.
It has been urged that the debtor corporation must be deemed to have intended the result of its own acts. This is very often a useful rule of evidence in arriving at a conclusion upon a question of motive and intention, but it is not a rule of law. If a given result must, by plain and absolute necessity, follow from a particular action, or if it be so likely to follow that no two minds of equal intelligence could differ in conclusion, viewing the subject from the same point of observation as the actor himself, then there would be no injustice in holding that he intended such result. Still the *112 question is one of fact; what was the intent ? What it was. is by no means uniformly proved by the result. On this point, the observations made by Judge Hubbard, in tire supreme court of Massachusetts (Jones v. Howland, supra), are eminently just: “When we look back upon events that have happened, we stand in a different position. We behold with a clearer vision, as we embrace within our glance the beginning and the end, the .act and the consequence. But the man who is doing the act may contemplate a very different result. His judgment may be'biased by his wishes.” “ Disappointments may also take place which were not anticipated. The experience of others is rarely guide to an embarrassed man.”
Full justice to this question, perhaps, requires that i should be presented in another light. I think we canno say, upon the language or intention of the statute unde consideration, that it includes, under any circumstances of insolvency, actual or contemplated, a security given for a loan or advance in cash where no other relations exist between the parties. The preferences condemned are those made between the existing creditors of the corporation, where the one preferred, if he loses his security, is in no worse situation than before. Equality among those having equal claims, was the evident policy of the legislature in enacting this law. If it had been the intention to include a cash loan, secured by a mortgage or a trust, then I think that, in accordance with all the analogies of the law, there would have been a saving clause in favor of the dealer having no notice of the insolvency of the corporation. We find such a clause in the previous 8th section, avoiding conveyances, &c., not authorized by a previous resolution of the directors. Its absence in the 9th section tends very much to strengthen the conclusion that such transactions are not within the intention of the statute, as I think they are not within the fair interpretation of the language used. If this is a correct view’, the result follows that the two trusts, regarded as *113 made simply to secure the persons in England, or elsewhere, who should purchase the bonds in market and advance their money thereon for the use of the corporation, are free from objection under this statute. It is true that a corporation, insolvent or contemplating insolvency, may create a security for the purpose of raising money in order to distribute it by preferential payments among its creditors. But in such a case it is the payments which the statute avoids, and not the security on which the money is raised. Preferential payments are not in question in this case.
When, however, these trusts were created, there was a collateral design to pledge the bonds, until a sale could be made, to the Palmers, not only for future advances but for the very large debt which had already accrued in the dealings with that house; and this, as we have seen, was actually done. The question can therefore be made under the statute, whether one of the objects of the two trusts was not, through the pledge, to give to the Palmers an illegal preference of their debt over other creditors; and, according to the construction we have just indicated, no other qestion of illegal preference can possible arise upon the facts of the case.
Were, then, the trusts made in order to pledge the bonds, with intent thereby to prefer the Palmers’ debt, in violation of the statute ? In this point of view there is still less difficulty in overcoming the objection; for, aside from the general facts of the case, indicating, as we have before said, the absence of design to give illegal preferences to any creditor or party, there are some special facts whicH are still more decisive, if the only question is, as we think it is, upon this pledge. In regard to the million trust, the inquiry must be referred to a period as early as some time in February, 1840, because the second trust deed and series of bonds then took effect, embracing in the scheme all the securities after-wards included in the final trust. These bonds, as we have seen, were held under the pledge; but to facilitate their sale *114 and remove special objections to .that scheme, the final trust and bonds were substituted early in May, and to these the Same pledge would attach without any new arrangement. Now in February 1840, the Palmers held, as security for their debt, state stocks sufficient to cover the entire amount., And if their defit was already secure, how is it possible to infer a design to prefer- them through the trust? Then as to the half million trust: this was a separate scheme, matured about the 1st of May. At that time the Palmers had surrendered a large portion of the stocks, but' in their place they held the million trust bonds, so that their debt, although increasing, was still secure. The half million bonds were, moreover, pledged with a particular design of procuring new acceptances to the amount of ¿£70,000. We come, therefore, to the conclusion, both upon the general and these special facts of the case, that- the two trusts did not violate the statute referred to.
II. The next question is, whether the trusts are void as to creditors, oft the ground that they were made “ in trust for the use of the corporation.” This objection rests upon certain reservations contained in the trust deeds, and upon a doctrine which was laid down by Judge Bronson, in the case of Goodrich v. Downs (6 Hill, 438), determined in the supreme court of this state. In that case the question was upon the validity of an assignment made by a failing debtor, against whom judgment had been recovered, on which execution was about to issue, of the mass of his property, being personal estate, for the benefit of part of his "creditors, but reserving to the debtor the surplus which should remain after paying the debts specified. The assignment was held fraudulent and void, Justice Bronson delivering the opinion of the court; and I do not see any reason to question the soundness of the decision, if we may understand it to rest distinctly on the ground of fraud. But the learned judge went on to say: “ The cases which have been mentioned also hold that where a deed is void in part, as *115 being contrary to a statute, it is void in toto. Now, here the legislature have not only declared that every conveyance made with intent to hinder, delay or defraud creditors, shall be void (referring to the statute against fraudulent intents in alienation of property, 2 R. S., 137, 1), but they have added that every conveyance of goods, &c., in trust for the use of the person making the same, shall be void as against creditors (referring to 2 R. S., 135, § 1). So far as relates to the surplus, after paying the preferred creditors, the case falls within both branches of the statute; and the deed being void in part, the whole instrument must fall to the ground.” In another part of the opinion, speaking again of the statute last mentioned, he observed : “ But there is another statute which provides that all conveyances of goods, chattels or things in action, made in trust for the use of the person making the same, shall be void as against the creditors of such person. There is nothing here about the intent with which the deed was made, and neither court nor jury has anything to do with the question,” &c. The doctrines embodied in these extracts, although not indispensable to the decision of that case, are thus laid down with a sanction certainly not to be lightly disregarded. If they can stand the test of examination, they are, beyond all doubt, fatal to these trusts. The principles declared are : First. That every conveyance of personal estate, for whatever object, if it contain any reservation of use or benefit to the grantor, is within the statute against conveyances in trust for the use of the person making the same; Second. Being thus void in part the whole is void; Third. The intent of the party maldng the conveyance, however meritorious, has nothing to do with the question. I say these principles, if sound, are fatal to the trusts, because they contain certain stipulations and reservations in favor of the corporation which created them, among which, and the chief of which in importance, so far as this question is concerned, is a trust to hold the property for the use of the corporation, and subject to its order, after *116 the trust bonds should be paid. Upon the most attentive consideration, we think that these propositions, if not each of them unsound, are certainly so in their agregate result and influence upon instruments of the class to which they were applied in the case cited.
They are, in the first -place, unsustained by the authorities to which we have been referred. Before Goodrich v. Downs was decided, not a few cases had arisen in this state which involved the validity of instruments conveying a" debtor’s property in trust, with some use or advantage reserved to himself, and in most of those cases the instruments were set aside. (Murray v. Riggs, 2 John. Ch. R., 572; S. C., 15 John., 589; Hyslop v. Clark, l4 John., 458; Seaving v. Brinkerhoff, 5 John. Ch. R., 329; Austin v. Bell, 20 John., 442, 450; Mackie v. Cairns, Hopk., 373, 404; S. C., 5 Cow., 548; Wintringham v. Lafoy, 7 Cow., 736; Grover v. Wakcman, 4Paige, 23; S. C. on appeal, 11 Wend., 187.) In all these cases the conveyances had been executed while both the statutory provisions (with immaterial differences in phraseology) which have been referred to were in force. Indeed, it should be observed that the statute, against trusts in personal property for the use of the persons creating them, had been enacted in England as early as 1487. In this state it had been reenacted in 1787. It is now, as we have seen, incorporated in the revision of 1830, with some difference of language of no importance to the present question. Now, in most of the adjudged cases which have been cited, the conveyances were held void by reason of provisions contained in them for the use and benefit of the grantor, but on a careful examination we shall find that in no one of them was the decision influenced by this statute. The inquiry uniformly was whether the debtor had attempted to place his property beyond the reach of his creditors, with a fraudulent design, contrary to the other statute which has been referred to, and to the principles of the common law. In the prosecution of that inquiry the cases are not entirely uniform in reasoning *117 or result. But nowhere shall we find the proposition stated that this statute pronounces a total condemnation of all conveyances and dispositions of personal property containing any provision for the use of the debtor. Indeed, I do not find that, in the many very able and elaborate opinions pronounced by judges in the cases cited, this particular statute was more than once mentioned. In Mackie v. Cairns (5 Cow., 580), Chief Justice Savage quotes it without comment; quoting, also, at the same time, the statute against conveyances made with intent to defraud creditors, which had been enacted in-this state at the same time with the other, and like it was derived from the legislation of the parent country. That case itself, like the others cited, was determined distinctly on the ground of fraud.
In England, as we have seen, this statute was enacted, now three hundred and seventy years ago, but I am confident we can find there no trace of the peculiar doctrine of Goodrich v. Downs. In Estwick v. Caillaud (5 Term R,., 420), Lord Abingdon had assigned part of his real and personal estate in trust, first to pay expenses, next half of the surplus to himself, and then the residue to certain of his creditors. At the trial, it was left to the jury to say whether the deed was made with an actual intent to defraud other creditors, and they found it was not. On motion made, in the court of king’s bench, to set aside the verdict, it was insisted that the conveyance was fraudulent, under the statute 13 Elizabeth, ch. 5, against alienations, with intent to defraud creditors. But the conveyance was upheld, because no actual fraud had been found by the jury. The judges, Lord Kenton, Bullee, Ashhüest and Geose, delivered their opinions seriatim, and all of them agreed that the question turned on the intention to defraud the creditors not provided for. According to the doctrine. I am endeavoring to refute, the statute against personal uses, for the benefit of the grantor, would have been entirely decisive. That statute had then been in force three hundred years, but neither the counsel.
*118 who were some of the ablest at the English bar, nor the judges so much as alluded to it. The judges conceded that the reservation, in favor of the grantor, could be reached ir equity by creditors, and although that was denied after-wards (2 Anstruther, 381), it would not for an instant be doubted with us, especially since the statute (2 R. S., 173, § 38) in relation to creditors’ bills. The decision in Estwiclc v. Caillaud was repeatedly examined by judges, both in the supreme court and the court of errors, in the cases I have cited; but its soundness in principle and result was not questioned, except in one instance by a senator, who assailed the result but not the principle on which it turned. (20 John., 448; 5 Cow., 562, 569, 582; 15 John., 585; Hopk., 397 ; 2 John. Ch. R., 580.)
Two cases in this court, later than Goodrich v. Downs, have been referred to as affording some sanction to the doctrine there laid down. These are Barney v. Griffin (2 Comst. 365); Leitch v. Hollister (4 Comst., 214). The first of these cases arose upon an assignment by an insolvent debtor of all his property, consisting of real estate only. The deed was held fraudulent and void. Judge Bronson, it is true, observed that “the question (of fraud) was considered upon authority in Goodrich v. Downs,” and added, “ we think the case was well decided.” I have already observed, in effect, that the decision may stand without resting it upon the particular doctrine which we are now considering. In Leitch v. Hollister (4 Comst., 214), the assignment was held good In sustaining that assignment, Judge Gardiner made some observations which appear to sanction this doctrine, but the case did not call for them.
In short, the doctrine, it is believed, rests upon no authority except the one which has been commented on. Before that decision, many cases, as we have seen, had arisen upon similar instruments, and an arduous contest was maintained in the courts, as will appear in the cases which have been cited, upon the question whether those instruments were to *119 be condemned as made with intent to defraud creditors. The decisions had fluctuated according to real or supposed difference in the facts. But if the statute of personal uses (I use the term for convenience) had anything to do with the subject, there was no room for such a contest. It furnished a simple unvarying rule of decision, and all questions of intention were wholly irrelevant. The absence of all reliance upon this statute, even of allusion to it except in a single instance, would seem to prove conclusively that it has more recently been misapprehended.
Upon what.principle can this doctrine be maintained? If it can be, the question may be asked, how can any mortgage of chattels to secure a creditor stand, however free from all imputation of fraud? It is extremely well settled that p such a mortgage passes the legal title to the mortgagee. (Butler v. Miller, 1 Comst., 500; Mattison v. Baucus, id. 296.) | It is moreover true, that these instruments uniformly contain 1 one or more reservations for the benefit of the grantor. Sometimes the possession of the chattle is reserved until default, always the surplus of its value or proceeds after paying the debt. We have, then, literally “ a trust for the use” of the grantor, yet no one ever thought of impeaching these securities under the statute of personal uses. They have often been held fraudulent in fact, but were never condemned on any other ground. If this statute applies to them, then they may be wanting in all the usual badges of fraud; even the possession may be delivered to the mortgagee, still they are void, because they contain a trust for the grantor after the debt is paid.
Singular, indeed, are the consequences to which this doctrine must lead. A man may be worth $1,000,000, owing one-tenth of that sum to each of two creditors. If he makes a mortgage upon or puts in trust some of his stock or other personal estate to secure one of them, with whatever motive, the transaction is void unless he secures the other also in the same instrument; although the debt unprovided for is ten *120 times secure upon the residue of his estate. Indeed, although each creditor is specially secured by separate instruments, each may insist that the security of the other is void. Judge Bronson was clearly right in saying that this statute does not deal with intentions. It most assuredly deals with no extrinsic facts. The error, I think, is in supposing that it applies at all to transactions where the reservation to the debtor is merely the incident, instead of being the whole or main object of the conveyance.
I think it may be laid down as a proposition, nearly, if not quite self-evident, that the mere expression of a trust, when the law implies one, if not expressed, cannot, of itself, avoid a conveyance otherwise good. “ Expressio eorum qua tacite insunt nihil operatur," is a maxim of unquestionable soundness. It cannot be unlawful to stipulate for that which the law provides. The doctrine, then, which has been contended for, must go farther or it must fall to the ground. It must include conveyances of personalty, although the resulting trust be not expressed; in short, all conveyances not absolute in their intention, if there be creditors existing or subsequent.
But, contrary to all this, it has been many times held that the actual expression of a trust, which the parties really intended, saved instead of condemned the instrument. Secret trusts, attending conveyances absolute in terms, have always been regarded as a badge of fraud since the celebrated , case of Twyne (3 Coke, 80). Even the continued possession of chattels by a vendor or mortgagor, usually regarded as evidence of a fraudulent trust, has been considered, in many adjudged cases, innocent, if it was provided for in the terms of the conveyance; in other words, if in its very language it expressed a trust for the use of the debtor. See cases on both sides of this question: Sturtevant v. Ballard (9 John., 337); Divver v. McLaughlin (2 Wend., 596); Bissell v. Hopkins (3 Cow., 166); and many others cited in Hare Wallace's note to Twyne's case (43 Law Lib., 41). In the numerous *121 authorities upon this point, the controversy has always been whether a declared trust did not protect and uphold the transfer, and in no one of them was it ever suggested that instead of saving, such a trust absolutely condemned it. Such a controversy could never arise if instruments made for lawful purposes, and upon lawful considerations in other respects, but reserving some incidental use or benefit to the person who made them, are within this statute of uses. The case cited of Sturtevant v. Ballard (9 Johns., 337), may be selected among many others as eminently instructive. There the debtor, between judgment and execution against him, executed a bill of sale of the tools belonging to his trade as a blacksmith, upon a fair consideration, consistint of cash advanced and a prior debt, but with an express reservation in the writing that he was to have the use of a portion of the tools for three months. Here most clearly was a case where the title passed upon a sufficient consideration, but with a perfectly well defined trust for the use of the debtor. Upon the most elaborate consideration, the transfer was held to be void, upon the principles of the common law and the statute against alienation with intent to defraud. If it had ever been supposed that the other statute, the particular one now under consideration, had anything to do with the question, it surely would have been known to the consummate learning of chancellor, then Chief Justice Kent. But we find no allusion to it. On the contrary, the chief justice stated-the great point to be “ whether the ract of permitting the vendor to retain possession of the goods did not render the sale fraudulent in law, notwithstanding such possession was inserted in the deed as a condition of the contract.” He further observed that the reservation appearing on the face of the writing did not “ necessarily ” render it valid. According to the doctrine urged in the present case, it rendered the sale necessarily void.
What then is the true meaning of the statute ? It declares that “ all deeds of gift, all conveyances, all transfers or assign *122 ments, verbal or written, of goods, chattels, or things in f action, made in trust for the use of the person making the same, shall be void as against creditors, existing or subsequent, of such person.” All reasoning and all authority, as we have seen, concur in the conclusion that it has no applica tion to cases of real and actual alienation upon valuable consideration and for active and real purposes, although incidental benefits are reserved to the grantor. There is but one other possible interpretation, and that is the one to which the language itself points. It is the deed, &c., to the use of the grantor, which is void, and not the deed to other uses and for other objects. Its true name should be a statute of personal uses. Its object is to render- simply ineffectual, purely nominal transfers of personal estate where the entire use and control are, by a declaration of trust in or out of the instrument, left in him who makes the transfer. Its policy is not unlike that of the statutes concerning passive uses or trusts in lands which have had, along with tips, a contemporaneous existence for some centuries. It is not, in any proper sense, a statute against frauds, although fraudulent practices may have led to its enactment; but it is founded on the self-evident principle that a man’s property should pay his debts, although he has vested a nominal title in some other person. For that purpose the statute declares the title to be in the debtor, and no transfer which is entirely nominal can stand in the way. It has no reference to intentions, whether fraudulent or honest. There may, in fact, be no creditors until long after the transaction, but if the debtor has property they are entitled to be paid. The simple inquiry is whether the property belongs to the debtor, j not upon a theory of fraud and against the terms of his conveyance, but upon a theory of equitable title reserved to himself by the very conveyance which transfers the legal and nominal title to another. If this is not altogether a misconstruction of the statute, the conclusion must be that it has no application to mortgages, trusts or other instru *123 ments created to raise money or secure a creditor. It is the necessary incident of all such transactions that some beneficial interest remains in the debtor, and that the whole belongs to him when he has discharged the obligation; and if parties cannot express in words the actual nature of the dealing without defeating their whole intention under this statute, then some of the most ordinary transactions in life cannot be carried on at all except by concealments, which the law justly pronounces to be badges of dishonesty.
This statute, then, only avoids conveyances, &c., which are wholly to the use- of the grantor. If we came to a different conclusion, if we held that it applied to transfers made for other objects, but containing a residuary interest or partial use for the debtor, then the question would arise whether the whole is void, or only so much of the grant as is not sustained by the valid pmposes for which it was made. On this point I should come to the conclusion that the statute does not subvert all instruments in which any inoperative trust is expressed along with others that are good, but leaves those which are good and valid to stand. This question belongs purely to the' construction of terms. If a statute in terms declares an entire conveyance void which has in it one such element, then it is all void because the legislature has chosen to make it so, but it is not void upon any other principle of law. If a deed is made with some evil intent, whether such intent is denounced by the common law or by a statute, then it is true the whole is void, because the whole is pervaded by a single vice. But a particular provision may be simply void or inoperative, either by common law or by statute, and all the others good. This is the true rule, where the question arises upon a statute simply declaring voidness, unless the declaration, in the strictest terms, embraces the whole instrument. Now, trusts in personal "estate, for the use of the person who creates them, are not illegal or criminal, unless they are made with fraudulent motives. In themselves they are entirely innocent. They are simply declared *124 inoperative and void as to creditors. This does not affect the valid trusts unless the declaration is broad enough to include them also.
Is it, then, the necessary construction of this statute that all the trusts, which in themselves are valid, must fail because in the same conveyance there is one perfectly innocent in its nature, but void when the superior rights of creditors are concerned ? I think not. A single deed may have a “ conveyance,” a “ transfer ” or an “ assignment ” upon a valid trust, and another upon a void one. The terms used do not, by inevitable construction, apply to the instrument in which the void use is contained. They are satisfied by applying it to the inoperative provision only. For this there is authority directly in point. In Doe v. Pitcher (6 Taunt., 363), the question was elaborately considered upon a statute containing the same terms as this, with others also. That case not only affirms the construction I have indicated, but contains an unanswerable refutation of the maxim “ void in part void in toto,” or rather of the uses to which that maxim has sometimes been very inaccurately applied. Without pursuing this question further, the following additional authorities may be referred to: Collins v. Blantern (2 Wilson, 348); Pigott’s Cases (11 Coke, 27); Darling v. Rogers (22 Wend., 487 ); Patterson v. Jenks (2 Peters, 235); Norton v. Simmes (Hobart, 12 c); Mackie v. Cairns (5 Cow., 564, per Sutherland, J.).
III. The remaining objection to the trusts is, that they were made with intent to hinder, delay or defraud creditors, and are therefore void under the statute against fraudulent alienations, and by the principles of the common law, which that statute merely affirms. It is scarcely claimed that there are any facts, out of the trust deeds, to sustain the allegation of fraud, and it will be found that the general features of the case point with great clearness to an opposite conclusion.
This company was certainly in a situation of extreme embarrassment, and even of great peril. It might possibly *125 have been wiser, in reference to all results, near and remote, to have made no attempt to meet its debts at maturity, and to have gone at once into liquidation. The scheme of raising money embraced in these trusts may have been in itself cumbrous and expensive. These inquiries are not material. We cannot close our eyes to the great fact that extrication from embarrassments by raising means for paying creditors, whenever and as fast as their demands became due, was the very end sought to be attained. It may be confidently asserted that no fraudulent debtor ever resorted to such an expedient. Fraudulent debtors have always been accused of a design to evade payment, by some trust or assignment withdrawing their property from the reach of process. The gravest allegation made against this company is, that it made an unwise attempt to meet all its payments with punctuality. More than a year afterwards it was forced into liquidation, but in the meantime it struggled on and paid until it could pay no longer. When the aid derived from the trusts was spent, its. condition became more and more hopeless. But it is difficult to believe that a debtor ever borrowed money to pay debts, upon a special security, fairly constructed as to its nature and amount, with an actual design of defrauding Ms existing creditors.
If fraudulent motives cannot be imputed to the mere act of borrowing in order to pay debts, as most clearly it cannot, we are to inquire whether the allegation can be sustained because a trust, rather than some other instrument, was selected as the mode of security. I speak now of the general and essential nature of the trust as a security, and not of its particular provisions. We are to observe that the property embraced in the trusts consisted wholly of choses in action, and therefore it was never liable to legal process. The trusts, therefore, did not withdraw it from execution, and as to the residuary interest in the fund, that could be reached in equity precisely as it could be if the transaction had been put in any other form. A direct pledge or mortgage was *126 clearly impracticable, and in principle there is clearly no reason for saying that either of those modes of assurance should have been resorted to rather than a trust deed. Any one of these forms would necessarily encumber a portion of the corporate estate, but if that was unlawful, then borrowing and lending upon security must cease when the borrower is already in debt.
I repeat, that, so far as any question of fraud is concerned, it was indifferent whether the company secured the proposed loans by a pledge, a mortgage or a trust. In Leitch v. Holister (4 Comst., 211), this court sustained an assignment, by a debtor, of a chose in action, to several of his creditors jointly, to secure their separate demands, but reserving the surplus to himself. It was not, like these trusts, a security for raising money to pay all debts, but a preferential assignment to secure a party only, with no provision for the residue. Judge Gardiner, delivering the opinion of the court, seems to have considered the instrument as a mortgage; which may well be doubted. But the distinction was plainly of no value, as will be seen from his remarks. He observed: “The property assigned was a chose in action. The complainant acquired a lien upon the interest of the assignor the moment his bill was filed. He was then at liberty to redeem or require a sale, subject to the rights of the respondents [the assignees], or compel an application of the surplus upon his own debt.” “ He has, therefore, not been hindered or sustained any injury other than that he has been postponed to other creditors equally meritorious with himself.” This reasoning, which appears to be entirely sound, obliterates all possibility of distinction, upon a question of fraud, between a trust and any other instrument, where, either from the nature of the security or of the property, the debtor’s interest can be reached in equity only. It cannot be said that a trust withdraws property from execution at law which was never liable to it; and as to the equitable remedy, that is the *127 same, whether the property is encumbered by a technical trust, a mortgage or a pledge.
The question of fraud, then, so far, stands thus: The company intended and hoped to pay its debts and go on with its business. To that end it determined to borrow a million and then a half million of dollars. In all this there may have been delusion and folly but clearly no fraud. It also determined to secure the loans by trust deeds conveying to trustees a certain portion, suitable in amount, of the securities for money which it possessed and which could not otherwise be realized in cash; and we have also seen that this was a mode of proceeding in principle quite as unobjectionable as any other. Where, then, it may be asked, is the fraud, so long as the law allows a debtor, in the hope of paying his debts, to borrow money and give a special security for the loan ?
But the argument on this question was understood to rely upon special reservations in the deeds for the benefit of the company. Instruments containing such reservations in favor of debtors have been so often set aside that unless we discriminate we are liable to conclude that they are fraudulent and wrong in their own essential nature. This is entirely a mistake. In and of themselves they are perfectly innocuous.
A man proposing to create a security upon his estate, or to assign it upon any trust, has a plain right in general to reserve to himself just such interests and benefits as he and those with whom he is dealing can agree upon. The law upon this subject is entirely adapted to the dealings of mankind.
If the owner makes a purely nominal conveyance of his personal estate, reserving to himself the entire use, then there f is no reason of convenience or necessity for giving any effect to the transaction. It is simply ineffectual, without regard , to motives. On this idea is founded the statute of personal j trusts where the use is wholly to the grantor. But in the I business of every trader exigencies will arise requiring a | pledge, a mortgage or some other assurance less than an *128 absolute sale, founded on some actual dealing, the very nature of which implies that some residuary or partial interest remains. Such instruments must, in the very necessity of things, take effect according to their terms, and the law, therefore, gives them effect. It permits most assuredly an inquiry into motives; but as such transactions are in their nature innocent, it pronounces no judgment that they are fraudulent until the fraud is made to appear. To say that such assurances are ever fraudulent in law, is an inaccurate use of language. If they were so, then the law would in all cases defeat what it most certainly tolerates, and dealings of every day’s occurrence would be void. Where besides the reserved benefits, certain other facts appear, an 1 only then, the law may declare a presumption of fraud, an this is the full extent to which it goes.
These principles, which are elementary, may be illustrate) 1 by the trust deeds now in question. We may take the million trust, as the two are alike. It declares that this company has issued its bonds for sale, in England, to the amount of $1,000,000; that the company, actuated by a desire to secure the payment of said bonds to the holders, has transferred certain specific securities, set forth in a schedule, to certain trustees for that purpose; and thereupon the trustees agree that they will hold such securities for such purpose. Then follows a provision that the securities shall be held in trust for the company until default in paying interest or principal upon the bonds, which is plainly limited, however, in the same sentence, to a trust for the mere purpose of allowing the company, until such default, to receive the interest accruing on the securities pledged. Then follow appropriate powers given to the trustees, to be exercised, after default, in converting the estate assigned and applying the proceeds to the payment of the bonds, among which are powers to raise money by a sale or borrow it by a pledge of the securities assigned. Inasmuch as moneys might become due on the securities during the existence of the trust, the *129 trustees are very properly authorized to make the needful collections, to be reinvested in other similar securities. The final trust declared is to return the fund to the company or hold it subject to its order after the million bonds are paid. This is the whole scheme, as disclosed in the trust deed, and what does it show ? Simply, that this company, wishing to borrow a million of dollars, for that purpose issued its nine hundred bonds, and placed in trust specific securities for their payment. In this there is plainly no appearance of fraud upon creditors, for the instrument does not disclose that there were any. On its face the transaction is entirely free from objection, so far, I mean, as questions of fraud are concerned. The several details, so far as I am able to judge, are precisely adapted to the end in view $ no one of them will justify a suspicion of any other view. As to the reservations for the use of the corporation, so far from being extraordinary, it would be extraordinary if they had not been inserted. The important one is the final trust to return the fund to its author. But what else should be done with it, when there was no longer any reason for keeping the trust in existence ? If the parties had not so stipulated, the law would have so declared. The only answer which can be suggested is, that the instrument should have gone further, and declared other trusts devoting the fund, except so far as pledged to the bondholders; to the payment of existing debts. But to this the reply is, that the company was not proposing, to wind up its affairs and assign for the benefit of its creditors. The suggestion of further trusts for creditors is inconsistent with the nature and objects of the transaction. The scheme was not to secure creditors, any one or all of them, by an insolvent assignment, but to obtain money and pay them all. When we look out of the trust deed, as we must, in order to find any fact on which to base a suspicion of fraud, we find a distinct -and well-defined plan for going on with business and paying debts. We may charge infatu *130 ation and folly; but we cannot charge fraud. That element cannot be found either in the instrument or out of it.
These trusts, then, although unusual in their magnitude, so far as any question of principle is concerned, belong to an innumerable class of dealings which take place in all communities where people engaged in various pursuits of life borrow money upon special security. The obnoxious feature is supposed to be in reserving uses and benefits out of the estate pledged; but it has not been contended that men and corporations cannot borrow money for legitimate uses, upon a pledge of property, without, at the same time, declaring further trusts in favor of their creditors. Yet to that result the argument against these trusts inevitably comes.
If this corporation had contemplated insolvency and a closing up of its concerns, and we were able to say that through the reservations in the trust deeds, it intended to tie up and place beyond the reach of its creditors any portion of its effects for its own use, then we might pronounce them fraudulent. But these conclusions would be directly contrary to the facts of the case. The danger of insolvency may have been very great, but we know it was not in fad contemplated. The corporation was forced into liquidation more than a year afterwards. It could not have intended to reserve a fund for its own use in defiance of creditors, for it is impossible to say that securities were pledged to any greater amount than was imperatively required in order to obtain the loans proposed. And there is a further difficulty in the way of imputing such a design. In what way, it may well be asked, could this corporation fraudulently set aside .a fund and use it, in a state of insolvency, with its creditors kept at bay ? The difficulty is in inventing some mode of corporate existence, sustained only by a reserved fund, with its creditors unpaid. Private debtors often resort to such expedients, and sometimes live in splendor on estates which justly belong to their creditors. Now, I suppose that an artificial being may, in judgment of law, intend to defraud
*131 its credible. But this company was an incorporated bank (so it hai been assumed throughout), and its very life depended on the punctual payment of its debts. When it ceased to pay, it ceased to exist. It could not prolong its operations for a single day, and it could have no possible use for a fund fraudulently kept from the reach of its creditors. Before a fraudulent intent can be imputed, it seems to me that some possible mode of using and enjoying the fund reserved, while creditors remained unpaid, should be suggested.
It can only be necessary to observe, further, that all the cases relied upon in support of this objection, are distinguishable by features which are fatal to the analogy supposed. The leading cases cited are Mackie v. Cairns (5 Cow., 549); Grover v. Wakeman (11 Wend., 187); Goodrich v. Downes (6 Hill, 440); Barney v. Griffin (2 Const., 365). In all these, and in all others of the class, it will be found that the assignor was an insolvent or failing debtor. In none of them was it the design or purpose of the instrument to raise money and pay debts. In all of them the assignment was of itself an act of voluntary bankruptcy, and not, as here, a scheme to raise money in a crisis for the very purpose of averting bankruptcy. In those cases the insolvent or failing debtor-conveyed the whole, or the mass of Iris estate, either for the benefit of only part of his creditors, leaving the other portion unprovided for, either in the trust or in other property not assigned, or, if all were provided for, it was only done on condition of a release or some other benefit to the assignor. In some of them the claims of creditors were made expressly subject to a reservation for the support of the debtor and his family. In others, while a part of the creditors were not embraced in the trust, the surplus of the estate was reserved to the debtor. But it may be safely affirmed that no decision was ever made annulling a conveyance solely and merely on the ground that it contained provisions in favor of the grantor. In themselves we have seen that such provisions are lawful. *132 and that they enter of necessity into all dealings between the borrower and lender on security. But when they are made in favor of an insolvent, who winds up his affairs by an assignment of his whole estate, then they have been justly regarded as high and sometimes conclusive evidence of a fraudulent design.
The principle, indeed, which runs through this whole branch of our law, is, that when a trader or dealer fails, and proposes to put his estate in trust, he must devote the whole of it, immediately and unconditionally, to the payment of his debts. It is only on those terms that he is allowed to withdraw it from the ordinary process of the law. He must reserve nothing to himself, but must give all to his creditors. The principle is sound, but it is not to be applied to transactions of a totally different nature. It is not a principle which interferes hi the honest arrangements which a person in debt may make to remove present embarrassments and go on in business. He may, like other men, in good faith, mortgage, pledge or put in trust his estate or a portion of it to raise money for such purposes, and when he does so, all the accustomed forms of dealing require that the uses of the conveyance should be declared, including the reversion to himself after the obligation is discharged. Such was the real nature of these trusts, and I can see no more reason for applying the principle stated to them than to the common transaction of pledging shares of stock to obtain at a bank the discount of a promissory note.
Having now examined all the objections, my conclusion is that the million and half million trusts are legal and valid; and that the several holders of the bonds are entitled to be paid out of the property and funds embraced in those trusts.
This is a conclusion which necessarily affirms the validity of the debt of the Palmers & Co., who are, as we have seen, pledgees of a portion of the bonds. The principles involved in that branch of the case were considered by this court in the case of The State of Indiana, and they are also now dis *133 cussed in the opinions of some of my brethren. The judgment of the supreme court must be affirmed, with some modifications, which will slightly reduce the amount of the Palmers’ debt.
Johnson and Bowen, Js., concurred in this opinion, in respect to the propositions adopted by the court, which will be found at the close of the opinions, post.
Brown, J.
When it was judicially ascertained that the associations formed, pursuant to the act of the 18th April, 1838, to authorize the business of banking, were bodies corporate, it followed, as a consequence, that they were also subject to the provisions of the statute concerning moneyed corporations. (1 R. S., 601.) Such is the judgment of this court in Talmage v. Pell (3 Seld., 328), as expressed in the first resolution. The learned judge who delivered the opinion declined to consider whether the certificates of deposit were promissory notes payable on time and void under the first and thirty-fifth sections of the safety fund act, or whether the assignment in question in that action was made when the corporation was insolvent or in contemplation of insolvency. He placed the decision solely upon the want of authority to traffic in stocks, or to purchase them as a means of obtaining money to discharge existing liabilities. The resolution, however, expressly declares that these associations are moneyed corporations, within the meaning of the statutes relating to such .corporations, and are bound and affected by those statutes, except so far as they are inconsistent with the provisions of the act to authorize the business of banking, or the act amending the same. (Gillet v. Phillips, 3 Kern., 114.) In Gillet v. Campbell (1 Denio, 520), an opposite opinion was held. The same judge, however, who delivered it, when he came afterwards to pronounce the judgment in Gillet v. Moody (3 Comst., 479), was not entirely certain that it stood on a firm foundation. *134 Indeed, I do not see how this conclusion could have been avoided. The fifty-second section of the title concerning moneyed corporations (1 R. S., 599), declares that the provisions of the title “ shall be construed to apply to every moneyed corporation created, or whose charter shall be renewed or extended after that time, unless such corporation shall be expressly exempted from this title in the act creating, renewing or extending such corporation.” The act of the 18th of April, 1838, must be deemed to have been passed in view of this provision, and the moment the banking institutions formed under it were found to possess the powers and attributes of corporations, and were, in fact, corporations, the result was inevitable that they were subject to the regulations made to prevent the insolvency of moneyed corporations, and to secure the rights of their creditors and stockholders.
The first subject which I shall consider in the progress of this investigation is, the force and validity of the trust deed, and the assignments of the bonds and mortgages, which are parts of the same transaction. It is, under these deeds, that the trustees and the Palmers, and other creditors through them, claim the bonds and mortgages which are the subjects in controversy in both actions. The counsel for the receiver insist that they are void, because not authorized by a previous resolution of the board of directors of the bank. Section eight, of the act concerning moneyed corporations, declares “ that no conveyance, assignment or transfer, not authorized by a previous resolution of the board of directors, shall be made by any such corporation, of any of its real estate, or of any of its effects, exceeding the value of $1000.” [The learned judge here states the facts substantially, as on p. 22-23, ante,and proceeds.] The resolution of the 6th of January authorized the issue of the bonds to the amount of one million of dollars. It appointed the time from which they were to draw interest. It also authorized the assignment of the bonds and mortgages to trustees to secure tire *135 payment of the money mentioned in the bonds, and did not define the amount of the security, otherwise than by the direction to make it as nearly equal to the sum proposed to be borrowed as practicable, thus leaving it in the discretion of the officers of the bank. The trust deed of the date of the first of February was unlike that of the date of the first of January, in these particulars only: in its date, in the time from which the bonds were to draw interest, and in the names of two of the trustees. One new provision was introduced into the deed of the first of February: the names of John Horsley Palmer, Thomas Dent and James Mackillop, residents of London, and members of the Palmers firm, were inserted as trustees to receive for the bondholders the proceeds of the bonds and mortgages, upon default being made in the payment of the bonds. In respect to the choses in action, assigned as security, the amount by the last arrangement was increased by the additional sum of $200,000, power to determine the amount being given to the officers of the bank by the terms of the resolution. The sole point of inquiry is whether the resolution authorized the transfer of the bonds and mortgages for the uses indicated in the deed. Whether the action of the officers of the bank, in giving effect to the resolution, conformed to its strict letter in other respects is a matter of no moment. The prohibition of the eighth section of the statute is against the transfer of the property without a previous resolution. As to the manner and the objects to be attained by the transfer, or the persons who were to take the property, these are matters in which the sectim takes no concern. If the resolution was authority for the disposition afterwards made, of the mortgages, then no act has been done which is forbidden by the eighth section of the act, and the trustees and the ccstuis que trust may hold them, provided their title be good in other respects. I see nothing unreasonable or unusual in the addition, which the officers of the bank found it convenient to make, to the bonds and mortgages transferred at the time *136 of the execution of the first deed. The amount to be covered was $1,000,000. The loan was to be obtained in a foreign country, from strangers. Without taking into account the difference of exchange, the property transferred as security was more greatly in éxcess of the money to be borrowed than is usual in such transactions. The directors saw this, and provided for 'it, declaring in their resolution that the amount of the property transferred as security should be as near the sum proposed to be borrowed as might be practicable. It is not safe to say that the resolution did not authorize the transfer of the property. The. most that can be said is, that it was not transferred to the three trustees named ilr the resolution. Two of them were changed, and there was no previous resolution to authorize the change. The name of John L. Graham is found in all the deeds. He was an officer of the bank", enjoying the confidence of its directors and stockholders. Without stopping to inquire whether it was in the power of the board of directors to supply the entire want of the previous resolution, demanded by the eighth section, by subsequent ratification, as a natural person in like circumstances might have done, I am well pursuaded that, after the resolution authorizing the transfer of the property had been adopted, the mere change in the name of two of the three trustees, who were, to take and hold the property, might become the subject of subsequent ratification and confirmation by the directors, so as to make the transfer operative and valid in law.
The final million trust deed, dated February 1st, 1840, was executed by the parties of the first and second parts in the city of New-York, on the twentieth of April of that year, and forwarded to the Palmers in London for execution at the same time. Before the third of June following, its execution by all the parties was complete. The bonds were also changed so as to refer to Blatchford, Graham and Curtis as trustees, in place of Beers, Graham and Tylee. The alterations to which I have referred, in the several instruments, *137 were effected in pursuance of resolutions of the committee of investments and finance, who were charged with that part of the company’s business. Numbers of these bonds were negotiated and the money advanced upon them, which was received by the company and appropriated to the uses of its business, while others of them were pledged by direction of the company, as security for the payment of moneys advanced to meet the company’s bills and pay its certificates of deposit. At this time the Palmers in London held state stocks to the amount of 6100,000 sterling or thereabouts, the property of the company, as security for money advanced and liabilities incurred for its benefit. Some of the bonds issued under the trust deed were left with them as a substituted security for the state stocks which were then sold for the company’s benefit. All these transactions were made upon the faith and security of the trust deed and the assignment of the bonds and mortgages. Three resolutions were also adopted by the board of directors, and entered upon their minutes after the execution of the various instruments: one on the 14th of June, one on the 30th July, and one on the 5th August, 1840, in which Blatchford, Graham and Curtis are recognized as the trustees in the deed. Can the corporation take to its own use the moneys realized from third parties, upon the faith of its validity, and then repudiate the authority by which it was created ? If the act done was within the power of the corporation, it must fall within the law of ratification and confirmation, so universally applied to the conduct of those who maintain towards each other the relation of principal and agent. This law should apply with quite as much force to corporate bodies as to natural beings, because, in respect to the latter, the principal may and often does act without the intervention of an agent, and in case of doubt recourse may be had to the principal himself. Not so with an artificial being. It can only act by and through its officers. In one sense they are the agents, in another sense they are the corporation itself. In respect *138 to persons and things outside of its own organization, to all the world, beside its own members and stockholders, the acts of the officers are the acts of the corporate body. It cannot be represented by its stockholders. No vote, resolution or action of theirs is of any avail in its commerce 01 intercourse with other persons. It is a fundamental condition of its existence that it can only act by its officers and directors ; the stockholders m their collective capacity can do no corporate act. So that, unless we are prepared to say that the acts of -the officers and managers of a body corporate, fairly within the scope of the corporate power, not forbidden by any statute, and which contravene no rule of public policy, but which are simply in excess of their authority, are incapable of ratification and confirmation, then the changes effected in the trust deed must be deemed to have been approved and confirmed in the fullest manner. (Story on Agency, 2 ed., § 239, 244; Davis v. Shields, 24 Wend., 322 ; Lawrence v. Taylor, 5 Hill, 107 ; McCullough v. Moss, 5 Denio, 567 ; Farmers' Loan & Trust Co. v. Walworth, 1 Comst., 433.) The eighth section demands a previous resolution to effect a transfer of the property. The exception, however, which immediately follows, saving transfers in the hands of a purchaser for a valuable consideration and without notice, shows that it was not intended to make the transfer, unsupported by a resolution, absolutely void. The holder, whether he takes directly from the officers of the corporation or from a third person, may always show, in support of his title, that he purchased for value and without notice. And unless it can be established that these bodies are hedged in by some special immunity, and are not subject to the laws of justice and equity which apply to natural persons, he may also show that the corporation, with a knowledge of the circumstances, acquiesced in the sale, and took to its own use the purchase money, or did any other act equivalent to a recognition and ratification of what its officers had done. If I am right in my conclusion, that there has been a *139 substantial compliance with the requisition which demands a previous resolution, it is not worth while to inquire whether the bondholders are purchasers within the meaning of the exception.
The ninth section of the same title, concerning moneyed , corporations, avoids every “ conveyance, assignment, transfer, payment made, judgment suffered, lien created or security given by any such corporation, when insolvent or in conteniplation of insolvency, with intent to give a preference to any particular creditor over other creditors.” The insolvency, or the contemplation of insolvency, with the intent to give the preference, at the time the trust deed was executed and the bonds and mortgages assigned, are facts relied upon by the receiver, to defeat the title of the trustees and those claiming through them. These facts must be established by the proof. The onus rests upon him. The bank must be shown to have been insolvent, or to have contemplated insolvency, on the 20th of April, 1840, that being the time when the transaction must be deemed to have been consummated. There must also have existed, at the time, an intent to give a preference, and this, too, whether the bank was actually insolvent .or merely contemplated insolvency. Generally, the qualifying words relate to the immediate antecedent, unless the sense requires a more extended application. Here, the object of the statute manifestly is to prevent preferences while insolvent or with a view to insolvency, and the qualifying words must apply to each of the predicates. Otherwise, an - act done for an honest and laudable purpose, even a payment made in the ordinary course of business, with no suspicion of the inability of the corporation to meet all its engagements, could be vacated and avoided by the subsequent discovery of insolvency. If the term insolvency, as applied to this and like institutions, signifies the want of cash or available cash resources with which the bank could have paid its debts and liabilities, outstanding at the time, then it was not solvent. It is not pretended, indeed it could not *140 be said with any degree of truth, that it had anything of the kind. Its capital consisted, almost exclusively, of bonds and mortgages upon real estate, a kind of property, valuable, it is true, but inconvertible, and incapable of being applied to the payment of liabilities at the counter of a bank. If this want of cash, or resources immediately convertible into cash, constitutes insolvency within the meaning of the act, then most of the banking institutions formed under the act of ' 1838, were insolvent at the time referred to ; for it is notorious that they were without the present ability to meet their liabilities, if suddenly and unexpectedly called upon for payment. I assume, for the purposes of this argument, what the proceedings in these actions, on both sides, affirm, that to acquire the bonds and mortgages, in exchange for its capital stock, was a legitimate exercise of corporate power. Indeed, the act of 1838 seems to have contemplated that the stock of these banks might consist of bonds and mortgages, state stocks or some equivalent not more convertible; for section thirty-three declares that no association shall at any time, for the space of twenty days, have on hand at its place of business less than twelve and a half per cent in specie on the amount of its notes in circulation as money. This provision implies that the rest of the capital might be represented by something else beside specie, without exposing the bank to the disabilities of insolvency. It might be invested in bills discounted, in balances due from other institutions, in stocks of the different states, or in bonds and mortgages acquired for the uses contemplated by the act. The term insolvency can mean nothing less than the inability of the company and the inadequacy of its property to pay its debts, and not a present inability to pay in cash or its equivalent. This construction results from the language, as well as the object, of the section under consideration. That object is to prevent undue preferences, and insure equality amongst all the creditors. If the property is sufficient to pay all, the payment to one does not prejudice the others. The assets may be *141 presently unavailable, because presently inconvertible. That is not insolvency which furnishes sufficient means' for the ultimate liquidation of all the debts. An undue preference amongst creditors means the giving to some that which the debtor withholds from and has not the ability to give to others. Surely upon a bill filed to set aside a payment made or security given, and for an equal distribution upon the ground of insolvency and undue preference, it is incumbent upon the plaintiff to show that the property undisposed of and within the reach of the unpaid creditors is insufficient to satisfy their debts. Anything short of that does not establish the insolvency referred to in the act. The primary and ordinary sense of the term insolvency is, “the inadequacy of a man’s funds to the payment of his debts.” ( Bell’s Com., 1G2.) The meaning of the word as used in the English bankrupt laws has been the subject of some difference of opinion among the highest judicial authorities. Some hold it to mean the inadequacy of the bankrupt’s entire property to pay the demands to which he is subject, while others insist that he is insolvent “ when his means of present payment are so crippled and his embarrassment is so great that he cannot proceed with and carry on his business in the usual course of trade.” (De Tastet v. Le Tavernier, 1 Keen, 161; Hémele v. Borst, 4 Hill, 650; and authorities cited.) Such a condition as would be deemed insolvency under the bankrupt laws, or which would justify the issuing of an injunction against a banking incorporation upon the grounds of insolvency, falls short of the actual insolvency requisite to avoid a security or a payment made with a view to a fraudulent preference. In the latter case the actual insolvency, the intent to give the preference, and the preference actually obtained to the prejudice of unpreferred creditors, would be indispensable preliminaries to the setting aside the security or the payment and a distribution amongst all the creditors. To this effect is the opinion in Gillett v. Philips (supra), wherein it is said that “when a moneyed *142 corporation is insolvent in such a sense that all its debts can not be discharged from its assets, the payment of one creditor in full is a preference within the meaning of the statute.”
To avoid the payment or transfer upon the other ground mentioned, in the section, there must have been a design to give a preference and a contemplation of insolvency. Contemplation is an operation of the mind, a purpose, an intention. The object of the law is to insure an equal distribution of the assets of an insolvent corporation amongst the creditors. The intention to give a preference and become insolvent defeats this end. They are voluntary acts. Payments made under the pressure of importunity, or transfers made with a view to raise money in the hope of a successful prosecution of the business, could not be regarded as manifestations of the unlawful intent. Indeed I do not perceive how a sale or mortgage of property to obtain money, while it is actually appropriated to the uses of the company in the prosecution of its legitimate business, could be esteemed evidence of a design to give a preference. If the object of the law is to insure equality amongst the creditors, the preference must be given to a creditor, and the payment or transfer made to satisfy or secure a preexisting debt. [The learned judge here cited from Fidgeon v. Sharpe, Crosby v. Crouch and Everett v. Stone, passages defining the intent to give a preference in contemplation of bankruptcy, quoted for the same purpose by Comstock, J., ante, p. 109. He then discussed, at some length, the evidence in relation to the insolvency of the company, and the knowledge of its officers upon that subject, and then proceeded.] It is not easy to resist the conclusion that the weight of the evidence is in favor of the solvency of the company at the time the trust deed and the transfers were made. In 1841, Strong, Davis and others of the directors, purchased no inconsiderable amount of the company’s stock. Loans of money were made to it by other directors, and some of them guaranteed the payment of loans of money obtained from strangers.
*143 These proofs, although of no great weight in themselves to establish the ability of the company to meet its liabilities and pay its debts, go far to show the good faith of the report of the 23d of December, and to repel the idea that the directors contemplated insolvency. Indeed, the correspondence with James B. Murray, the company’s agent in London, and other contemporaneous acts of its officers and directors in New-York, exhibit the most entire absence of a design to become insolvent, or to give an undue or fraudulent preference. The object of the trust deed was not to pay or to secure the payment of a precedent debt. Those who were to become holders of the bonds and cestuis que trust, under the deed, were not creditors of the company until they had parted with their money. And when the proof shows that the object of the transaction was to borrow money for the uses of the company, to which uses it was applied as soon as received, does it not effectually repel the idea of insolvency and a design to give a fraudulent preference? A decision which would defeat and destroy the lien of the bondholders upon this ground, under the circumstances presented by the proofs, would be at variance with reason and good sense. It cannot have my sanction.
It is not claimed that the proof makes out an actual fraudulent purpose in the execution of the deed, but it is said that it is fraudulent, per se, being made in trust for the use of the grantor. The object of the deed was to obtain money upon the bonds. It took the form of a trust, but was, in fact, a mortgage, and, like any other mortgage, made to secure the payment of money to be borrowed. Until the money was obtained it did not have effect. Until that time the transaction was inchoate and incomplete, and subject to the revocation of the company, and consequently to all the claims of the company’s creditors. The conveyance and transfer, as soon as it took effect, was not wholly for the use of the company. That was not its principal or priman end. The primary trust in the deed was to secure the pay *144 ment of the bonds which should be negotiated; and the securities transferred, and the moneys to be realized from them, were to be held in trust until such bonds of the company, as should be negotiated, were paid. After that, there was the further trust to return the securities pledged or the proceeds of them to the company, or make such disposition of them as the company should direct. Without this resulting trust, either express or implied, for the use of the mortgagor or pledgor, it is difficult to perceive how property, real or personal, can be mortgaged or pledged to secure the payment of a debt. The trust to restore the thing mortgaged or pledged to the mortgagor or pledgor, when the condition is fulfilled is the distinguishing feature between an absolute and a con ditional sale. Without the resulting trust for the use of the grantor, the whole title would vest in the grantee or assignee and the sale would be absolute. A trust for the use of the assignor, in a deed of assignment for the payment of debto, does not, per se, vitiate the instrument. In itself, such a trust may be wholly inoffensive; but if, in addition to a benefit to the grantor, it may operate to the prejudice or injury of the creditors, then it taints the whole instrument and renders it void. The principle is well expressed by Chief Justice Savage, in Wintringham, v. La Foy (7 Cow., 735): “ But it is contended,’’ he says, “ that the provisions for reassignment or repayment of the surplus of the proceeds, after payment of all the debts, renders the assignment void. This is a mistake. In the case of Mackie v. Cairns (5 Cow., 547), the assignment was held fraudulent and void, because it contained a provison in favor of the insolvent debtor, to the exclusion and prejudice of the creditor. Not so here the debtor is to derive no benefit from the property assigned, till his debts are paid. This provision is precisely what he would have been entitled to if nothing had been said about °it in the assignment.” Grover v. Wakeman (11 Wend., 189), was an assignment upon trust for the payment of debts, coupled with an attempt, apparent upon the face of the *145 deed, to extort a release as a condition of a preference. The Chancellor and the Court of Errors held the deed void, because it contained a trust for the benefit of the assignor, and to the prejudice of the creditors. Judge Sutherland, speaking of the debtor’s right to assign and give preferences, says: “ He may assign the whole of his property for the benefit of a single creditor, in exclusion of all others, or he may distribute it in unequal proportions either amongst a part or the whole of his creditors. No matter how or upon what principle the distribution is made, if the debtor devotes the whole of his property to the payment of just debts, neither law nor equity inquires whether the objects of Ms preference are more or less meritorious than those for whom he has made no provision. Whenever they (assignments to pay debts) depart from the simplicity of a direct and unequivocal devotion of the property of the assignor to the payment of his debts, and contain reservations and conditions intended for ease and advantage, they are viewed with considerable, and I may add, in. view of the course of judicial decisions in the state, with increasing distrust.” Senator Tract, in the same case, also says: “Upon every moral principle the property of an insolvent belongs to his creditors; and, although the law tolerates him in distributing it amongst them, according to his notions of right, yet it will not tolerate him m locking it up, in order that in its final distribution he may secure a future benefit to liimself. In short, while the law permits a debtor to prefer one creditor to.another, it will not permit Mm to prefer himself to any creditor.” So, in Goodrich v. Downs (6 Hill, 438), Justice Bronson, speaking of the debtor, says: “ He may prefer one creditor, or one set of creditors, to another; but if he secures anything to himself before all the debts are paid, or attempts to extort anything from the creditors as a condition to their receiving the property, the transaction cannot be supported. Deitch v. Hollister (4 Comst., 211), asserts the same principle. “ If a part of the fund,” says Judge Gardiner, “ is assigned for the benefit of pre *146 ferred creditors, and a trust as to the surplus, after their payment, is created for the use of the assignor, it is obvious that the creditors who are excluded, some or all of them, must be delayed and injured. As the whole fund would be insufficient for the payment of all the claims upon it, the dividend of those excluded from the assignment must be diminished by just the amount of the surplus secured to the debtor. In the meantime, the whole interest in the property from which it is to be raised, vests in the trustees, and is withdrawn from the reach of process, and the creditors thereby delayed until the winding up of the trust. Cases of this kind, it seems to me, are within the spirit, as they certainly are within the letter of the statute, which declares all conveyances, transfers or assignments of goods or things in action, made in trust for the use of the person making the same, shall be void against creditors existing and subsequent.” He adds, that neither the principle to which' he adverts, nor the statute, applies to assignments, made in good faith, of a part of the debtor’s property, to creditors themselves, to secure their debts. I quote this part of the opinion to show that the trust is condemned, not because it is for the use of the person making it, and so within the personal statute of uses, as it was termed upon the argument, but because, in addition, it excludes some of the creditors from the benefit of the fund, and thereby hinders and delays them, and makes out the fraudulent intent. I omit to notice numerous other cases upon the briefs of the learned counsel, in confirmation of the same doctrine. How, indeed, can any other obtain? Every mortgage of personal estate contains a trust for the use of the mortgagor, a trust to pay over the surplus after the mortgage debt is satisfied. And every deed, transferring personal estate upon trust, for the payment of debts, contains a similar trust for the use of the grantor, express or implied. After the payment of all the debts, the surplus, if there is any, results, by operation of law, or more usually by express provision, to the use of the grantor. So that these instruments, with such a *147 trust upon their face, are not obnoxious to the statute and vicious unless it also appears that the trust will operate to the prejudice and injury of the creditors. This view is n conflict with that expressed by Mr. Justice Bronson, in Goodrich v. Downs (supra). He held that the trust in that case for the use of the assignor was within the first section of the personal statute of uses. (2 R. S., 135.) He certainly was quite right in his condemnation of the deed, for it assigned certain wood, and nearly all the other property of the debtcr in trust, to convert the same into money, and apply the proceeds to pay four of his creditors, the surplus to be paid over to the assignor. There was no provision for the other creditors, and the deed was assailed by one having a judgment at the time it was made. There was not the slightest necessity for invoking the aid of the personal statute of uses to overthrow the deed, for the intent to hinder, delay and defraud was manifest. The learned counsel, Mr. O’Conor, showed, I think, upon the argument, that in all the cases which have come up in our courts, and they are very numerous, to say nothing of those in the courts of other states, until that of Goodrich v. Downs, whenever similar deeds have been declared void, because of the presence of a trust for the use of a maker, it was upon the ground that such a trust was proof of fraudulent intent, and not because it was within the first section of the personal statute of uses. The aid of the latter statute, it is believed, has never, until Goodrich v. Downs, been called in for such a purpose. This branch of the law has been repeatedly and thoroughly examined, and greatly illustrated since the case of Sturtevant v. Ballard (9 John. R., 337), decided in 1812. The best minds within the bar and upon the bench have shed upon it the light of them learning and wisdom. But if the doctrine announced in Goodrich v. Downs is sound, and contains the true rule, then their labors were misapplied and their faculties misdirected, for the presence of the' usual trust, in the surplus, to the use of the maker, was enough to avoid the deeds without regard to *148 the intent or the object or the tendency to hinder and delay. The words of the act (2 R. S., 135, § 1), to which the learned judge refers, are as follows: “All deeds of gift, all conveyances and all transfers or assignments, verbal or written, of goods, chattels or things in action, made in trust for the use of the person making the same, shall be void as against creditors, existing or subsequent, of such person.” There is not one word about intent, or object or purpose, or excluding, delaying or injuring creditors. The effect of the trust is not a subject for consideration. Its mere existence avoids the transfer and destroys the title as against creditors existing or subsequent. The argument leads to this conclusion: although the deed devotes all the property of the debtor to the payment of debts, although it imposes no conditions, and makes no reservations for the benefit of the grantor, the moment a general creditor can point with certainty to the trust in the surplus for the use of the maker, then the statute has effect and the transfer falls to the ground. In MacJcie v. Cairns (HopJc., 373), Chancellor Sanford’s opinion contemplates a different construction, and exhibits the true nature of the trusts condemned by the first section: “ A conveyance by the owner of property to another, in trust for -himself, is in effect a conveyance to himself, and such a measure can never be necessary for any legal or honest purpose. He who having the full title desires to retain the control and use of his property, and yet transfer it to another, to be held for the use of the grantor, can, in the general course of human actions, have but one motive for that measure, and that motive must be to defeat or elude the claims of others. Hence, all conveyances to the use of the grantor, are fraudulent and null against creditors and others having just claims upon the grantor, or upon the property conveyed. In all the refinements of uses and trusts, in the midst of multiplied distinctions between legal and equitable interests, which have abounded in the progress of English jurisprudence, this principle has never been *149 doubted, and the mockery of a transfer by a debtor of his property, to be held for the use of the debtor, has never been allowed to defeat the rights or remedies of creditors.” These observations exhibit the true rule of construction, and show that the trusts referred to in the section are those mere passive trusts, exclusively for the use of the grantor, and where the title of the trustee is purely nominal, and the grantor is to retain the control and enjoyment of the property, and not trusts which are incidental, expressed or resulting to the use of the grantor, after the execution of primary trusts, active, commendable and lawful. A transfer of property upon trusts, to secure the payment of a precedent debt, or of money borrowed, or upon the trust to sell and convert into money, and apply the proceeds to the payment of debts, with the usual trust in the surplus to the use of the maker of the deed, is not a trust for the use of the grantor or maker, within the meaning of the first section of the personal statute of uses,- because its primary purpose is not to the use of the maker. It is an active trust, devoting the property to other .uses, to wit, the payment of debts or of the borrowed money, and whatever trust there Is for the benefit of the maker is purely incidental to the principal object. This court, in Leitch v. Hollister (supra), has in effect so held. Judge Gardiner, after referring-to the provisions of the section under consideration, proceeds to say: “ Neither the principle to which I have adverted, nor the statute, applies to mortgages made in good faith of a part of a debtor’s property, to creditors themselves, for the purpose of securing particular demands. The conveyance, whatever may be its form, is, in effect, a mortgage of the property transferred. A trust as to the surplus, results from the nature of the security, and is not the object or one of the objects of the assignment. The assignee does not acquire the entire legal or equitable interest in the property conveyed subject to the trust, but a specific lien upon it. The residuary interest of the assignor may, according to its *150 nature, be reached by execution or bill in equity. The creditor attaches that interest as the property of the debtor, and is not obliged to postpone action until the determination of the trust. He is, therefore, neither delayed, injured or defrauded in any respect.” And is not the residuary interest of the assignor—that is, his interest in the trust ‘for his use—in the case of an assignment of property to pay debts, equally within the reach of a creditor and equally applicable to the payment of debts ? And is the delay attended upon closing up the trust likely to be greater than in ascertaining and appropriating the surplus resulting from the mortgage ? I respectfully submit, however, that the bona fides of the mortgage, the nature of the title which the grantee takes, and the speed or delay in closing the trust, have little to do with the question. The inquiry purely and simply is, whether this class of trusts for the use of the grantor, which are not the object of the deed, but are necessarily incidental thereto, are within the first section of the act which forbids trusts for the use of the person making the same. Leitch v. Hollister was the case of a mortgage of a chose in action to secure a debt, reserving the surplus to the mortgagor. Its validity was put in controversy by a judgment creditor, upon the ground that it reserved a trust for the use of the maker. The court sustained the instrument upon the reasoning which I have endeavored to give. I cannot regard it otherwise, when taken in connection with the course of judicial decisions upon kindred subjects, than an authority in support of the trust for the use of the banking company in the deed of the 1st February, 1840.
Among the objections taken by the receiver to the bonds which it is the office of the trust deed to secure, is that of usury. At the sum at which they were taken by the holders, a rate of interest greater than that provided by the laws of this state or of England was reserved. They were actually sold in London, were made payable there in pounds sterling, the currency of Great Britain. The contracts must be deemed *151 to have been made there, as they certainly were to be executed there. They are, therefore, to be governed by the laws of that kingdom. To invalidate the bonds under the usury laws of Great Britain, it will be necessary, first, to establish that they are not specialties; that, being unsealed, they are promissory notes, within the case of Leavitt v. . Palmer. This is one of the disputed points in the case. The act of 2d and 3d Victoria, ch. 37, set out in the cross bill, and which was in force when these contracts were made, repealed the usury laws as to all bills and promissory notes not having more than twelve months to run, and also as to all other contracts foi the loan or forbearance of more than ¿£10, with a proviso that the act shall not extend to loans of money upon the security of lands, or of any estate therein. Without examining whether security upon lands in the United States brings the loan within the proviso, or whether the bonds were the principal subject of the contract, and the transfer of the mortgages only collateral thereto, and so within the principle of the English cases cited upon the argument, I think the receiver has been deprived, by a statute of our own, passed during the pendency of these actions, of the power to make any such defence. Our act to prevent usury, passed May 15th, 1837, is severely penal in its provisions. It is, in fact, a barbarous act, unworthy of the age and country where it is found, for it abrogated the just and equitable maxim, that a plaintiff, to entitle himself to equity, must do equity, and required the chancery courts to lend their aid to enforce a penalty or forfeiture. In section one, the usurious contract is declared void, whatever may be its form; and in section five it provides that whenever it shall appear, by the admissions or the proof, that any bond, bill, note, assurance, pledge, conveyance, contract, security, or any evidence of debt, has been taken in violation of the act, the court of chancery shall declare them void, and order them to be surrendered and canceled. Section six makes the taking of usury a misdemeanor, punishable by fine and *152 imprisonment. These features are brought out to show the penal and savage nature of the act, and for the purpose of giving point to the repealing statute of April 6th, 1850. It is entitled, “An act to prohibit corporations from interposing the defence of usury.” “No corporation,” says the first section, “ shall hereafter interpose the defence of usury in any action.” Section two declares, the term corporation shall be construed to include all associations and joint-stock companies having any of the powers and privileges of corporations. The receiver, in these actions, represents the company, and, in respect to the claims of the bondholders, can only make such defence as the company could make This latter statute does not create a debt, as is said by the receiver’s counsel, for that proposition assumes there is no debt, and that is the point in dispute. Prima facie, at least, there is a debt, for there is the written obligation of the bank acknowledging the existence of a debt, as there certainly is, also, a moral obligation to pay. Nor does the construction which makes the law retrospective, render it void. That depends upon its effect, whether it impairs obligations or takes away vested rights. Every right resting in perfect obligation is vested, and cannot be disturbed; but rights, arising under a statute, which are imperfect and inchoate, cannot claim any such immunity. For example, the right given to redeem under the statute of executions, was held to be taken away by a repealing act passed subsequent to the time when the right to redeem accrued. ( The People v. Livingston, 6 Wend., 526 ; The People v. Townsey, 5 Denio, 70.) The general rule of the common law is, that a statute shall be so construed as not to have a retrospective operation. (1 Bl. Com., 45 ; Bac. Air., Statute C\ Saclcett v. Andross, 5 HiU, 327; Palmer v. Conly, 4 Denio, 374.) In Butler v. Palmer (1 Hill, 324), where most of the authorities are referred to, Mr. Justice Cowes says: “ A number of cases have been cited by the counsel for the defendant, and some veiy strong ones, to show that any enactment of the *153 legislature, annulling contracts or creating new exceptions and defences, shall be so construed as not to affect rights of action existing at the time of the enactment. Cases were also cited to show that a statute in any way modifying the remedy of a party by action, shall never be so construed as to affect actions before the statute. But these are all cases relating to positive enactments; none of them arose upon a repealing clause.” “ The amount of the whole comes to this, that a repealing statute is such an express enactment as necessarily divests all inchoate rights which have arisen under the statute, which it destroys. These rights are but incident to the statute, and fall with it unless saved by express words in the repealing clause.” Butler v. Palmer involved the right of a judgment creditor to redeem, which was held to have been taken away by the operation of a subsequent statute. This case, and those there cited, are also authority for the rule that the effect of a repealing clause, upon a previous statute which imposes a penalty, takes away all right, to the penalty. If the repeal takes place after conviction, it arrests the judgment. Chief Justice Savage, in delivering the opinion in The People v. Livingston, indicates the rule in the following words: “For instance, the present statute prohibits gaming, and allows an action to be brought to recover back money won at play. An action is brought and ready for trial; the day before the circuit the legislature repeals the act; the suit dies because the court has no jurisdiction, and the party has no right to recover the money. Such right'.did exist, subject to the contingency of obtaining a judgment, and such jurisdiction too, existed, but both have been taken away because the means of enforcing the right no longer exists.”' The borrower can have no vested interest in the penalty or forfeiture which follows the proof of usury in an action where that defence is interposed. Whatever right he had was contingent upon the fact of the usury being established upon the trial. This the repealing act declares shall not be done. It makes *154 no difference whether the forfeiture is given to the borrower, to be recovered in an action, as under the gaining statutes, or whether it is given him by way of defence to an action brought to enforce the contract. The form of the remedy is of no moment. In either case it is the penalty which the law imposes upon the lender, which the borrower seeks to appropriate to his own use; and the act under which he hopes to effect this must be subject to the same rules of construction as other penal statutes. The effect of the act of the 6th April, 1850, is to repeal the statute of usury so far as it applies to corporations. The condition of this class of beings becomes the same as if the usury laws never existed. The title of the repealing act is significant. It is “ to prohibit corporations from interposing the defence of usury in any action.” The first section then declares, in a few short emphatic words, that the defence of usuiy shall not thereafter be interposed. It is the defence which is prohibited, The barrier wall, the place of strength which the usury laws set up between the lender and the borrower, is thrown down and leveled with the ground, whenever the borrower is a corporation. Henceforth the law offers no rewards for bad faith and broken promises to this class of contractors. The act is not limited to contracts thereafter to be made, or actions thereafter to be brought; but it declares, without -qualification, limitation or exception, that the defence shall not be interposed. Nor is the word interposed to be restricted to the time of serving the plea or answer. This would be a narrow interpretation. A defence is certainly interposed when set up in the answer, and in like manner it is also interposed when resorted to upon the trial, but the interposition is not complete until it is heard and disposed of at the trial. The object of the act is to take away from corporate bodies the defence of usury—a defence which most men have come to regard as immoral, mischievous and unjust. . It should have a liberal interpretation.
*155 In the several cases reported in the books, where the powers, rights and obligations of the banking associations have been the subjects of judicial decision, it is nowhere determined that they are within the prohibition contained in the thirty-fifth section of the safety fund act. (Laws of 1829, p. 173.) In Leavitt V. Palmer, the instruments did not profess to be anything else than promissory notes, payable on time, with interest, and they were held void under the fourth section of the act of the 14th of May, 1840, having been issued after it took effect. In Talmage v. Pell (3 Selcl., 328), the paper was in the form of certificates of deposit, negotiable, payable on time, given to the State of Ohio upon a purchase of stock to be resold. They were held to be promissory notes, illegal and void, because the bank had no authority to traffic in stocks. Judge Gardiner, who-delivered the only opinion, declined to consider whether they were void under the thirty-fifth section of the safety fund act. The certificates of deposit in the New-York Life Insurance and Trust Co. v. Beebe, were held to be illegal, because they were issued to be loaned in contravention of section four of the restraining act. (1 R. S., 600.) Judge Selden, in delivering the judgment upon the claim of The State of Indiana v. The North American Trust and Banking Co. (4 Kern., 178), assumes that associations under the banking law, even prior to 1840, had no power to issue negotiable paper on time; placing this assumption, however, not upon the safety fund act of 1829, but upon the general principles of law, which limit corporations to the exercise of the powers expressly given to them, or such as are necessarily incident thereto. Judge Mitchell, in the same case, assorts, upon grounds' which I think it impossible to controvert, that the safety fund act is not a general statute within the meaning of the resolutions of the court, adopted in Talmage v. Pell, and that the moneyed corporations, subject to the provisions of the act, are those only which contributed to the fund, and which existed, or should exist, *156 under the banking system which prevailed before the law of 1838 took effect. The bonds in the present actions were made and sent abroad, to be negotiated before the act of the 14th of May, 1840; and although some of them may have been finally negotiated by the company’s agent in London after that time, still, as the transfer took place in a foreign country, and they were taken in good faith and for value, in no aspect could the transaction be deemed within the prohibition of the fourth section. The prohibited securities are notes and bills payable on time, with interest. I shall presently attempt to show that these instruments were neither the one nor the other. They were not issued to be loaned, nor were they designed to circulate as money. They were payable abroad in sterling money, a currency unknown to the laws of this country. They had neither the form nor the substance of circulating notes, and were not convertible except into the stock of the association. In no sense, therefore, can they be regarded as issued in violation of the sixth section of the restraining act. I refer to these statutes for the purpose of showing that up to May, 1840, there was no legislative expression against the issuing, by the banking associations formed under the law of 1838, of obligations for the payment of money on time or with interest, and not intended to be loaned or to circulate as money, although such obligations should assume the form of promissory notes. Whether such an act was ultra vires is another question.
This brings me to consider what I have regarded as the principal question to be determined, and that is, the power and authority of these corporations to borrow money. If they have no such authority, then the transaction of obtaining the money and issuing the bonds is ultra vires, and cannot be upheld. But, on the other hand, if the obtaining money upon loan is an act fairly within the scope of the legitimate power of the association, then the contracts are legal and valid, and such as the law will execute and enforce.
*157 It is useless, at this day, to theorize and speculate upon the nature and the limits of corporate powers generally. “ The modern doctrine is to consider corporations as having _ such powers as are specifically granted by the act of incorporation, or as are necessary for the purpose of carrying into effect the powers expressly granted, and as not having any other.” (2 Kent's Com., 290.) The eighteenth section of the act of 1838, specifies most of the powers given to the banking associations, but not all. They shall “ have power to carry on the business of banking, by discounting bills, notes and other evidences of debt; by receiving deposits; by buying and selling gold and silver bullion, foreign coin and bills of exchange, in the manner specified in their" articles of association, for the purposes authorised by this act; by loaning money on real and personal security, and by exercising such incidental powers as shall be necessary to canyon such business.” The last clause is also to be found in the third section of the act in regard to the general powers, privileges and liabilities of corporations. (1 R. S., 600.) Sections one, two, three and seven, of the act of 1838, confer two "additional powers of very great importance; the power to convert their capital, or a portion of it, into state stocks, bonds and mortgages, and to deposit the same with the comptroller, in exchange for circulating notes, and the power to loan and circulate the same as money. Such notes are to be made payable on demand, at the place of business of the association by whom they are issued. The power to borrow money is not given m words or terms. If it exists at all, it is as an implied and not as an express power. The implied powers exist by virtue of the grant, and are not enumerated and defined; because no human sagacity can foresee what implied powers may, in the progress of time, the discovery and perfection of better methods of business, and the ever-varying attitude of human 'relations, be required to give effect to the express powers. They are, therefore, left to implication. Unless the power claimed, be directly and *158 immediately appropriated to the execution of the specific powers, and a useful and necessary means to give them effect, it cannot be recognized as within the scope and measure of the grant. Whatever incidental power is a necessary and appropriate method to enable a banking institution to carry on the business of banking in the manner, to the extent, and with the means contemplated by the act of 1838, is as clearly within the terms of the grant as if it had been specifically mentioned. Before we can say, with any assurance, whether the power to borrow money is to be implied, we must look at the act under which the associations are created, and see the nature of the business in which they are to embark, the usual and customary modes in which it is conducted, the instruments and resources with which they are to be furnished, and the emergencies and hazards to which the business is necessarily exposed. Banking is a system of credits. Its circulation is upon credit, it receives deposits upon credit, and if it deals in exchange, either domestic or foreign, that too, is upon credit more or less. It discounts bills and notes upon the faith and credit that its circulation will not be suddenly returned for redemption, or its deposits suddenly withdrawn. It is thus that it multiplies its capital and realizes its profits. Take away its power to use its credit, and confine it to the use of its capital alone, and its business would perish. Thus we see that, under the act of 1838, the circulation is to be based upon state stocks, and bonds and mortgages upon real estate, deposited with the comptroller, and twelve and a-half per cent in cash in the vaults of the banks. Neither the state stocks, nor the securities upon real estate, are convertible into money, except at the end of a long and tedious process. While the liabilities of the banks, the circulating notes and the deposits, are payable on demand, bills discounted are payable on time. With its liabilities constantly due and open to demand, and its resources unavailable for the moment, it is easy to see that, without the power to obtain temporary relief in an
*159 emergency, institutions perfectly solvent would be driven to the wall. I therefore infer that, with such an organization and such a basis, the legislature designed to place the power to borrow, in an emergency, amongst the implied powers granted. It could mean nothing else. It surely intended the business should be safely and successfully prosecuted. It surely did not design to deny to these institutions the means of self-preservation. What other power, express or implied, is there which can be exerted so readily, so effectually, and so beneficially to themselves and their creditors, as the power to obtain relief under a pressure, until their own resources can be called in and made available ? Relief might be found, it is true, in a sale of securities and evidences of debt in the market; and this was the argument upon the hearing. If there is any difference in point of expediency and safety, between a sale of the securities or a temporary loan, it is greatly in favor of the latter, for reasons which I need not name. I am unable to see why borrowing, under such circumstances, is to be deemed an act ultra vires. It does no more than create a debt. A debt without limit may be created under the power to receive deposits. And so is a debt created under the power to issue circulating notes. In these forms, the banks obtain the money of their dealers, without objection, and apply it to the uses of then- business. Surely, the repayment of deposits and the redemption of the circulating notes, is an object which the law will encourage and aid, and any reasonable authority which may be necessary to effect it, promptly and without delay, will be regarded as amongst the implied powers referred to in the act. What possible rule of public policy is transgressed for such a purpose ? What possible difference can it make whether the debt is due to depositors and bill-holders, or to lenders who have parted with their money after a full examination? Banks should be lenders, and not borrowers, of money; and it cannot' be denied that a habitual and frequent resort to loans must lead to disaster. This, however, is an abuse of *160 the power, and no argument against its existence; nor is it any reason why it may not be judiciously and beneficially exercised. The right to raise money by loan for a legitimate end, must exist as one of the incidental powers of the cor poration, because its exercise may be indispensable to the preservation of its credit and the sucessful prosecution of its business. There is a wide difference between the power to issue bills or other evidences of debt for circulation, and’ -the simple power to borrow money. The one is fraught with mischief, while the other is comparatively inoffensive. The one is the sovereign power to issue bills of credit and furnish the circulating medium, while the other furnishes no inconsiderable portion of the capital which supplies the channels of business and commercial intercourse. Bankers, merchants, and all others, must resort to it for aid, in periods of inactivity and depression. So long as power is given to employ credit, as the basis of discount and circulation, the power to borrow must be implied, or the business cannot be usefully or successfully conducted. To refuse to recognize it as one of the powers conferred by the statute, is to withhold from the banking institutions a function essential to their existence.
The stock of .the banking company was originally $2,000,000, and it was afterwards increased to $3,285,900. More than three-fourths of this large sum was made up of bonds and mortgages upon real estate, of which those in controversy in these actions, were a part. The bank might acquire this class of securities upon loans under the eighteenth section. It might also acquire them for the purpose of deposit with the comptroller, under the seventh section. The bonds and mortgages were taken in exchange for the company’s stock, and comparatively few of them were lodged with the comptroller. Beyond the two sections to which I have referred, and for the purposes therein indicated, I know of no authority of the bank to.accept securities of this character. Yet nobody seems to doubt *161 its power. The trustees and the bondholders claim them under the trust deed, and the receiver claims them as the representative of the bank and the other creditors, and as its property. . Yet it will be no easy task to maintain this right of property, if the title is subjected to the rigor of the rule which the receiver seeks to apply to the claims of the bondholders. All parties seem, nevertheless, to concur in the idea that the bank acquired the bonds and mortgages rightfully, and is to be deemed to have been the true owner at the time they were taken in exchange for the capital stock. To what end was it to hold these securities ? They were not immediately convertible into money, and, except such portion of them as might be used to obtain circulating notes from the comptroller, for all the other purposes of banking they were useless. The bank had the right of property, and with it the incidental right of sale, absolute or conditional. If they could be converted into money by an absolute sale, or by becoming the basis and security for a loan, they could be applied to the uses of the bank, but in no other way. If I am right in thinking the bank had the power to borrow money, and that it was the owner of the bonds and mortgages, with the incidental right to sell them, all question upon this branch of the case would seem to be disposed of; because the execution of the trust deed, and the issuing of the bonds, and the subsequent transactions with the foreign creditors, was the simple exercise of these powers, and nothing more. Rather than sell the bonds and mortgages in the market, at a depreciation perhaps, the bank chose to borrow the money and put them in pledge to secure its repayment. If the right to borrow money and to sell the bonds and mortgages existed, as incidental to the powers expressly granted by the act of incorporation, the wisdom with which they were exercised, or the consequences which followed, do not belong to the courts to consider. The trust deed is the instrument by *162 which the pledge was made, and the bonds delivered to the lenders are the written contracts specifying the sums borrowed, the rate of the interest, and the time and place of payment. Some of the bonds passed directly to those who loaned the money and received them as the evidence of the investment. Others of them were delivered to and pledged with the Palmers, as security for the moneys advanced, and to be advanced, by them to pay the company’s bills and certificates of deposit. The right to mortgage or pledge property as security for future advances, which may be made prior to the attaching of a creditor’s lien, does not seem to admit of any dispute. (Bank of Utica v. Finch, 3 Barb. Ch. R., 293, and the cases there cited.)
It was a point much relied upon at the hearing, that these instruments were promissory notes payable on time And with interest, within the decisions before referred to, and not bonds or specialties, because there was no such seal upon them as is required by law. They certainly possess' some of the qualities of promissory notes. They are written promises for the payment of money absolutely, and at all events. In this respect, bonds for the payment of money and promissory notes,are not unlike. They have also the quality of negotiability in some sense, for they are payable to Walter Mead or his assigns, and upon them is written an assignment executed by Mead, under his hand and seal, with a blank, where the name of the assignee may be inserted. This formality of transfer is seldom found in connection with a promissory note. On the other hand, the form of the instruments is that of bonds. This is the designation given to them in the instruments themselves, and also in the trust deed. They have also a formal attestation clause, in which it is said the banking company have caused this bond to be attested in their behalf by their president and cashier, and their seal to be thereunto affixed. Then follows the corporate seal, impressed with, a screw press, and standing in plain relief upon the paper. There *163 is no wafer, wax or other tenacious substance upon which the seal is impressed, and this is the point of the objection. The common law demands an impression upon wax, wafer or some other plastic substance. (4 Kent's Com., 452; Bank of Rochester v. Gray, 2 Hill, 227; Farmers' Mechanics' Bank v. Haight, 3 Hill, 493; Coit v. Milliken, 1 JDenio, 376.) The act of the 7th April, 1848, which authorizes a corporate seal to be affixed, by an impression directly upon, the paper, declares it shall not affect the rights or remedies of-parties to suits or proceedings commenced before its passage; so that the ancient rule is in force as to these instruments. I regard it as of no moment by what name they are called. If they are not obligatory upon the corporation as bonds, they are as special contracts for the payment of the money obtained under them ; and if the judicial conscience cannot be satisfied with anything less than the common law seal to make them effectual for the purposes intended by all the parties to them, then the court should relieve against the defective execution and reform them, upon the pleadings and proofs in these actions. The banking company intended to give, and the holders intended to receive bonds, under seal executed in due form. The former omitted to affix the seal, and the latter supposed it was duly affixed, and thus made a mistake of fact. The present instruments are not those which either party designed should be "executed; and if they are reformed and the proper seals affixed, it will not be substituting one class of instruments for another. The principle is stated by Mr. Justice Story (1 Fq. Jur., $ 115), in commenting upon the case of- Hunt v.. Rousmaniere (8 Wheat., 174; and 1 Peters, 13), in the following words: “ Equity may compel parties to execute their agreements, but it has no authority to make agreements for them, or to substitute one agreement for another. If there had been any mistake in the instrument itself, so that it did not contain what the parties had agreed on, that would have proved a very different case : for where *164 an instrument is drawn and executed, which professes or is intended to carry into execution an agreement previously entered into, but which, by mistake of the draftsman, either as to the fact or the law, does not fulfill that intention or violates it, equity will correct the mistake, so as to produce a conformity in the instrument.” ( Champlin v. Layton, 18 Wend., 407; Hall v. Reed, 2 Barb. Ch. R., 500; Many v. Beckman Iron Co., 9 Paige, 188.) The claim that a corporation may take to its own use money or property, under a contract, made at its own solicitation and for its own benefit, and then repudiate its obligation to pay the consideration, not because it is malum, in se, or against any general principle of public policy, but simply upon the ground of excess of authority, was very justly and effectually overruled in Tracy v. Talmage (4 Kern., 162), upon principles and authorities which will command universal assent. The court did not approve of the company’s traffic in stocks, nor would it lend its aid to enforce the collection of the certificates issued in payment, but it held the company liable for the value" of the property purchased and received under the contract, and thus set its face resolutely and firmly against the system of spoliation which the defence of ultra vires, if successfully applied to such cases, is sure to create and encourage.
In respect to the claim of Holford & Co., and the transactions with the Philadelphia banks, I deem it unnecessary to say more than to express my concurrence in the opinion just read by Judge Comstock.
Shankland, J.
I shall, in the first instance, examine the primary and fundamental question, viz., what power or capacity this bank possessed of incurring obligations, and whether it extended to the borrowing of money. This question is antecedent to and independent of the further *165 one, as to the nature and form of the written evidences with which it could furnish its creditors.
It is admitted the legislature had the constitutional power to create banks, with such faculties as they chose, in respect to the business they were to transact, the obligations they could assume, and the evidences they could furnish of such obligations. The question is, therefore, not one of power but of intention. The act itself is the only legitimate source of the bank’s powers, and to its language the court must be confined in the work of construction. But in legal enactments, as in all human composition, words are often used symbolically, or . with a secondary meaning. Hence, frequent ambiguity, and hence the necessity of exegesis and construction. In determining the powers of this bank, while we must confine ourselves to the language of the act, yet we may look to all other sources of information to evolve the true meaning of that language.
The fifteenth section of the act authorizes persons to associate, and establish offices of discount, deposit and circulation, on the terms prescribed. The eighteenth section confers the power on such associations to “ carry on the business of banking, by discounting bills, notes and other evidences of debt, by receiving deposits, by buying and selling gold and silver bullion, foreign coins and bills of exchange, in the manner specified in their articles of association, for the purposes authorized by this act, by loaning money on real and personal security, and by exercising such incidental powers as shall be necessary to carry on such business.” It will be seen this language confers the same powers as were possessed by the old banks, by virtue of their charters (Laws of 1831, ch. 178, and other acts), and was probably intended to put them upon an equality in regard to their powers; although the old bank charters contained restrictions peculiar to them, and not found in this general act. The receiver’s counsel contend that the powers enumerated in the eighteenth section exclude all *166 others, except the necessary incidental powers to animate those enumerated, and, as the power to borrow money is not enumerated, it must be excluded. But this mode of testing the power of banks is quite too summary and dogmatical. It assumes, first, that the capacity or faculty of borrowing money is a power; secondly, that it is not a power necessary and incidental to any one of the enumerated powers: and thirdly, that the capacity to borrow cannot be evolved from any of the enumerated powers.
The power to receive deposits is given specifically, and without limitation. But what are deposits, and what, in commercial law, are the obligations which are, or may be, assumed by the parties to that species of contract ? Originally, a deposit of money was made by placing a sum of money in gold or silver with a bank or other depositary, to be returned, when called for, in the same indent!cal coin, and without interest, the depositor paying the depositary a compensation for his care. But, for more than a century prior to the passage of the act in question, the term “deposit” had come to mean quite a different transaction, as to the rights and liabilities of the parties to it. It became customary to deposit money for a particular period, and on interest, or payable at certain prescribed periods after notice. In short, the term deposit became a symbolical word to designate not only a deposit, in its original sense, but all that class of contracts where money in any of its forms, as specie or bank bills, was placed in the hands of banks of bankers, to be returned in other money, on call or at a specified period, and with or without interest. The transaction it designated, in this figurative use of the term, was in reality the same as that called a loan of money, when it occured between individuals. In this last and widest acception of the term deposit, it was most probably used by the legislature of 1838; for it was well know in all commercial communities, at that period, and to all competent legislators, that borrowing money to lend again is a part of *167 the legitimate business of banking. A banker is a dealer in capital, an intermediate party between the borrower and lender. He borrows of one party and lends to another, and the difference between the terms at which he borrows and lends is the source and measure of his profits. ( Gilbert's Pr. Obs. on Banking, 25; 1 McCulloch's Com. Die., 86-117.)
I am unable to perceive any reasons of policy to deny to the banks the privilege of incurring obligation by way of loan while they can incur the like obligation by taking in deposits. In truth, the obligations we have seen are the same, except in name. The act does not define the mean ing of the term deposit, nor does it in any way restrict its meaning. Hence we are at liberty to assume it to have been used in that sense in which it was used and understood amongst banks and bankers. These considerations tend to the conclusion that the legislature intended to include the power or privilege of borrowing money in the power to receive deposits, that it meant the same thing, in commercial language.
That the power to borrow money is a legitimate inference from the power to take in deposits, and is indeed a unit with that power, is proved by the decision made in reference to other clauses of this act, and other similar charters. In Safford v. Wyckoff (4 Hill, 422), the question arose whether d bank organized under this act could bind itself by a bill of exchange not countersigned and registered by the comptroller. The Court of Errors held that it could, and that the power to sell bills of exchange included the power to draw bills of exchange; and that as the drawing such bills was a usual, ordinary business of banking, it could not be presumed the legislature intended to prohibit it. There is another class of obligations into which these banks can enter, and which, though not expressed, are yet inferred as incidental to the power of receiving deposits. It is that of assuming to charge endorsers of the notes of its customers left with the bank for collection. This obligation springs *168 out of the custom of bankers receiving such notes to collect, on the express or implied agreement that the money, when paid in or collected, will remain on deposit, for some short time at least, for the benefit of the bank. If the bank neglects to use due diligence, to charge endorsers on commercial paper thus left with it, it is subjected to the loss. This responsibility of banks has been enforced in this state in numerous instances. (20 John., 372 ; 3 Cow., 662; II Wend., 473 ; 22 id., 215; 6 Hill, 648.) In all these cases, the consideration of the bank’s promises to charge the endorser is based on the benefit of the expected deposit. It is evident, therefore, that the terms of the deposit, the consideration to be paid therefor, and all its concomitants, are left to the contract of the parties, or to the general usages of the commercial world. Why, therefore, does not the word embrace the case of a loan of money for any agreed period of time, to be repaid with interest ? In the absence of statutory definition of the term deposit, it should be held to be synonymous with and include a loan, when used in respect to a transaction in which a bank becomes the debtor by borrowing money.
In addition to the express powers enumerated, the act confers all necessary incidental powers to carry on the business authorized, viz., the business of banking in the three departments of issue, deposit and discount. The word necessary, as here used, does not mean physical, or logical, or moral necessity; because, if it did, then the opinion of the chancellor, in the case of Safford v. Wyckoff, and every other member of that court whose opinions are reported, cannot be sustained. They all concurred in holding that the bank could incur indebtedness for rent, clerk hire, &c. But if the word necessity is to be construed in logical strictness, it is impossible to hold that these banks can incur any sort or degree of indebtedness, for the reason that they can always pay down or in advance. The term is used to mean that kind of necessity which custom and usage impose on *169 that particular branch of business called banking. These customs vary with tunes and localities, and hence these incidental powers could not be enumerated, but are left to time and circumstances. This construction of the term is strengthened by the word incidental, in corelation with which it is used. It means casual or accidental, beside the main design, occasionally. Taken together, they may, and probably must, mean to authorize those occasional acts of power which are necessitated by the mutual wants of the banks and their customers, but which may not fall within the strict letter of the enumerated powers, such as drawing bills of exchange, as in the case of Safford v. Wyclcoff. or receiving notes to collect and charge endorsers, in expectation of the use of the money, as in the cases above cited, or to make a loan of money to redeem its circulation or pay debts, or to endorse bills of exchange on the sale, or to obtain the rediscount of commercial paper, and numerous other occasional transactions rendered necessary by the exigencies of business, but which are incidental to the regular business of banking.
Although the power to borrow money may be justly predicated on the express power to receive deposits, on principles of construction above indicated, or may be found amongst the mass of unenumerated, incidental and necessary ones, I prefer to put my opinion upon the broad ground that every corporation, unless prohibited by law, can incur obligations, as a borrower of money, to carry on the legitimate business for which it was incorporated, although not specially authorized to borrow by its charter. Such has been the uniform language of the courts in this country. I refer to the following authorities, which cover the question,, and affirm the power in so many forms and aspects, that it ought no longer to be doubted. 12 S. & R., 256; 16 Mass., 94; 7 Wend., 31; 6 Humph., 515 ; 1 Sandf. Ch. R., 283 ; 1 Seld., 547 ; 2 id., 412; 3 W. & Mino:, 105 ;
*170 I Smedes & M. Ch. R., 207; 4 Hill, 442; 1 Cow., 513; 3 Wend., 94.
The capacity or liability to incur obligations in conducting the legitimate business of banking is not a power, in any just sense. The term is used in a sense synonymous with franchise, and the borrowing money is not a franchise. A franchise is a special privilege conferred by government on individuals, and which does not belong to the citizen of a country generally, by common right. (Bank of Augusts v. Earle, 13 Peters, 519.) The right to issue a circulating medium, to hold property in a corporate capacity, and to perform the general functions of a banking institution, are powers, or franchises ; but the mode by which the money shall be obtained for carrying on the operation, whether by the sale of property, or by borrowing, or donation, cannot be a franchise. As well may it be said that the privilege of Keeping their money in an iron safe is a franchise or power.
Nor is there reason for the opinion advanced by some, that the legislature of 1838 intended to withhold from the banks the capacity to incur debts; but much to show the contrary intent. Prior to that time, the holders of bank bills and other creditors stood on an equality, the former having no better security than the latter, in case of the bank’s insolvency. Hence, the necessity of the prohibitions contained in the twenty-seventh and thirty-fifth sections of the act of 1829, called the safety fund act; the first named section limiting the amount of the bank’s circulation, and the' latter forbidding the issue of time paper. Both served to limit the total amount of indebtedness of banks, and contributed to the security of all classes of creditors. Hence, too, the absence of these provisions in the act of 1838. They were unnecessary, because the circulating notes of this class of banks were secured by the pledge of stocks and mortgages, deposited with the comptroller. The other creditors were left to rely on the general solvency of the banks to which they had Trusted. *171 The legislature had discharged their trust, when they had protected the citizens against a depreciated currency.
The North American Trust and Banking Company had, at the time of this loan, millions of assets, in bonds and mortgages, but little or no cash capital. It became necessary to turn these assets into cash in some mode, or cease business. That it could have sold every dollar of these assets is not denied. It chose to hypothecate them instead. It may have been unwise, in a business point of view. But here the question is not one of prudence, but of power or capacity. Í have no doubt it had full power to borrow money in the manner it did, both as a necessary incidental power to carry o«t the enumerated powers specifically granted, and also as a capacity inherent in every corporation, unless expressly forbidden.
Assuming it as an established proposition, that banks organized under the law of 1838 may incur obligations, in conducting the business of banking, the next question in order is, whether any prohibition existed, prior to the law of 1840, to their executing and delivering written evidences of such obligation. It has been decided by this court, that banks organized under this law are moneyed corporations, and therefore within the provisions of title 2, of ch. 18, of part 1, of the Revised Statutes ; and to this decision we ought to adhere, whatever might be our views, were it res nova. Conceding this to be so, still I find no express provision against this class of banks executing any evidence of indebtedness they saw fit, either in the eighteenth chapter aforesaid, or in the act of 1838. In the absence of prohibition, there can be no doubt they had the right. The safety fund law of 1829 did not apply to these banks, but to such institutions only as were organized between 1829 and 1838, and to those the charters of which were amended and made subject to the provisions of that act. It is true, the first section of the safety fund act declares “ every moneyed corporation, having banking powers, hereafter to be created *172 in this state, * * * shall be subject to the provisions of this act.” This is comprehensive phraseology, and would include these banks of 1838, were it not for the implied exemption of this class of banks, which is inferable from the total incompatibility of the provisions of the two acts. There was no law prior to 1840, expressly forbidding this class of banks issuing obligations of any character they chose.
As most of the obligations referred to in the trust deeds were issued before the act of 1840 took effect, that portion of them which fell into the hands of purchasers for a valuable consideration, and without notice, must be held valid securities. If any of them were issued after the act took effect, they are ineffectual as securities. It has been vehemently urged, by counsel for the appellant, that it is contrary to the policy of this state to allow banks to issue time paper. I know of no general or settled policy on the subject, nor of any source from whence it can be learned, other than the statute laws of the state. It is true that in 3829 the banks, subject to the safety fund law, were prohibited from issuing bills and notes payable in future. But this act was not general, and did not extend to the large number of banks then in existence, nor to those under the act of 1838. I have already suggested the reasons why limitations were imposed on the banks, under the safety fund system, and that those reasons do not apply to the new banking system of 1838. Not until May 14th, 1840, was the prohibition against issuing notes and bills on time extended to banking associations by name; and at the same period many other provisions, peculiar to the safety fund system, were extended to them, which clearly did not previously affect them. The legislature, by thus classing the prohibition of time paper with other provisions, which confessedly did not previously apply to the banks of 1838, seem to admit that, before that time, it was lawful to give time paper. If it had been the intention or policy of the *173 legislature of 1838 to forbid the issue of such paper, the law should have said so plainly, and not have left the prohibition to rest on doubtful inferences. I am of opinion these banks had the right to issue such obligations as these so-called bonds, or any other obligations they and their customers agreed on, for any indebtedness they were enabled to contract. The following authorities support this proposition: (15 John., 44;. 1 Cow., 531; 3 Wend., 94; 12 John., 227; 2 Hill, 267; 1 Mer., 541; 3 Bing., 589; 13 Peters, 519.)
The appellant contends that if the obligations called bonds are valid in other respects, they are void for ustiry, whether regarded as English or New-York contracts. As these bonds were payable in England, and sold there, or the loan obtained there, it is clear that they must be considered as English contracts, and the question of usury be determined by the English law.
The respondents seek to avoid the defence of usury by three answers: First. That by the laws of England the contract is not usurious; Second. That the receiver cannot seek relief and discovery without offering to pay what is justly due, as he is not the borrower; and Third. That by the act of 1850 corporations are disabled from interposing the defence of usury. As the last answer is a valid answer to the defences, I shall pass the other two without remark, except that I am of opinion, the receiver representing the corporation for all legal purposes, that he is a borrower within' the true meaning óf the act of 1837, and is the corporation within the true meaning of the prohibition in the act of 1850. It was competent to the legislature to make this law. It did not impair the obligation of this contract, but affected the remedy only, by depriving the borrower of a defence in the nature of a penalty or forfeiture.
In 1837, the legislature altered the remedy in favor of this defence of usury, by allowing borrowers to file bills *174 for discovery and relief, without tendering the amount justly owing; and this law was applied to contracts already made.
That the act applies to contracts already made, is apparent from the explicit language used. “ To interpose the defence,” means not only to plead it and give evidence thereof, hut also to use it at the trial as a defence. The inhibition extends to the entire series of acts which constitute the defence, and to each of them. All will admit that the language of the act will include the case of such a defence, where the plea was not interposed when the act passed. But it would be unreasonable to make a distinction between such a case and one where the plea is already put in but not tried. Hence, we should hold the act to include all cases where the defence was yet to be made complete.
The next questions arise on the validity of the instruments called trust deeds. Whatever may be the most appropriate name for those instruments, I am of opinion they were such assignments, or sales of the effects of the corporation, as fall within the scope of the eighth section of the act, entitled “Of moneyed corporations” (1 R. S., 589). I am also of opinion that no such resolution, as the said section requires, was passed by the board of directors previous to such assignment. I am also of opinion that a resolution, passed subsequently, will not render valid a previous assignment, made without the requisite authority. The language of the section is positive, and admits of no other construction. The validity of the trust must depend, so far as this section operates upon it, on the fact whether the holders of the bonds were purchasers in good faith, without notice that the assignment was made without a previous resolution. The jiurchasers of those bonds, and those who advanced money upon them as pledges, are purchasers of the securities assigned by the trust deed. They obtained an interest in them the moment they advanced money upon the faith thereof; and if the trust deeds come *175 within the meaning of the eighth section, for any purpose, the holders of those bonds, for a valuable consideration, are confessedly purchasers. The last clause of the section embraces immediate as well as remote purchasers, but the trustees were neither. They were mere trustees, without any interest in the trust, and, so far as they were parties to it, the trust was inoperative, as against the company and creditors. One óf them was a director, and, so far as he is-concerned, it must be assumed that the assignment was taken with notice that no previous resolution of the board of directors authorized it. But notice to trustees of a want of that resolution was not notice to the subsequent purchasers of the bonds, because the trustees were not the agents of the bondholders, or if they could be so held, yet notice to Graham existed prior to this creation of the agency, and did not come to him in the course of his agency as trustee. But if the trustees can be adjudged purchasers, and chargeable with notice, then the bondholders must of course be held subsequent purchasers, without notice expressed or implied.
It is further claimed by the receiver that the trust deeds are void, because made while the company was insolvent or in contemplation of insolvency, with intent to give a preference to particular creditors over other creditors, contrary to the ninth section of the act above cited. The bonds were made to secure a loan of money to the company, to be used in the payment of the debts of the latter. It is not proved that the money to be obtained was intended to be paid to any particular creditor, or that any preference was in the contemplation of the directors. The case is not within the ninth section of the statute, for the reason that the assignment was made, not to secure existing creditors, but to secure a new class of creditors, to be thereafter created on the faith of these very assignments. The object of the section was to prevent preferences amongst existing creditors, when the company was insolvent. It did not *176 intend to prohibit offering security to a new class of creditors, who loan money to a corporation to enable them to pay debts. It is true that the money thus obtained might be used to give preferences amongst existing creditors, by paying one or more, to the exclusion of others; but, if so, the money thus paid illegally may be recovered back by the receiver, within the explicit language of the act. The illegal act of the directors, in using the money to give preferences, cannot, however, retroact on the previous valid assignment to secure the loan. I, therefore, hold that said assignments are not impeached, as.contrary to the ninth section of said act.
The trust deeds are also claimed to be void upon their face, as against creditors, because made in trust for the use of the company. In support of this position, the counsel rely on 2 R. S., 135, § 1, and some decisions of this court. (Barney v. Griffin, 2 Comst., 365; Leitch v. Hollister, 4 id., 211; Goodrich v. Dowms, 6 Hill, 438.) From a careful examination of the above section, and its origin, I am satisfied that it is to be confined to cases of trusts created for the sole benefit of the grantor of the property in trust, and is not applicable to a case like this, where the sole object of the trust is to secure third persons for a loan of money, although some trust may happen to be expressed in the deed, incidentally beneficial to the grantor.
In the case of Goodrich v. Downs, the opinion of the court alludes to the first section of this statute, and seems to rely upon it, as in point, to prove that the question of intent need not be submitted to the jury. In that respect the court probably erred, in that case, as the section cited had no bearing on the point in judgment. The question in Barney v. Griffin was on an assignment of real estate, and the said first section relates only to personal property.
I am of opinion that, in all, cases of conveyances, &c., where third persons are made beneficiaries, the case falls under 2 R. S., 337, §§ 1, 4 and 5, and the question of *177 fraud is one of fact, depending upon intention. It being a question of fact, I have examined the evidence to discover the intent with which the trust deeds were executed, and have arrived at the satisfactory conclusion that the trust deeds were executed to secure a loan of money for the use of the company; and without intent to hinder, delay or defraud creditors. In coming to this conclusion, I am much influenced by the fact that the assignment comprised not to exceed one-half of the assets of the company; and there is no proof to show that the residue, together with the money to be loaned on the assigned securities, would not have paid all the existing debts of the company.
Having determined that the company had capacity to sorrow money; that it was not prohibited from issuing written evidence of its promises, in any form it chose to contract, prior to the act of May 14, 1840 ; that the million and first half million trust deeds are valid in behalf of th purchasers of the bonds they were intended to secure still remains to determine who, amongst the holders • those bonds, come within the saving clause of the eighth section of the act. Clearly, none but “ purchasers for a valuable consideration and without notice ” can claim to have a good title within that section. Those bonds which were sold in London, out and out, passed to the vendees a good title or claim to the fund created by the trust, or so much thereof as will satisfy them. There is not any evidence that those several purchasers had notice of any defect in the title, and they paid valuable considerations for the said bonds.
I am also of opinion that the bonds pledged to the Messrs. Palmers, in February, 1840, for advances then and thereafter made, and in consideration of the state stocks surrendered up by them, on the faith of such pledges, place them in the position of purchasers for value, within the meaning of the said section and of the law merchant. These bonds were pledged to cover the general balance of accounts, as *178 I understand the evidence. But the judgment appealed from should be modified in two respects as to the claims of Messrs. Palmers. They should be allowed English interest on their demands, inasmuch as it is an English contract and not a New-York contract. The amount of their commission for the sale of the bonds to themselves should also be deducted. The relation of agent and purchaser of and from the same principal is incompatible and should not be countenanced.
The claims of the Messrs. Holford stand on different facts. It is charged in the cross bill, and is admitted in the answer of the trustees and of the Palmers, that twenty-four of those bonds were delivered to James Holford & Co., as collateral security for a preexisting indebtedness of the company, and that nothing was advanced at the time as a new consideration for said bonds; and none is alleged in the said answers. Holford & Co. have suffered the bill to be taken as confessed; but the trustees and their counsel claim ta represent their interests. Admitting this to be so, I incline to the opinion that they cannot sustain the Messrs. Holford’s claim to hold those bonds for any purpose. The Messrs. Holford are not purchasers for valuable consideration , using that term in the commercial sense; and, as applied to bills of exchange and promissory notes, the taking of the bonds, as collateral security for an antecedent debt, is not paying value within the rule, either in England or in this state. The farthest any court in this state, or the supreme court of the United States, has gone, is to hold him a purchaser for a valuable consideration, who takes a note in payment of a precedent debt. (16 Peters’ U. S. R., 1; 2 Kern., 551.) If the proof in this case would have sustained an answer, alleging that the time of credit was extended, in consequence of the deposit of those bonds, and that such fact in law would furnish the requisite valuable consideration, yet, the fatal answer is that no such fact was put in issue, and cannot be available as proof. It must be *179 recollected that; this is a contest between the stockholders and creditors, on one side, and other creditors who claim a preference by means of the trust deeds, on the other. The legal title has not passed out of the company, for want of the previous resolution authorizing the transfer; and it is only as purchasers in good faith, for value, that the Messrs. Holford can have a standing in court. Admitting the question of good faith is to be determined by the English decisions, none go far enough to protect this transaction. The case of Percival v. Prampton (2 Cromp. Mecs. & Ros., 180), is cited to sustain the position, that taking a note as security for a precedent debt is taking it for value. But in that case, the plaintiffs were bankers, and they discounted the note in payment in part of a precedent debt, and paid the balance in cash, and the decision is really put on that ground.
The United States Bank of Pennsylvania and the Girard Bank, loaned to the company $250,000 in July, 1840.
[The learned judge here stated the facts in relation to the making of the loan, and issuing of the certificates of deposit, and proceeded. ]
These certificates of deposit are essentially bills or notes, and are void promises, because issued after the act of May 14, 1840, took effect. They fall within the description of paper condemned in Leavitt v. Palmer (3 Comst., 19) ; and the mortgage bonds having been taken as collateral security for the performance of those void promises, cannot be enforced. Those bonds are not bills or notes, within the act of 1840, nor are they specialties, for want of a common law seal; but I hold them to'be special agreements not under seal. They are not bills or notes, because they are not negotiable, although they, are assignable. Prior to the Code, they would have been suable in the name of the payee only. They are, in this respect, like the case of the India bonds, reported in 13 East, 510. They contain a power, in addition to a promise to pay a specific sum of *180 money, viz., the holder has the option to turn the bond into the stock of the company. The general form of the instrument, also, is so variant from that of bills and notes, that I am clearly of opinion it does not come within the the letter or spirit of the prohibitory statute of 1840. I therefore hold, that whether they were issued to the Philadelphia banks, before or after the act of 1840 took effect, they are such obligations as the company had the right to issue. Nevertheless, these particular bonds, having been turned out to secure the payment of illegal bills and notes, they cannot be enforced, if the case of Leavitt v. Palmer is to be upheld. Having sat in the court on the argument of that case, and concurred in the decision, and having reconsidered the reasons for that decision, I am confirmed in their solidity. In that case the court treated the trust deeds as valid, but, being made as collateral to the notes which were void, they held the trust deeds not enforceable. Here, the bonds hold the same relation to the certificates of deposit as the trust deed did in that case. The result is, that the two hundred and seventy bonds turned out of the Philadelphia banks cannot be enforced, so as to entitle those debts to a preference; but being legal debts, they should be so adjudged, and allowed to come in as a charge on the general assets of the company.
I do not deem-it necessary to inquire into the origin of all the debts due the Messrs. Palmer, which resulted in the large balance due them, on account, from the company. But in respect to that portion of it growing out of their acceptance and payment of the Davis bills, it is clear that it was not illegal in the Messrs. Palmer. The stock of the company had been purchased and paid for before the bills were drawn; and whether the purpose of the company, in allowing Davis to draw on the Palmers, was known to the latter before they accepted those bills or not, is of no legal importance. I hold it to be legal for one man to loan another money to pay an illegal debt, although he knows *181 the use for which the borrower designs it. Admitting the Messrs. Palmer knew that the company, through Davis, had bought in some of the capital stock,' not with surplus funds of the company, and had paid for the same, and had drawn those bills to reimburse or replace the money thus used, still it was lawful for them to accept and pay those bills, at the request and on the credit of the company. There is a limit to human responsibility, in legal ethics at least, however, it may he in morals. The Messrs. Palmer were not responsible that the money should be used for a legal purpose.
It is quite uncertain whether the Messrs. Palmer sold the South Carolina Stocks to the company as principals, or as agents for one Simon, in August, 1840. But whoever was the vendor, the stocks were paid for soon after, by the company, out of the moneys received from Sanderson & Co., to whom those stocks were pledged. The purchase of those stocks, to sell again, was an unauthorized transaction, according to Talmage v. Pell (3 Seld., 328). Was the same question in this case as in that, I should feel bound to follow that case, however, I might doubt its correctness. But the question is quite different. In that case, the State of Ohio was attempting to enforce payment of securities turned out to it, as collateral to promises to pay for state stocks sold the company, in opposition to the rights of the receiver, who claimed to repudiate the contracts, and to reclaim the securities. The court held the purchase ultra vires, and, therefore, not binding on- the company. Of course, the direct promise .to pay being held illegal, the collateral securities failed also. In this case, the stocks have been sold, transferred and paid for specifically, and the Company have since transferred them, by pledge or sale, to Sanderson & Co. The receiver now seeks, in effect, to recover back the money paid for those stocks, without offering to return them to the Messrs. Palmer
*182 This claim strikes me as exceedingly unjust, and without precedent.
The eminently just principles enunciated by this court, in the case of Tracy v. Talmage, involving the claim of Indiana, will rescue all the other items in the accounts of Messrs. Palmer from the charge of illegality; and I forbear, therefore, to comment upon them in detail.
Paige, J.
The first question which I propose to examine, is the one embraced in the proposition of the receiver: that the million and the first half million trust deeds, and the assignments of bonds and mortgages connected therewith, are void because not authorized by a previous resolution. The examination of this question necessarily involves the consideration of the question, whether the provisions o:i the title of the Revised Statutes, in relation to moneyed corporations, are applicable to banking associations organ ized under the general banking law. If this latter question was res integra, I should have very little difficulty in disposing of it. The act authorizing the business of banking contains intrinsic evidence that the legislature which passed it did not intend to authorize the creation of moneyed corporations. The word corporation is not to be found in any part of the act. The provisions inserted in every bank charter since 1828, conferring the general powers of a corporation, as defined in the Revised Statutes, are studiously omitted. The act also omits to confer, in express terms, in accordance with legislative usage, prior to the adoption of the Revised Statutes, the power to make and use a common seal, to adopt a corporate name by which to sue and be sued, and to grant and receive property, and to make bylaws for the government of the association; three of the ordinary incidents of a corporation. (Laws of 1823, § 16; 2 Kent’s Com., 278.) There is also convincing evidence in the circumstances under which the system of free banking was proposed and adopted by the legislature, independent *183 of the internal evidence of the act to authorize it, that the legislature intended to authorize only the creation of banking partnerships or unincorporated joint-stock companies. I am not aware that any doubt has been expressed, in any one of the numerous cases which have been before our courts, involving the question whether our banking associations were corporations or partnerships, that the legislature intended they should be partnerships merely. (1 Hill, 616, 623; 7 Hill, 506.) But it is insisted, and it has been so decided, not only by the late Supreme Court and the Court of Errors, but also by this court, that, notwithstanding the intent of the legislature to the contrary, banking associations, organized under the act to authorize the business of banking, are corporations, and corporations to all intents and purposes. (Thomas v. Dakin, 22 Wend., 9, 69-74; Warner v. Beers, 23 Wend., 103, 190; People v. Supervisors of Niagara, 4 Hill, 20; S. C., 7 Hill, 504, in error; 1 Hill, 616, 620; Livingston v. Gifford, 2 Denio, 380, 394; Talmage v. Pell, 9 Paige, 415; Gillet v. Moody, 3 Comst., 485 ; Talmage v. Pell, 3 Seld., 340.) These decisions- are based upon the ground that the conferring upon these associations the corporate attributes of a succession of the members, without changing the identity of the body, of the transferability of the shares of the association, and of the exemption of the shareholders from personal liability for the debts of the association, necessarily made such associations corporations. The reasons assigned for these determinations was that it was not within the power of the legislature to give to these associations the essential attributes of a corporate body, without creating them corporations; that “ human powers are not equal to the task of changing a thing by merely changing its name,”- per Beonsoít, J. Without pausing to inquire whether these decisions are warranted by the principles of law and sound logic, and whether the legislature, .in the exercise of its approximately unlimited legislative power, cannot, if it so wills, confer upon a part *184 nership a portion of the ordinary attributes of a corporation, without converting such partnership into a corporation, it is sufficient for the present purpose to say that the principle of stare decisis stands in the way of a reagitation of the questions embraced in these decisions. Before dismissing this topic, it is proper to remark that the British Parliament has asserted its competency, by the enactment of various statutes, to confer upon joint-stock companies certain of the powers and "privileges of a corporation, without creating them corporations. The act of 1 Victoria, ch. 75, authorizing the queen to confer upon joint-stock companies many of the ordinary attributes of a corporation, without destroying their character as partnerships, resembles, in many essential particulars, the act to authorize the business of banking. (Smith's Mer. Law, 57-72; 2 Law Lib., 5th series, 68—77.)
But, conceding the necessity of defeating the legislative intent, to authorize the formation of banking associations without imparting to them a corporate character, there certainly was no necessity for defeating the intent of the legislature, that the statutes of the state previously enacted, which related specially to moneyed corporations with banking powers, organized under the then existing system, should not apply to such associations. If the legislature intended that these associations should be partnerships merely, and not moneyed corporations, it needs no argument to show that it could not have intended that such associations should be subject to such statutes. An intent that these associations should not be moneyed corporations, necessarily embraces an intent that they should not be subject to statutes which related specially to such corporations. Besides, the act to authorize the business of banking contains internal evidence that the legislature neither contemplated or intended that such associations should be subject to the general statutes applicable to the'then existing moneyed corporations. It provides (§27) that these *185 associations may be proceeded against for any violation of the provisions of the act to authorize the business of banking, and be dissolved by the court of chancery in the same manner as any moneyed corporation may be proceeded against and dissolved ; thereby clearly indicating the understanding of the legislature, that the provisions on that subject, in the safety fund act and in the Eevised Statutes, would not be, and an intent that they should not be, applicable to these associations. (2 R. S., 464, § 39, Ist ed.)
The act to authorize the business of banking, also provides (§28) that if any portion of the capital of the association shall be withdrawn, whilst any debts remain unsatisfied, no dividends shall be made until the deficit of capital shall be made good. This provision is inconsistent with the provisions of the Eevised Statutes, in relation to withdrawing the capital of moneyed corporations, and the prohibition of dividends in case of a reduction of capital by losses, and shows that an entirely new system of banking was intended to be inaugurated, to which the provisions of the Eevised Statutes relating to the old system wrould not be applicable. (1 R.. S., 589.) The several acts of the legislature, passed subsequently to the act to authorize the business of banking, applying specially to banking associations provisions in previous statutes relating to moneyed corporations, especially the act of May 14, 1840, are a legislative construction of the general banking law, and are emphatic legislative declarations that banking associations were not subject to the general statutes above mentioned. It is a rule of construction of statutes, that such a construction should be put upon them as will best effectuate the intent of the makers. In my judgment, the provisions of the act to authorize the business of banking, in connection with the proceedings of the legislature attending its introduction into and passage through its two houses, clearly show an intent, on the part of the legislature, that the *186 associations to be formed under such act should not be subject to the general statutes above mentioned.
There is a distinction between the statutes, exclusively applicable to moneyed corporations, and the general laws of the state, written and unwritten, applicable to all corporations. It may very well be that the determination that these associations are corporations, may necessarily subject them to such general statutes as are applicable to all corporations, as they .undoubtedly are to the rules of the common law in respect to corporations in general; bu* from these - concessions, it by no means follows that thi statutes exclusively applicable to a particular class of corporations, must be applicable to these associations, in opposition to the intent of the legislature. There is no necessity for this application. These associations may be corporations without being placed in that particular class of corporations . designated in the Revised Statutes as moneyed corporations.
If 1 am right in this conclusion, the title of the Revised Statutes in relation to moneyed corporations, is not applicable to these banking associations. But although I entertain no doubt in respect to the soundness of this conclusion, I apprehend that we cannot give effect to it in this case, in consequence of several decisions of this court the other way. In Gillett v. Moody (3 Comst., 479), where the directors of the St. Lawrence bank (a banking association), after such bank had stopped payment, purchased of the defendant, a director,' his stock in the bank, and paid him for the same an equal amount in Arkansas bonds, it was held by this court, Judge Bronsok delivering the opinion of the court, that the act was forbidden by the second and fifth subdivisions of the first section of the title of the Revised Statutes, in relation to moneyed corporations, which prohibit the directors from dividing, withdrawing or paying to the stockholders any part of the capital stock of the corporation, &c., and the application of the funds of the corporation, except siuqfius profits, to the purchase of *187 shares of its own stock; and it was also held in that case, that as banking associations were moneyed corporations, to all intents and purposes, that that title of the Revised Statutes applied to such associations.
In Talmage v. Pell (3 Seld., 328, 340), Judge Gardiner expresses the opinion that banking associations, as banking corporations, were'subject to all the general laws relating to that class of corporations, except so far as those general laws have been modified or superseded by the general banking law; and he says this proposition is the necessary result of the decision in the Supervisors of Niagara v. The People (7 Hill, 504), and Gillet v. Moody, in this court. Judge Gardiner proceeds and says, p. 341: “ If banking associations are subject to taxation, and to the act to prevent the insolvency of moneyed corporations, as settled by the adjudications, no reason is perceived why they are not bound by all general laws relating to moneyed corporations not in conflict with the one under which they were created.”
In Gillett v. Philips (3 Ker., 116), where the St. Lawrence Bank, a banking association, in December, 1841, stopped specie payments, and was then insolvent, and afterwards, in April, 1842, the cashier sold to the defendant, a stockholder in and a director of the bank, three promissory notes owned by the bank, amounting to $2016, for $1200, for the purpose of raising funds to redeem the circulating notes of the bank, it was decided by this court, Gardiner, C. J., delivering the opinion of the court, that the sale of the notes was void, being made in violation of the eighth section of the title of the Revised Statutes in relation to moneyed corporations.
We are asked by the counsel for the respondents not to regard these decisions as authority, for the reason that the point, of the applicability of the title of the Revised Statutes, in relation to the moneyed corporations, to banking associations, did not arise in the case of Talmage v. Pell, *188 and that it was passed upon by the court without being discussed by the counsel in the cases of Gillett v. Moody, and of Gillett v. Philips, and, therefore, that it is evident it could not have been fully considered by the court in those cases. In Gillett v. Philips, Judge Gardiner says not a word upon the point in his opinion. He assumes, as a matter not in dispute, that the title applies; and the point seems, in like manner, to have been assumed in Gillett v. Moody, by Judge Bronson, without much examination; as is apparent from his placing his decision, in part, upon a violation of the second subdivision of the first section of the title in relation to moneyed corporations, which was clearly superseded by the twenty-eighth section of -the act to authorize the business of banking.
It is quite clear that this question has never been fully considered by this court; but inasmuch as it has been expressly determined by the court in two cases, I do not feel at liberty to disregard the determination, although I believe it to be erroneous, for I do not think that the correction of the error will compensate for the mischief of shaking the stability of the decisions of the court. “It is essential to the security of property that a rule should be adhered to when settled, whatever doubt there may be as to the grounds on which it originally stood.” (Per Sir Wm. Grant, 18 Ves., 110.)
If the title of the Revised Statutes in relation to moneyed corporations is to be deemed to apply to banking associations, the next question to be considered is, whether the million and the first half million trust deeds, and the accompanying assignments of bonds and mortgages, were authorized by a previous resolution of the board of directors. The only previous resolution of the board of directors, in relation to the million trust, previous to the execution of the final million trust deed and of the accompanying assignments, was that of the 6th January, 1840. That resolution furnished no authority for executing the trust deed anJ
*189 assignments in question. It authorized an assignment of bonds and mortgages only to the amount of $1,000,000, and to Beers, Tylee and Graham, as trustees; while the assignments in question were made1 to Blatchford, Curtis and Graham, as trustees, and were of securities amounting to $1,200,000. These latter assignments cannot be regarded.as authorized by the resolution, as they did not conform to it. The North American Trust and Banking Company, under the decisions, must be regarded as a statute corporation, and its powers of alienation, as such, were limited and regulated by statute. It is a familiar rule, that a statute power must be strictly pursued, and must be pursued in the mode and form prescribed by the act creating it, or by the act which regulates its exercise. (8 Bard., 133,149; 1 Story Eq. Jur., § 96; 1 Hill, 114,115 ; 3 Comst., 396; 2 Cow. & Hill, 1288,1289; 4 Wheat., 77; 3 John. Cas., 107 ; 7 Cow., 88, 462 ; 7 Faige, 83, 84; 2 Sold., 92.)
The eighth section of the title in relation to moneyed corporations inhibits the assignment by such corporations of any of their effects, exceeding the value of $1,000, unless authorized by a previous resolution of the board of directors. This statutory provision limited the jus disponendi of these corporations, and should have been strictly pursued by the directors of the North American Trust and Banking Company. The previous resolution adopted by its board of directors should, at least, have specified the names of the trustees and the amount of the securities to be assigned. There was no previous resolution of the board of directors, of any kind, authorizing the execution of the first half million trust deed and its accompanying assignments.
The want of original authority, to execute the million and the first half million trust deeds and accompany assignments, could, not be supplied by a subsequent ratification, because the statute peremptorily calls for a previous resolution, and the statute is to be strictly pursued. Even in the case of conventional powers, where the nature and *190 object of the power, and the circumstances of the case point to a previous consent, there such previous consent is necessary, and the execution of the power cannot be ratified by a subsequent consent. ( Greenham v. Gibbeson, 10 Bing., 363, per Tindal, C. J., Eng. Com. Pleas.) But as the board of directors did not itself exercise a delegated authority, it undoubtedly had power to delegate, to a committee of its own members, authority to adopt the resolution required by the statute, and to cause the assignments of the securities mentioned therein to be executed and delivered. The cases in 2 Mete., 166, and in 3 Comst., 293, and the decision of the late chancellor in the Farmers’ Loan and Trust Company v. Blake, not reported, sustain this proposition. It was held in Burrill v. NaJiant Ba.nk (2 Metc., 166), thata board of directors of a bank in Massachusetts, not exercising a delegated authority,, and constituting, for all purposes of dealing with others, the corporation, could delegate an authority to a committee of their own members to alienate or mortgage the real estate of the bank; and it was held in this court, in Howland v. Myer (3 Comst., 290), that the president of the Alliance Mutual Insurance Company, chartered in 1843 (a moneyed corporation), under a by-law of the company empowering him to make contracts and transact all the ordinary business of the company, could transfer "a note exceeding the value of $1,000, without a previous resolution of the board of directors.
The cases referred to by the receiver’s counsel, on this point, relate to the construction of statutes granting statute powers, and to the subdelegation of judicial powers con ferred by statute, and of a delegated private authority, involving personal trust and confidence. (3 Comst., 396 ; 2 Seld., 92; 26 Wend., 485; 16 Vesey, 27.) I, however, entertain doubts whether the articles of association, and the by-laws, of the North American Trust and Banking Company, did delegate authority to its committee of investment and finance, to pass the resolution of the date of 20th April, *191 1840, authorizing the assignments accompanying the million trust deed, and the resolution of the 30th April, 1840, authorizing the assignments accompanying the first half million trust deed.. The superior court of the city of New-York, in Fainter v. Yates (3 Sandf. S. C. R., 137), however, came to the conclusion that the by-laws of the company did delegate this authority to the committee of finance, and that the resolutions' adopted by that committee must be deemed the resolutions of the board of directors; and the Supreme Court for the first district, in Leavitt v. Blatchford, came to a like conclusion. (5 Barb., 27.)
The remaining question under this branch of the case is, whether the holders of the mortgage bonds, issued under the two trusts, are purchasers for a valuable consideration without notice, within the meaning of the saving clause ¿1 the eighth section, before mentioned.
[The learned judge here states the disposition made of the several bonds, and proceeds. ]
The receiver insists that the saving clause of the eighth section, does not apply to a party who takes the transfer directly from the corporation; that the previous resolution is part and parcel of his title; that he is• chargeable with knowledge of the law, and is bound to see that the officers of the corporation are authorized to make the transfer; that the trustees were not purchasers for value; and that they purchased with notice that there had been no previous resolution.
Neither the letter nor spirit of the saving clause, in my judgment, authorizes the construction that it does not apply to the party who takes directly from the corporation. The language of the clause is, that the section “ shall not be construed to render void any conveyance, &c., in the hands of a purchaser, for a valuable consideration and without notice.” By these terms any purchaser, whether immediate or remote, from the corporation, is protected if he purchases for a valuable consideration, and without *192 notice of the omission to adopt a previous resolution; and such has been the. construction given to the section by this court. In Howland v. Myer (3 Comst., 290, supra), it was decided that the plaintiffs, who took the transfer of a note for a sum exceeding $1000, directly from the corporation, without notice that no previous resolution of the board of directors had been adopted, authorizing the transfer, were Iona fide holders of the note, for a valuable consideration without notice, within the meaning of the saving clause of said eighth section. If the purchaser of the property of a moneyed corporation, is to be chargeable with knowledge of the law requiring a previous resolution to authorize thf. sale, and in all cases where no resolution has been passed with notice of such omission, then the saving clause of thi, eighth section is a dead letter, and may be regarded a* stricken from the statute. No such proposition can, upon any sound principle, be maintained. We are bound to give effect to the statute. . That declares that no conveyance, &c., made by the corporation, &c., shall be void, when “ in the hands of a purchaser for a valuable consideration and without notice.” If the purchaser shows that he paid value for the property, and if there is no proof that he had any notice of the omission of the directors to pass a previous resolution, his conveyance will not be invalid. He can repose upon affirmative proof of a valuable consideration, and the want of proof of notice. The obligation rests upon the party, assailing his conveyance, to prove affirmatively that he had actual notice, or what is equivalent thereto, that there had been no previous resolution to authorize the execution of the conveyance. This notice should be, at least, as clear and certain as that which is necessary to break in upon the registry acts. (4 Kent's Com., 171, 172; 2 John. Ch. R., 182; S. C., 15 John., 569, and cases cited in Fox v. Burch., 6 Barh., 78.)
In this case there is no evidence that the English bondholders had either any knowledge of the title of the Revised
*193 Statutes in relation to moneyed corporations, or any notice, either direct and positive or implied, of the statutory requirement of a previous resolution authorizing the execution of the assignments in question as security for the payment of the mortgage bonds, or of the neglect of the directors to pass such a resolution, or even of a notice sufficient to put them on inquiry; and the inference from the testimony is irresistible, that the English bondholders received the bonds as purchasers, or pledgees, or mortgagees, in good faith, without any notice of any defect in the authority of the officers of the North American Trust and Banking Company to make and sell such mortgage bonds, and to execute the assignments as collateral security for their payment. If the question had been one only of the statutory power of the officers of the company to execute the bonds and accompanying assignments, and there had been no saving clause in favor of bona Jide purchasers, the bondholders would have purchased at their peril, and would have acquired no title to or interest in the bonds and mortgages assigned, unless the statute in relation to the execution of .the assignments had been strictly pursued; and in that case the previous resolution would have been part and parcel of their title. But the saving clause alters this rule of lav, and furnishes a protection to them, if they are shown to be purchasers for a valuable consideration without notice. Under the operation of this saving ■clause, they are not chargeable with knowledge of the title in relation to moneyed corporations, and will not be presumed to have notice of the same. Ignorance of the law of a foreign government is regarded as ignorance of a fact, and may be relieved against in' like manner as a mistake as to a matter of fact. (9 Pick., 130; 8 Barb., 233.) The bondholders had a right to infer from the recitals in the trust deeds, the attestation clauses to the same, the letters of the officers of the company, and from the jus disponendi of corporations at common law, that such officers *194 had legal authority to execute such deeds and accompanying assignments, and to make and sell the mortgage bonds' and they had a right to regard the execution of these instruments, by the proper officers of the company, as prima facie evidence of their authority to execute them. (Angel & Ames on Corp., 270; Bank of United States v. Danbridge, 12 Wheat., 70, per Story, J.; 2 Metc., 166; Farmers’ Loan and Trust Company v. Morse, Willard’s opinion; Same v. Blake, id., and opinion of Chancellor, on Appeal, unreported; 7 Hill, 91.)
If Graham, one of trustees, was chargeable, as director of the company, with knowledge that there had been no previous resolution, notice to him was not notice to his cestuis que trust. He did not stand to them in the relation of an agent. He was selected and appointed as trustee by the company, not by the cestuis que trust. His powers and duties were conferred and prescribed by the company, not by the bondholders. There were at the time of the execution of the trust deeds no bondholders; no cestuis que trust. It is a necessary attribute of an agency that it should be created by the principal; it is an agreement by which the principal confides to the agent the management of some business to be transacted in his name and on his account, and by which the agent assumes to do the business and render an account of it. (1 Bow. Law Dic., 91, tit. Agency ; 2 Kent's Com., 612; Paley on Agency, 1.) The doctrine that notice to an agent operates as constructive notice to his principal, is applicable only to cases where an agency m fact has been created; and in such cases only where the notice is to the agent while engaged in the same transaction or negotiation to which the agency applies. (Dunlap’s Paley on Agency, 262-266, and notes.) In this case, as the relation of principal and agent did not exist between the bondholders and Graham, notice to him, or knowledge by him that there was no previous resolution, was not con structive notice to the bondholders.
*195 The trustees are not. to he regarded as the purchasers of .the bonds and mortgages assigned to them. No consideration proceeded from them; they were mere assignees of these securities, coupled with no interest, in trust to hold them as a security for the payment of all the mortgage bonds that should thereafter be sold or negotiated by the company, and after the payment of such bonds to hold the same subject to the disposition of the Company. Whoever purchased the mortgage bonds became purchasers of the bonds and mortgages so assigned as security for their payment, or of an equitable right to hold them as such security.
The purchasers of the four hundred and ninety-nine bonds, issued under the million trust, and the Palmers, as pledgees of the unsold bonds of both trusts, were purchasers for value, within the eighth section of the title in relation to moneyed corporations. The purchasers of the four hundred and ninety-nine bonds paid cash for the same, and the Palmers advanced cash, on the credit of the pledge to them of the unsold bonds as security for such advances. Mortgagees, who, at the time of becoming such, part with a new consideration on the faith of the mortgage, are bona fide purchasers for a valuable consideration, within the recording acts (1 R. S., 756, 762, §§ 1, 38,1st ed.; 4 Paige, 221; Rev. Notes to ch. 3 of 2d part of R. S.), and they are also purchasers within the statute in relation to fraudulent conveyances. (2 R. S., 134, 137, §§ 1, 7; 4 Greenl. ed. of Cruise, tit. 33, ch. 78, §§ 38, 39; Chapman v. Emery, Cowp., 279; Lister v. Turner, 5 Hare, 281.) Mortgagees of real estate, and mortgagees or pledgees of personal property, are, upon principles in analogy to those applicable to such statutes, also purchasers within the eighth section above referred to.
The only question, in this branch of the case, arises out of the delivery of the twenty-four bonds to Holford & Co.as security for a preexisting debt. Holford & Co. cannot *196 claim to be purchasers in good faith for a valuable consideration, upon the principles applicable to the recording acts, or to the transfer of negotiable paper. A subsequent purchaser or mortgagee, without notice of a prior unrecorded conveyance or mortgage, cannot claim the benefit of the recording acts, as a purchaser in good faith and for a valuable consideration, unless he advances a present consideration, or relinquishes some available security, upon the faith of his deed or mortgage. If he received his deed or mortgage in payment of, or as security for, a preexisting debt merely, without parting with anything of value, he is not a Iona fide purchaser within such acts. (Dickinson v. Til linghast, 4 Paige, 220.) The same principles applies to the purchaser of negotiable paper. To constitute a bona fids purchaser of a negotiable security for a valuable consideration, without notice of a prior equity, he must have taken it in the usual course of business, and paid a present value for it. If he merely received the paper in payment of, or as security for, a preexisting debt, he cannot hold it against a prior equitable owner. (20 John., 637, in error; 6 Hill, 93, 95, 96.) But it seems to me that the principles of these cases do not apply to the case of Holford & Co. Under the recording acts the.question arises between several mortgagees, or persons who have acquired specific liens, or several purchasers from the grantor; and, in respect to negotiable paper, between the purchaser and the rightful owner of the same. In all such cases, to entitle a subsequent mortgagee o.r purchaser to a preference over a prior unrecorded mortgage or deed, or a purchaser of negotiable paper to hold it as against the rightful owner, the former must have advanced a present consideration for his deed or mortgage, and the latter have paid value for his paper.
A preexisting debt is in all cases a good and valuable consideration for the transfer of either real or personal property, as between the parties to the transaction. It is a valuable consideration also for a sale or mortgage in good
*197 faith, within the statute in relation to fraudulent conveyances and the statute as to sales by a defendant in execution before an actual levy. (Birdseye v. Ray., 4 Hill, 162, 163 ; 2 R. S., 366, § 17 ; Id., 134, 136, 137, 1st ed.) A debtor, although in failing circumstances, has a right to give a preference to one creditor over others ; and he may pay or secure him by the sale or mortgage of his real or personal estate, before the lien of any other creditor has attached thereon. (Birdseye v. Ray, 4 Hill, 163, supra; 11 Wend., 187.) Where the contest is between creditors endeavoring to obtain preference in payment of preexisting debts, the creditor who first secures a specific lien on the property, by a purchase or mortgage from the owner, is entitled to hold it as against all the other creditors who have not previously acquired specific liens thereon, and also as against the debtor himself and his representatives. This was expressly decided in the Court of Errors, in Walker v. McDonald (6 Hill, 97, in error.) An exemplification of this principle is to be found in the case of Birdseye v. Ray (4 Hill, 162), where it was held that a creditor of a defendant in an execution, to whom such defendant, after the issuing of the execution, but before an actual levy, turned out certain personal property as security for a preexisting debt, was l purchaser in good faith, within the statute (2 R. S., 366, § 17, 1st ed.), and could hold the property as against the plaintiff in the execution. (5 Term R., 236; 3 Maule & Selw., 371; Cowp., 278; Prec. in Ch., 13; Coote on Mort., 355.) This decision was based upon the principle that, as between creditors having equal equities, the debtor may lawfully prefer one to the other, before the latter has acquired a specific lien, by an actual levy upon his property or otherwise.
The contest in the present case is between creditors of the corporation, to whom the twenty-four bonds in question have been pledged as security for a preexisting debt, and the receiver of the corporation, appointed subsequent to the *198 pledge, and representing the corporation, its stockholders and general creditors: the precise case within all the cases, where a preexisting debt is a valuable consideration for a sale or mortgage made in good faith. I conclude, therefore, that Holford & Co., as pledgees of the twenty-four bonds are purchasers for a valuable consideration, within the eighth section of the title in relation to moneyed corporations.
The next question to be examined is, whether the trust deeds and accompanying assignments are void under the ninth section of the title in relation to moneyed corpora • tions, because made by the company when insolvent or in contemplation of insolvency, with the intent of giving a preference to particular creditors. To bring these securities under the condemnation of this section, they must have been executed by the officers of the company, with the intent of giving a preference to certain particular creditors over other creditors, when the company was insolvent, or when its insolvency was contemplated by its directors and officers. The intent to give a preference, and either an actual insolvency or a contemplation of insolvency, must be proved as facts. The intent and the contemplation of insolvency may be proved either by direct evidence, or inferred as the necessary consequence of other facts clearly proved. If insolvency is relied upon to defeat the securities, knowledge of the insolvency by the directors of the company, or a belief by them that it existed at the time the securities were made, must be proved ; for an intent to give a preference to particular creditors, in fraud of all other creditors of the company, cannot be conceived, except as connected with a knowledge or belief that the company is insolvent, or with a contemplation of its insolvency. It is the intent to give a preference in violation of the statute, and in fraud of the general creditors of the company, which stamps the conveyance or assignment with criminality, and subjects the directors cooperating in such violation of the statute, *199 to punishment as for a misdemeanor. (1 R. S., 591, 592, §§9, 11, ha ed.)
There can be no criminal intent to violate the statute and defraud the creditors, unless the conveyance or assignment is made with knowledge or belief of insolvency, or in contemplation of insolvency. If these elements are wanting in the transaction, the conveyance or assignment must be deemed to have been made in good faith, as a payment or a security, for a preexisting debt, and not with intent to give a preference. (Jones v. Howland, 8 Metc., 382, 386 ; Denny v. Dana, 2 Cush., 171, 172; 1 R. S., 591, 592, §§ 9, 10, 11, 1st ed.) It is quite apparent from the evidence, and especially from the correspondence of the managing directors and financial officers of the company, in respect to the million and first half million trusts, and the accompanying assignments, and the negotiation of the ^mortgage bonds issued under such trusts, that they had, at the time of the execution, and of issuing these instruments, no knowledge, suspicion or belief that the company was insolvent, and did not at that time, in the event of the sale of such bonds, contemplate its insolvency. I use the term insolvency, as meaning an insufficiency of the property and assets of the company to pay all its debts. The uniform and concurrent language, at this period of the history of the institution, held by its managing directors, in their letters to their foreign correspondents, expressed an earnest desire that the mortgage bonds should be negotiated in England, and a confident belief that if they should be cashed, all the engagements of the company could be met as they became due.
It is apparent, also, that the million and first half million trust deeds, and the accompanying assignments, were not made with any reference to the stoppage of payment by the company, and the liquidation and winding up of its affairs, but for the sole purpose of enabling it to continue its business, and to meet all its outstanding liabilities as *200 they became due in the usual course of business. The success of the directors, although achieved with great difficulty, in continuing the ordinary business of the company for upwards of a year and three months after the execution of the two trust deeds, and their accompanying assignments, and in being able during all that period to meet all the engagements of the company, by payment or the renewal of its obligations, conclusively shows that the directors could not, at the time of the execution of such trust deeds and assignments, have either contemplated the insolvency of the company, or have known or believed that it was insolvent. The insolvency intended by the statute was, in my opinion, an actual or absolute insolvency, by which is meant an inability of the company to pay all its debts from its own property. Another meaning is sometimes accorded to this term, especially in cases arising under the bankrupt act, viz., an inability of the debtor to pay all his debts as they become due, in the ordinary course of trade, as contradistinguished from the ultimate sufficiency of his property to pay all his debts upon the final liquidation of his affairs. The former is its primary or derivative, as well as its popular and literary signification. This is also its meaning, when contained in statutory provisions in relation to the frauds of insolvent debtors, except in cases where it is declared that a different meaning is intended. It is used in this sense in the title in relation to moneyed corporations. ( Web. Dic., Insolvent and Insolvency ; Bouv. Law Dic., Insolvent; Whar. Law Lex., Insolvent; 2 Bell's Com., 162; Herrick v. Borse, 4 Hill, 650; Stuart v. Mechanics' Bank, 19 John , 512, per Spencer, Ch. J.; Fidgeon v. Sharpe, 5 Taunt., 539; 3 Wend., 594, 595, in error, per Sutherland, J.; S. C., 1 Paige, 515; Denney v. Dana, 2 Cush., 171; Leitch v. Hollister, 4 Comst., 215 ; Gillett v. Phillips, 3 Kern., 119.)
The word insolvency is defined by Webster, the “ inabilty of a person to pay all his debts ; or the state of wanting property sufficient for such payment.” Bell, in his Com *201 mentaries on the Laws of Scotland, vol. 2, p. 162, says : “It seems to have been held that the only conclusive proof of insolvency, is a comparison of the debts with the funds of the debtor; and in most legislative remedies provided against the frauds of insolvent debtors, &c., it is to this sort of proof that reference has been made as the criterion of insolvency.” In Stuart v. Mechanics' Bank (19 John., 512), Spencer, J., says: “A bank may be quite solvent, notwithstanding it fails to redeem its bills.” Dallas, J., in Fidgeon v. Sharpe (5 Taunt., 539), says, “ A man may stop payment and not be insolvent.” Gardiner, J., in Leiich v. .Hollister (4 Comst., 215), defines insolvency to mean, “ that all the assets of the insolvent, if honestly appropriated, will be insufficient to pay his debtsand in Gillett v. Phillips (3 Kern., 114, 119), he interprets in like manner the word insolvent, as used in the identical section of the title in relation to moneyed corporations, under which the question we are now considering arises. He says: “ When a moneyed corporation is insolvent in such a sense, that all its debts cannot probably be discharged from its assets, the payment of any one creditor in full is a preference within the meaning of the statute.”
The title containing special provisions relating to certain corporations (§ 4), and the safety fund act (§ 25), recognize a distinction between a refusal to pay debts and insolvency. The same distinction is recognized in the article in relation to proceedings against corporations in equity. (2 R. S., 463, 1st ed.) Questions in respect to the meaning of insolvency, in cases arising under bankrupt acts, are exceptions to the general rule. In such cases, the signification of the word is determined by the peculiar provisions of those acts.
Within the meaning of the English bankrupt acts, a trader is an insolvent when he is not in a condition to pay his debts in the usual and ordinary course of trade and business. (Shone v. Lucas, 3 Dow & Ryl, 218 ; De Tastet v. Le Tavernier, 1 Keen, 161, 171; Bayley v. Schofield, 1 Maule *202 & Selw., 338; 2 Bell’s Com., 162, 164; Everett v. Stone, 3 Story’s, 453.) To determine whether the North American Trust and Banking Company was insolvent at the time of the execution of the trust deeds and assignments, a comparison must be made between its assets, at the then market prices and values thereof, and its debts. I infer from the evidence that the result of such a comparison would show a sufficiency of property belonging to the company, as thus estimated, to pay all its then outstanding liabilities. It seems that in December, 1840, some eight months after the execution of the trust deeds, a committee of the board of directors, after a minute examination of the affairs of the company, reported that it was solvent to the amount of $2,321,395.
If the company was not insolvent at the time of the execution of the trust deeds and accompanying assignments, within the meaning of the ninth section of the title in relation to moneyed corporations; or if it was insolvent, but the directors of the company had no knowledge or belief of such insolvency, and there were no circumstances which must or should have reasonably led them to believe that such insolvency existed; and if they did not at that time contemplate or anticipate the insolvency of the company,' these deeds and assignments are not void under the sections referred to, although the company may at the time have been in an embarrassed condition in consequence of its want of a cash capital to enable it to meet its maturing obligations.
Although a moneyed corporation is embarrassed in its financial condition; although it fails to discharge its liabilities as they mature, and even stops payment; yet if it is entirely solvent, and there is no probability of insolvency, and no contemplation of it, its directors, entertaining a bona fide expectation of extricating .it from its embarrassment, may sell, or assign, by way of hypothecation, a portion of its assets for the purpose of raising money to *203 accomplish that object by the payment of its debts; and such conveyance or assignment will not be deemed fraudulent or a violation of the ninth section of the title in relation to moneyed corporations. (Gibson v. Boutts, 3 Scott, 229, 238, Eng. Com. PI. and Exchequer Chamber; Harwood v. Bartlett, 6 Bing. N. C., 61; Greenwood v. Churchill, 1 Myl. & Keene, 546; Fidgeon v. Sharpe, 5 Taunt., 539; Bittleston v. Cooke, 36 Eng. L. & Eq. R., 97.) A contemplation of insolvency is where the debtor, having full knowledge of his embarrassed circumstances, has no hope or expectation of relief, and anticipates an entire failure in business and absolute insolvency; or when Ms circumstances are such that any prudent man, talcing a reasonable view of his situation and of the surrounding circumstances, might at the time fairly expect insolvency to follow. (Gibson v. Mushett, 3 Mann. & Gr., 158, 168.) In such cases the question is, was the money paid, or property assigned, with a view to a fraudulent preference, and also in contemplation of insolvency? (Flook v. Jones, 4 Bing., 20; Fidgeon v. Sharpe, 5 Taunt., 539.) If the debtor believes he has funds sufficient to pay all Ms debts, and does not anticipate insolvency, his conveyance of his property cannot be impeached.
Under the English bankrupt acts, if a debtor, after committing an act of bankruptcy, pays a demand to his creditor, on a surrender by the latter of a lien for such demand, such creditor cannot be divested of the money so paid to him; as he cannot be placed in a worse situation than he would have been if he had retained Ms security. ( Thompson v. Beatson, 1 Bing., 145; Mavor v. Croome, Id., 261.) The principles of these cases applies to the pledge of the mortgage bonds to the Palmers, as a substituted security in place of the state stocks surrendered by them to the company, upon the faith of such pledge.
Under the English bankrupt acts, contemplation of bankruptcy cannot be inferred from mere insolvency; there must be an actual contemplation of a failure in business, a *204 stoppage of payment. (21 Verm., 616; 3 Story, 386, 544.) Under these acts, if the debtor honestly believes he is able to go on in his business, and with such belief pays a debt, without design to give a preference, such payment is not fraudulent, although insolvency then exist, and bankruptcy afterwards ensues. (8 Metc., 385, 386, 387.)
It is said a party must be supposed to intend the natural results of his condition and acts. But this proposition must be received with qualifications. The result cannot always be relied upon as evidence of the imputed intent. We must judge of the acts as they appeared to the debtor at the time they were transacted, not as they appear to the observer after the result is known. We all know that an embarrassed debtor often goes on after his condition is irretrievable, with confident hopes of relief. (Jones v. Howland, 8 Metc., 386, 387, per Hubbard, J.)
The next question to be examined is, whether the- trust deeds are void upon their face, because made in trust for the use of the company, and also whether they were made with intent to hinder, delay and defraud creditors.
If the trust deeds and accompanying assignments were made, and intended to operate only as mortgages of a part of the capital of the company, to secure future advances to the company by way of loan for lawful purposes, they do not come within the condemnation of the section in relation to transfers of personal property in trust, for the use of the vendor. (2 R. S., 135, § 1.) That section has no application to assignments or conveyances in trust given by way of mortgage, or hypothecation, as a security for a loan of money, or a preexisting debt. It applies to a conveyance or assignment made in trust, where the principal motive of the person making it is, to reserve or secure to himself the entire, or at least a part of, the beneficial use of the property. If the only object of the conveyance or assignment is to secure the payment of a loan of money, or of an existing debt, and the express reservation or resulting of the *205 residuary beneficial interest in the property is a necessary incident of the conveyance in trust, and not one of its objects, the section in question has no application. (5 john., 335, 345; 2 Seld., 516; 4 Comst., 216.) In all cases of a mortgage, whether created in the form of a trust or otherwise, the mortgagee acquires only a specific lien on the property transferred, and the whole residuary interest therein remains in, or results by implication of law to, the grantor; and an express reservation of such residuary interest, being nothing more than what results to the party making the assignment, by operation of law, will not vitiate the assignment.
Such an express reservation has not the effect of hindering or delaying creditors. The assignee acquires no legal or equitable title to the property, only a specific lien thereon. The residuary interest of the assignor may be immediately reached by his creditors by means of an execution, if the property assigned is a chattel, or by a complaint in the nature of a bill in equity, or by proceedings supplementary to an execution, if the property is a chose in action. The creditor without any delay, can attach the interest of the debtor in the property, and can enforce its sale, subject to the specific lien, to obtain satisfaction of his debt; and if the debtor has given the mortgage security in the form of a trust, the creditor will not be compelled to postpone proceedings against the property until the determination of such trust. These principles were advanced by Judge G-ardiner, and unanimously adopted by the Court of Appeals, in Leitch v. Hollister (4 Comst., 216), and they are conclusive upon the point I am now discussing, if the trust deeds and accompanying assignments are in legal effect mortgages to secure the payment of the mortgage bonds. In the case of Leitch v. Hollister, the debtor assigned to three creditors a chose in action, declaring therein that the amount realized by them should be applied in the payment of his indebtedness to each of them, in equal proportion to the amount of *206 their respective demands, the balance to be returned to him, the debtor.
It is apparent upon the face of the trust deeds and accompanying assignments, and from the evidence in the case, that the object of the officers of the company, in making the instruments, was to obtain a loan of money by creating a mortgage or pledge of the bonds and mortgages assigned, to secure the payment of the mortgage bonds to all persons who .should thereafter advance money on such bonds to the company on the credit of such securities ; and it is furthermore apparent that it was not one of the objects of these securities to create a trust for the use of the company. A trust as to the surplus, after the mortgage bonds should be satisfied, was not one of the objects had in view when the trust deeds were executed. The uses reserved in the deeds in favor of the company are precisely those which would have resulted in its favor by operation of law. The deeds declare that the trustees shall hold the bonds and mortgages assigned, in trust for the company, until default be made in payment of the mortgage bonds, and until that time to permit the company to receive the interest which shall accrue thereon; and upon such default, to make collections on the bonds and mortgages, and to pay the same to the London agents, to be applied by them in payment of the mortgage bonds, and after the bonds are paid to return the securities to the company. The uses thus reserved are the same, and no other, as would have resulted to the company by operation of law, in case no such reservation had been made. It is, therefore, evident that these trust deeds, being nothing but mortgages given to secure the payment of a loan of money, and for that object only, do not belong to that class of instruments which are condemned by the section of the Revised Statutes in relation to conveyances of personal property in trust for the use of the vendor. (2 R. 8., 135, § 1.)
*207 No sound objection can be taken to these mortgages, because they are created in the form of trusts, and by means of conveyances to third persons. Precisely the same thing was done in the mortgage of the Merchants’ Exchange Company to James Gr. King, as trustee, to secure the payment of money to be advanced to the company on its bonds; and that mortgage was held by the Court of Appeals, to be a valid security. (I R. S., 727; 1 Seld., 547.) By the trust deed in that case, the real estate was conveyed to King in trust for the use and indemnity of the bondholders; upon condition, however, that if the company paid the bonds, the estate granted should determine, &c. It was held by this court, in respect to this deed, that it conveyed no title; that it was a mortgage, a mere security for a debt; and that the title remained in the mortgagor. If the mortgage of the Merchants’ Exchange Company was valid, although it was in the form of a trust, I cannot see why the mortgages in this .case should be deemed invalid because they were created in the same form. Express trusts, in personal property, may be created for any purpose which is not illegal. The article in relation to uses and trusts has no application to this kind of property. (8 Paige, 305.)
If the trust deeds, and accompanying assignments, were executed for the sole purpose of borrowing money to enable the company to pay its existing debts, and to continue its business, and not with reference to. its insolvency and a liquidation (as I think the case shows); and if these instruments do not contain provisions which necessarily have the effect of hindering and delaying creditors, we are not authorized, in the absence of any proof of actual fraudulent intent, to infer from the evidence that they were made with intent to hinder, delay and defraud creditors.
I think the error of the counsel of the receiver, in this part of °the case, consists in assuming that the trust deeds had the effect of hindering the creditors in the pursuit of their ordinary legal remedies, in respect to the assigned *208 property. This error is made perfectly apparent by the reasoning of Judge Gardiner, in Leitch v. Hollister (4 Comst., 216), before referred to. If the trust deed and accompanying assignments are in legal effect only mortgages, mere securities for the payment of money, the bondholders and trustees acquired only a specific lien on the bonds and mortgages assigned, and there was no obstacle in the way of the general creditors in pursuing their ordinary remedies against the assigned bonds and mortgages. If the proper legal proceedings had been instituted by such creditors before the sale of any of the mortgage bonds, the negotiation of them by the company would have bee, arrested; and if such proceedings had not been commence! until the negotiation of the bonds, the creditors would have secured a lien on the assets assigned, subject only to the payment of the bonds previously negotiated.
It is an established principle, that a mortgage, executed to secure the repayment of future advances, is valid in respects to all such advances as shall be made prior to the time when creditors shall obtain a lien on the property mortgaged. (16 John., 165; 2 John. Ch. R., 309; 5 id., 326 ; 6 id., 429.) The present case comes within the prinple of these decisions. Whenever the design of a debtor is to raise funds for the payment of debts and the continuance of his business, an assignment or transfer of a portion of his property as security for present or future advances is unobjectionable, although a trust as to the surplus results by operation of law, or by virtue of an express reservation in the deed. But if an assignment is made by a debtor when in failing circumstances, which looks to a final liquidation, and implies an inability to meet his engagements, it will be invalid, unless it is an unqualified devotion of the assets assigned to the payment of all his debts, without any reservation of an interest therein to the prejudice of his creditors. The trust deeds and assignments, in question in *209 the present ease, I think are embraced in the former class of assignments and conveyances.
The next question to be examined is the proposition of the receiver, that the trust deeds are void, because given to secure the payment of instruments called bonds, which were illegal contracts, the company having no power to give them, and the issuing of them being expressly pro hibiteu by statute; and that the coupons annexed to the bonds are open to the "same objections as exist against the bonds. Under this general proposition, it is insisted by the counsel for the receiver: First. That the company had no power to borrow money; Second. That it had no power to issue time paper, sealed or unsealed, for that purpose; Third. That the banks had no such power previous to the safety fund act of 1829, and the act of 14th May, 1840, prohibiting its exercise, the issuing of such paper being contrary to public policy; Fourth. That the bonds issued, after the act of 1840, were forbidden by that act; Fifth. That they were prohibited by the safety fund act; Sixth. And that they were issued in violation of the restraining law.
The statutory declaration, that a corporation has no corporate powers except those expressly given in its charter and such as shall be necessary to the exercise of the powers so given, is only declaratory of the common law rule on the subject. (1 R. S., 600, §3, 1st ed.; 15 John., 358, 383.) Every corporation has certain powers and capacities, which are, at common law, incidental to its existence. Among these are the powers to take and grant property, and to contract obligations. (2 Kent's Com., 278; 15 John., 383 4 Wheat., 658 ; 1 Kyd on Cor., 13, 69, 70.) These general powers may be curtailed by the act of incorporation, and restrained and qualified by the nature and object of the corporation. When the charter is silent as to the contracts which a corporation may make, it has, as incidental to its existence, the power of making all such contracts as are necessary and usual, in the course of the business it trans *210 acts, as a means to attain the object for which it was created. (Ang. & Ames Corp., 83, 84, 245, 3d ed.; 2 Kent's Com., 278, note c, 7th ed.; 15 John., 383, per Thompson, J; 1 Sandf. Ch. R., 288, 289.)
The power of the North American Trust and Banking Company to borrow money may be maintained, as an incidental power necessary to carry on the.business of banking. This power has always been claimed and exercised by banks of discount in all commercial countries. In the original charter, granted in 1694, to the Bank of England (Act of 5 and 6 William and Mary, ch. 20), the power of that bank to borrow, as an incidental power, was conceded by imposing a restriction in respect to the amount to be borrowed. The same concession was made by the enactment of the sevéral acts of the British Parliament, restraining in favor of the Bank 'of England, all corporations, &c., from borrowing money on their notes, payable at a less time than six months. The Scotch banks exercise this power. It is one of the principal sources of their profits, to borrow, at a low'rate of interest, and lend at a higher. (3 Edin. Encyclo., tit. Bank, 220, 224; Cyclopaedia of Arts, &c., tit. Bank; 1 Chitty on Bills, 15, 16.) Beawes, in his Lex Mer catoria, 384, says: “ That the legitimate business of a bank of discount, deposit and circulation, consists in borrowing money upon their own credit; lending money on good securities ; buying and selling bullion ; discounting bills of exchange or other secure debts; and receiving and paying the money of other persons.” And at p. 398, he says: “ The Bank of England may borrow money on any contracts, and may give such security as shall be satisfactory to the lender.” This power was always exercised by the old incorporated banks of this state, and it has also been exercised by the banking associations since the passage of the act authorizing their formation. It has been exercised by these banks as a legitimate power of banking, and as the necessary and usual means to enable the banks to carry *211 on the business of banking. It is conceded that this power is an attribute of a system of legitimate banking; but it is insisted that the act of April 18, 1838, to authorize the business of banking, denies this power to banking associations. It is assumed that the act, unlike previous bank charters, particularly specifies all the powers intended to be granted; and it is therefore, and upon this assumption, argued that the power to borrow is denied, upon the principle that, in such a case, every power not expressly granted, is impliedly prohibited. Expressio miiíts est exclusio alterius. I think it will be found, upon an examination of the act to authorize the business of banking, and of the previous acts incorporating the safety fund banks, that there is no essential dissimilarity between them, in respect to a particular enumeration of the powers expressly granted, although there is between that act and the banks created previous to the adoption of the safety fund act. The only essential difference between the act to authorize the business of banking and the acts incorporating the safety fund banks, consists in the insertion, in the charters of the safety fund banks, of restrictive clauses, prohibiting such banks from trading in goods and in United States and state stocks, unless in selling the same when pledged to them by way of security for debts, which are not contained in the act to authorize the business of banking.
The banking powers granted to the safety fund banks, and to banking associations, are substantially the same, and are specified with equal particularity and definiteness. (Laws of 1838, 246, 249, 250, §§ 3, 18, 24; Laws of 1832, 240, §§ 3, 4, 5, and pp. 43, 44, §§ 3, 4, 5, &c.) The only restrictive clause, in the charters granted prior to the safety fund act, was the same as the one contained in the banks incorporated under that act.
The restrictive clause in the charters granted previous to 1838, in relation to trading in goods and stocks, was unnecessary. The chartered banks would not have possessed
*212 the power to trade in goods and stocks, had this restrictive clause been omitted. Their powers were restrained by the nature and purposes of their incorporation. They could only, in the absence of such restriction, have exercised the powers expressly granted, and such other incidental powers as should be necessary to carry on the business of banking. Such is the express declaration of the Revised Statutes (1 R. S., 600, § 3), and which is merely an enactment of the common law. Without any restrictive clauses, they could not have trafficked in goods, nor insured property against loss by fire, nor insured lives, nor granted annuities, nor constructed railroads, nor engaged in manufactures, or in any business except the business of banking, and could have exercised no powers except those incidental to that, business. (Ang. & Ames on Cor., 84, 85 ; 4 Peters, 152,168; 15 John., 383 ; 1 R. S., 600, § 3, 1st ed.; 2 Kent's Com., 299.) If this proposition is not sound, then the old chartered banks had the implied power to engage in any and every kind of business, no matter how foreign to the business of banking, except the trading in goods and stocks, to which the restriction in their charter was confined; and this power could have been defended upon the principle of expressio unins est exclusio altering, urged in this case against the power to borrow money ; for it could have been argued that the express prohibition against dealing in goods and stocks, was an implied grant of all other corporate powers. In neither the old charters or in the general banking law, are there inserted in connection with the express grant of banking powers, as will be found in the charters of the Bank of France and of the Bank of the United States (Act of United States, of April 10th, 1816, § 17; Edinburgh Encyclopedia, tit. banks), negative words in respect to the exercise of any powers other than those expressly granted. And the only sound and safe doctrine, therefore, both as it respects the safety of the corporation and the protection of the public, is, to regard the powers of corporations as limited, as well by *213 the purposes of their creation, as to those powers which are expressly, granted, and to such incidental powers as are necessary to the exercise of those enumerated, and also to such general powers as are, by the common law, tacitly annexed to every corporation, unless prohibited by statute or its charter, or restrained or qualified by the nature and objects of the corporation. There is no -necessity for the strict construction of the act to authorize the business of banking contended for, as the result (of unlimited powers) apprehended, could not follow from the adoption of the construction applied to previous charters. The Revised Statutes and the common law, deny to corporations all powers except those expressly granted, and such incidental powers as are necessary to their exercise, and also such general powers as are incidental to the existence of every corporation. It is, therefore, apparent to my mind, if the banks, under the old system, had the right to exercise the power to borrow money for the legitimate purposes of banking, which is conceded, that the present banking associations possess the same power. This power is, however, limited to the purposes of the association. It can only be defended when exercised to aid in carrying on the legitimate business of banking. It cannot be exercised to accomplish any object foreign to the legal objects for which the organization of the corporation was authorized. With these limitations, I think the power of banking associations to borrow money for the lawful purposes of the corporation is unquestionable.
This power may be exercised under the general power tacitly annexed to every corporation, when created, to contract obligations as a necessary and directly appropriate means to enable it to conduct the business for which it was created. (2 Kent’s Com., 278, and note c; Ang. & Ames on Cor., 245.) Under this general power to contract obligations, a banking association may make all such contracts as are necessary and usual in the course of its business, as a means to enable it to carry on the business of banking.
*214 >The exercise of the power to borrow money is usual in the course of the ordinary business of a bank; and it is directly and immediately appropriate to the execution of the expressly granted powers. It is not prohibited by the act to authorize the business of banking, nor is it restrained or qualified by the nature and object of the corporations organized under that act. Being a power, then, neither prohibited nor inconsistent with the nature and objects of a-banking association, if its exercise is necessary and usual in-carrying on the business of banking, and' if it enables the company to accomplish the purposes of its creation, it is an-essential attribute of the corporation, tacitly annexed to it by the common law. (Ang. fy Ames on Cor., 83, 84, 245; 15 John., 383 ; 2 Kent's Corn., 278, and note e, 7th ed.)
This power to borrow money for the legitimate purposes of the company may also be maintained as a power conferred upon it by the express terms of the general banking law, as an incidental power necessary to carry on its business of banking. It may be supported as an incident to some, if not to all, of the specific powers expressly granted, viz., the power to discount notes, &c., to receive deposits, to buy and sell gold and silver bullion, and bills of exchange, to loan money, to purchase public stocks to deposit with the comp trailer, and such real estate as it was authorized to purchase The old chartered banks exercised the power to borrow, to enable them to discount notes. I can see that a prudent exercise of this power by a bank, in anticipation of receipts from the payment of its outstanding paper, for the purpose of accommodating its customers, may be' an appropriate means to enable it to exercise the power of discounting notes. So borrowing money to provide funds to. be placed temporarily in the hands of a foreign correspondent, in anticipation, of those to be. supplied in the regular course of business, may be so useful and appropriate as to be regarded as an incidental power necessary to the sale of bills of exchange. But whatever may be the better opinion in respect to the exercise *215 of this power as incidental to discounting notes and selling bills of exchange, I apprehend no doubt can be entertained of the right of a banking association to exercise it as a means to enable it to repay deposits, to pay a debt contracted in the purchase of bullion or foreign coins or bills of exchange, or to pay the price of public stocks or the consideration of real estate purchased. The express grant of the general power to buy gold and silver, bullion, &c., bills of exchange, public stocks and real estate, implies the power to purchase these things on credit; and the power to contract debts is a necessary result of the power to buy on credit. The debts of a banking association, thus legally contracted in the course of its legitimate business, may become due at a time when, in consequence of unexpected losses or an unforeseen drain on its cash resources, the company, although perfectly solvent may be unable to pay them. In such an emergency has not a banking association the power to extricate itself, and thus to avert its ruin by means of a temporary-loan of money? It is very apparent to me that these associations, when placed in such circumstances, and even under any circumstances, have the power to borrow money for the purpose of paying their lawful debts. The consequence of a neglect or refusal to pay their bills or notes would be the loss of their credit; the forced sale of their securities, in the hands of the comptroller; the sacrifice of their assets and their dissolution. To avert such disastrous consequences, a loan ought to be regarded as the exercise of an incidental power necessary to carry on the business of banking, or necessary to the exercise of the powers expressly granted, or as incidental to the existence of the corporation.
The exercise of the power to borrow money for the specific purpose above mentioned, comes within the definition given by Judge Ellsworth, of an incidental power, in the case of Hood v. New-York & N. H. R. R. Co. (22 Conn. 16), cited by the counsel of the receiver. He defines such a power to be one which “is directly and immediately appropriate to *216 the execution of the specific power granted, and not one that has a slight or remote relation to it.”
I am aware that it is objected to the necessity of the exercise of this power to borrow, that a banking association may meet its liabilities by the re-discount of its discounted paper or the sale of its other assets. I apprehend that this is not a sound objection to the exercise of the power to borrow. It may not in all cases be possible for the association to obtain a re-discount of its paper, or to sell any portion of its assets in time to meet a pressing emergency; while it may be able, upon the credit of its corporate liability, in connection with an hypothecation of a portion of its assets, to obtain a loan. And, if it should be able to obtain a re-discount of its paper, it would probably be required, in accordance with the usage of banks to superadd its guaranty or endorsement.
If the object of denying to banking associations the power to borrow money, and the use of their credit, is to confine their operations to the use of their capital, in order to create a check against their improvidence, the absolute sale of 'securities which form their capital, accompanied by covenants of guaranty and indemnity, would have a like tendency, to defeat this object, as a loan secured by an hypothecation of such securities. In both cases an indebtedness would be created, although in one case it would be contingent, and in the other absolute. The same objection which is made to the exercise, by an association, of the power to borrow, may, for like reasons, be made against the power to alien. Neither of these powers are enumerated in the act to authorize the business of banking, and the one does not violate the principles of public policy any more than the other. Neither can exist except as incidental powers, or as general powers which the common law tacitly annexes to every corporation eo instanti it is created, unless expressly prohibited by law or its charter. (2 Kent's Com., 281; 3 Barb. Ch. R., 122; 3 Comst., 238; 3 Wend., 13.) lean clearly *217 see that cases may arise, in which the exercise of one or both of these powers may be necessary to protect a banking institution from'ruinous loss, and even to preserve its very existence.
A banking association may unquestionably buy gold and silver bullion, &c., on credit. The act expressly grants the general power to buy, without restricting the exercise of the power to either a purchase for- cash or on credit. It follows, necessarily, from this unrestricted grant, that the purchase may be made in either mode. Now, what is a purchase on credit but a buying of the article sold, and a borrowing of the price. It is in substance the same transaction, as if the purchaser had paid the price to the seller, and then had immediately received it back on a loan, The contract of borrowing, for all practical purposes, exists as much in the one case as in the other. Is not this, then, an emphatic recognition of the right of a banking association to exercise the power to borrow money, as an incidental power. The same remarks apply to the powers to buy bills of exchange, public stocks and real estate. Again, what is the power to receive deposits, but a power to borrow ? It is, in every sense of the term, a loan. The money deposited, if a general deposit, becomes the property of the deposit bank, and the latter becomes a debtor, and the depositor a creditor to the amount of the deposit. (2 Seld. 416, 417.) This express power to receive deposits is another recognition of the right to exercise the power to borrow.
The general understanding in respect to the construction of a statute, and the usage of all persors in a particular business in accordance with such understanding, is always regarded as of great weight in fixing the construction of such statute. “Contemporanea expositio est optima et fortisima in lege." (Broome's Legal Maxims, 532.) The general understanding of bankers and the usage of the banking associations have, ever since the passage of the general banking law, been in accordance with the right claimed by these associations
*218 to borrow money. The state has recognized this right by loaning from time to time the surplus revenues of the canal' fund to these associations.
An express authority is not indispensable to confer upon a corporation the right tb borrQW money, to deal on credit, or to become a party to a promissory note or bill of exchange. It is generally sufficient, if such right be implied, as the usual and proper means to accomplish the purposes of the charter. (Ang. & Ames on Corp., 86, 234, 3d ed.; Grant on Corp., 276; 3 Sandf. Ch. R., 339, 347, 349; 1 id., 280 ; 3 id., 34; Chitty on Bills, 15; Story on Bills, § 74,15 John., 44, 52; 3 Bar. & Ald., 1, 7, 11; 2 Kent’s Com., 299.) Best, J., in Broughton v. Salford Water- Worlcs. (3 Bar. SfAld., 1, 11), says: “When a company like the Bank of England or East India Company are incorporated for the purposes of trade, it seems to result, from the very object of their being, that they should have power to accept bills or issue promissory notes.” It has been repeatedly decided in this state that a corporation, without any express power in its charter for that purpose, may, when not expressly prohibited by law, make a promissory note payable either at a future time or upon demand for a debt contracted in the course of its legitimate business; and that this power is incident to all corporations. (9 Paige, 476; 2 Hill, 267 ; 1 Cow., 513; 3 Wend., 94; 4 Hill, 265.)
The power of the North American Trust and Banking Company to borrow money may also be maintained upon judicial authority. There has not been a single decision of any court of this state, which has come to my knowledge, against the existence of this power, while several have been made in favor of it. Vice-Chancellor McCow decided, in Leavitt v. Yates (4 Edw. Ch. R., 165), that banking associations possessed the power to borrow, as incidental to the power of discounting notes, of buying bills of exchange, bullion and foreign coin, and also of buying state stock to be deposited with the comptroller. A like decision was made by Assistant Vice-Chancellor Sandford, in Boisgerard v.
*219 The New-YorTt Bank Company (2 Sandf. Ch. R., 23), and by the general term of the Supreme Court of the first district, in Leavitt v. Blatchford, (5 Barb., 23, 24.) In this last case, Edwards, J., defended the power of banking associations to borrow, as a necessary incident to the power to become indebted. (P. 24.) In Beers v. The Phoenix Glass Company, the general term of the second district (14 Barb., 858), held that every incorporated company possessed the power to borrow, without any express grant for that purpose, in all cases where its exercise was essential to the -transaction of its ordinary affairs. Judge S. B. Strong, in delivering the opinion of the court, held that the Phoenix Glass Company, the defendants in that suit, had the right to borrow, to pay for materials purchased for their factory, or the wages of their operatives, or whenever essential to conduct any of their legitimate operations; but that the exercise of the power must be limited to and for the appropriate business of the corporation. The same decision was made by Assistant Vice-Chancellor Sandford, in Barry v. The Merchants' Exchange Company. (1 Sandf. Ch. R., 288, 289, 290, 312.) The right of a corporation to borrow money is. conceded in the case of The Life and Fire Insurance Company v. The Mechanic Fire Insurance Company of New-York (7 Wend., 31.) It has been frequently decided that insurance companies, without an express grant of the power to borrow, may exercise that power to pay losses. It is regarded as a power implied by the common law, as essential to accomplish the objects of the corporation. (Furniss v. Gilchrist, 1 Sandf. S. C. R., 53, per Oakley, C. J.; Brown v. Harbeck, 1 Duer, 114.) The existence of this power, as incidental to every corporation, unless expressly prohibited, or inconsistent with the nature and object of the corporation, has been repeatedly recognized by this court as a well established principle. In Leavitt v. Palmer (3 Comst., 19), same as Leavitt v. Blatchford (5 Barb., 9), the learned counsel for the receiver did not, as appears from *220 his reported argument, deny the power of banking associations to borrow money; and its existence was plainly conceded by Judge Bronson in his opinion delivered in the case. Although Judge Bronson, in his opinion, condemns the notes issued by the North American Trust and Banking Company, because made payable on time, yet he expressly affirms the legal liability of the company on account of which the notes were given. (3 Comst., 34,36,37.) This concession of the existence of the power to borrow is made more apparent from the. fact that a question was raised in the Superior Court in regard to this power, and was fully discussed by Judge Edwards, in his opinion delivered in that court. Judge Denio, in his opinion, prepared at the request of the receiver, expressly admits the right of banking associations to borrow; he says it is a necessary incident to the business of a banking company. The existence of this power, as incidental to every corporation, with the qualification before named, may be inferred from the determination of this court in favor of the doctrine of incidental powers, in the case of The Farmers' Loan and Trust Co. v. Clowes (3 Comst., 470, 473.) The Farmers’ Loan and Trust Co. had powers expressly granted to it to insure upon lives, to grant annuities, and to assume and execute trusts, but no express power to loan money had been conferred. The court decided that Jhe company had, by implication, the power to loan money, as a proper and necessary means to enable it to'accomplish the purposes for which it was incorporated. If the power to loan money may be implied, as necessary to the exercise of certain enumerated powers, so may the power to borrow money. But the question of the implied power of a corporation to borrow money was expressly raised in this court, in King v. The Merchants' Exchange Company (1 Seld., 553, 557), and was passed upon by the court. The Merchants’ Exchange Company was authorized by its act of incorporation to purchase real estate, and to erect an exchange thereon for the accommo *221 dation of the merchants of New-York, and to receive the rents and divide them among the stockholders. Banking privileges, and power to engage in any other business, except as was proper and necessary to carry into effect the declared objects of the act, were expressly prohibited, and no power to borrow money was granted. The company had made and issued bonds for the purpose of borrowing money to enable it to complete the building, then being erected for the purpose authorized by the act; and had executed a mortgage to James E. King, in trust, as a security for the payment of the bonds. A bill was filed to foreclose the mortgage; and when the final decree was made in the Superior Court of New-York, to which the cause had been transferred, establishing the validity of the bonds and mortgage, and referring the cause to a referee, the counsel of the company was accidentally absent. The company afterwards applied for a rehearing of the cause, which was denied, and a final decree was made confirming the report of the referee, and ordering a sale of the mortgaged premises. From this decree the company appealed to the Court of Appeals, &c. In the Court of Appeals the cause was argued upon the merits, and the question as to the validity of the bonds and conveyances in trust, and the right to borrow money, were distinctly raised and presented to the court. The court decided the cause upon its merits. Judge Foot, who delivered the opinion of the court, states expressly that the decision was made upon the validity of the trusts contained in the mortgages. The decision that the bonds and mortgages were valid securities, necessarily involved a decision in favor of the power of the pompany ° to borrow money; for it was not possible to determine the. validity of the bonds and mortgages without a determination that the company had the right to borrow money. The two things were inseparable. We must regard this case, therefore, as establishing the principle that the power to borrow money is incidental to every corporation, unless expressly *222 prohibited, or inconsistent with the nature and object of the corporation; and especially if it is a proper and necessary means to enable it to accomplish the purposes for which it was incorporated.
The reasons above stated, in my judgment, clearly establish the proposition that the mortgage bond» in question in this suit are not invalid, upon the ground that they were given to the holder for money borrowed by the company.
It is also insisted, on the part of the receiver, that the company had no power, prior to the act of 1840, to issue time paper, upon the ground that the isusinj; of such paper was contrary to public policy. The case of Safford v. WyTcoff (4 Hill, 442), in the Court of Errorj, establishes a contrary doctrine. In that case, a negotiable draft, upon the cashier of the North American Trust and Banking Company, issued by a banking association in favor of a third party as payee, payable on time, and signed only by the cashier, but not countersigned by the comptroller, was decided to be a valid instrument, and binding on the association. Senators Hopkins and Bockee delivered the prevailing opinions, and it must be presumed,' especially under the decision in James v. Patten (2 Seld., 15,16,18,19), that the opinions expressed by them, in respect to the questions which arose in the cause, and in which they agreed, were adopted by a majority of the court. They held, that as the draft bore no resemblance. to a bank bill or circulating note, and was not calculated to form a part of the circulating medium, and as there was no evidence that it was put in circulation as money, it was not a violation of the restraining law; and that the association had a right to issue it as an incidental • power necessary to the carrying on of the business of banking,” and especially as necessary to the exercise of the expressly granted power to buy and sell bills of exchange; and that the draft having been issued before the act of 1840, its being payable on túne was no objection to its validity. This decision is a direct authority in. favor of the right of *223 banking associations to issue time paper, prior to the act of May 14, 1840.
If the views urged upon us by the counsel for the receiver, in respect to this question, had been entertained by the majority of the members of the Court of Errors, in Saffcml v. WycJcoffj who united in a reversal of the judgment of the Supreme Court, their decision in that case must necessarily have been the converse of the one actually made. For, if that majority believed that banking associations had no power, even prior to the act of 1840, to issue paper on time, they must necessarily have decided that the draft in question was void. Their decision in favor of the validity of such draft is, therefore, an express adjudication that banking associations, prior to the act of 1840, possessed the power of issuing time paper. This decision, being directly in point upon this question, must be regarded as conclusive, upon the principle of stare decisis.
But, irrespective of its being an authoritative adjudication, I think it can be sustained upon both principle and authority. Prior to any statutory prohibition against the issuing by banks of promissory notes or bills of exchange, payable on time, they exercised the power of issuing such paper, without its being questioned by either the civil authorities or judicial tribunals. Judge Hand says, in his opinion in the Indiana case, that he knew of no principle of the common law which required the bills or notes of banks to be made payable on demand. In the absence of any statutory prohibition, a chartered bank, under an express grant of the general power to issue notes and bills without any limitation or qualification, as to the mode or manner in which they are to be issued, may issue such paper either on demand or,, on time. The effect of time paper, upon the circulating medium and upon the banks, proving mischievous, a prohibition against issuing it was inserted in the safety fund act of 1829. This prohibition, however was applicable only to the banks subject to the provisions of that act. Banking *224 associations, after 1838, having engaged in issuing the same paper, the act of 1840 was passed to extend a like prohibition to those associations. Judge Bronson, who delivered the opinion of the court, in Leavitt v. Palmer (3 Comst., 32-34), did not express any doubt in respect to their power to issue such paper, prior to the act of 1840; and it is plainly inferable, from his opinion, that he believed they had this power. In Talmage v. Pell (3 Seld., 323, 347), in which case time certificates of deposit had been received, previous to the act of 1840, by the State of Ohio, in payment of state stocks, from the North American Trust and Banking Company, Judge Gardiner, who delivered the opinion of the court, made no suggestion that the certificates were void, because contrary to public policy, and he expressly disclaimed the consideration of the question, whether the certificates of deposit were void, under the first and thirty fifth sections of the safety fund act, because payable at ij future day. It is very evident that the banks of Venice and Amsterdam, which were banks of deposit merely, issued certificates of deposit, payable on time. And in England, instead of notes payable on time being void, all notes of joint stock banks, and banking partnerships consisting of more than six partners, doing business in London, or within sixty-five miles thereof, are by statute prohibited, unless made payable more than six months from date. The act of 1838, to authorize the business of. banking, plainly contemplates the issuing, by banking associations, of evidences of debt, other than circulating notes, not intended to perform the office of circulating notes, or to be put in circulation as money, and not calculated to form a part of the currency of the country, such as ,drafts and bills of exchange drawn against funds on deposit with corporations or individuals, for the payment of balances, or sold to customers ,• certificates of deposits given to depositors, founded on actual deposits, and notes given for debts contracted in the course of the legitimate banking business of the association, and within *225 the scope of its legitimate purposes, and obligations or contracts given specially for the repayment of borrowed money. The issuing of these evidences of debt, especially drafts, bills of exchange, and certificates of deposit, form a part of the daily operations of every bank. The right to issue them is an incidental power necessary to the carrying on of the ordinary business of banking. The act to authorize the business of banking, does not require these evidences of debt, as it does circulating notes, to be countersigned by the comptroller, or to be made payable on demand, or at the place of business of the association. (Laws of 1838, 246, 249-251, §§3, 18, 21, 26; 4 Hill, 445, 446,. 450, 451, 454-456, 462, 463, 465; 1 Cow., 513; 3 Wend., 94; 9 Paige, 470.) Since the act of 1840, they must, however, all, except perhaps obligations expressly given for the repayment of borrowed money, be made payable on demand and without interest. (3 Denio, 70; 3 Comst., 35; 10 Paige, 114.) Under the principles above stated, and the decisions referred to, such of the mortgage bonds in this case as were issued prior to the act of 1840 cannot be pronounced void, as contrary to public policy, merely because they were payable at a future day.
I think these bonds are not, by the law as established in this state, sealed obligations. The common law intended, by a seal, an impression upon wax, or wafer, or some other Similar tenacious or adhesive substance, .capable of b.eing impressed. (4 Kent's Com., 452; 5 John., 224.) It was expressly decided, in Coit v. Millikin (1 Denio, 376), and in Fanners' and Mechanics' Banlc v. Haight (3 Hill, 494), that an impression upon paper alone is not a seal, except where it has been made so by statute. (2 Hill, 227.) The provisions in the Revised Statutes (1 R. S., 404, § 74, 3d. ed.), and the act of April 7,1848 (Laws o/'1848, 305), in relation to seals, are legislative declarations that an impression upon paper alone is not a seal at common law. Independent of statutory enactments, the seals of private corporations and *226 individuals are similar in character, and both are alike dis tinguishable from the seals of courts and public officers. I am aware that this objection is strictly technical in its character, and especially so, as a distinct and durable impression can be made upon paper as well as upon wax or wafer, and, as in this case, the company manifestly intended to make the instruments in question bonds, by affixing to them its common seal; but it is our office to declare the law as we find it established.
The mortgage bonds were not issued in violation of the restraining law. They were neither issued for the purpose of being loaned, or of being put into circulation as money. (1 R. S., 712, § 6, 3d ed.) The evidence, and the instruments on their face, show that the company did not intend that they should perform the office of a circulating medium, and it is apparent that they were not capable of performing that office. (9 Paige, 470; 4 Hill, 450, 452, 463.) They are not made in the similitude of bank notes ; they are pay able in sterling money; and are in the form of bonds, and contain a provision making them convertible into stock; they were made to be negotiated in England, and are for the payment of large amounts, and at a distant day, and were intended to be payable in England; and the interest is payable there. These characteristics prevented the circulation of these bonds as money.
The mortgage bonds being valid, the coupons annexed to them must be valid also. The latter have no existence or vitality independent of the bonds; they together form but one agreement. The coupons are intended to be cut off when the interest is paid, and delivered to the obligor, to bo retained by him as receipts for the interest paid. They are attached to the bonds for the double purpose of being used as receipts for interest paid, and as evidence to the purchaser of the bonds, of the non-payment of the interest represented by such of the coupons as remain attached to the bonds. ( Clark v. City of Janesville, Dist. Court U. S. for *227 Wisconsin, 4 American Law Reg., 597, per Miller, District J., 1 Sandf. Ch. R., 313.)
It is also insisted, on the part of the receiver, that the four hundred and ninety-nine bonds secured by the million trust negotiated in England are void for usury. The documentary and oral evidence shows that the contract for the sale of these bonds was made and the money advanced on them paid in England; that the semi-annual interest to accrue thereon was to be paid in London, and the principal ultimately to be repaid there. The purchasers, at the time of the purchase, resided and still reside in England. These facts make the contract an English contract; and the question of usuiy, therefore, is to be determined by the English law. It is a general rule that the law of the place, where contracts purely personal are made, must govern, as to their construction and validity, unless they are to be performed in another state or country, and were made in reference to the laws of such state or country, in which case their construction or validity depends upon the laws of the place of performance. (6 Paige, 630; Story on Confl. of Laws, § 242 ; 2 Kent's Com., 457, 7th ed., note a; Parsons on Cont., §§ 95, 96; 1 Cow., 108; 2 Burr., 1077; Story on Confl., §§ 653, 654; 13 Peters' U. S. R., 65; 4 Cow., 510, note ; 17 John., 518.) If no place of performance is expressly stated or can be implied from the terms of the contract, the law of the place where it was made will govern. (Story on Confl. of Laws, § 282.) It is a settled principle, where no place of payment is mentioned in the contract, that its legal construction is, that the money is to be paid to the creditor where he resides, or wherever he may be found. (6 Paige, 630; 10 Wheat., 367; 2 Parsons on Cont., 95, 99.) Where the contract for a loan -of moneys is made in one countiy and payable in another, the parties may stipulate for the payment of interest according to the laws of either countiy. (2 Parsons on Cont., 95, 96; 20 Martin's Law R., 1; 14 Verm., 33; 6 *228 Paige, 634; 13 Peters' 65 ; 1 Paige, 220; 7 id., 632; 22 Barb., 127, 128, 329.)
The fact that the mortgage bonds were secured by the assignment, to the trustees, of mortgages on lands in this state, will not, in my judgment, make the contract of loan in this case a New-York contract. (Story’s Confl. of Laws, § 287, a, 293; DeWolf v. Johnson, 10 Wheat., 367, 383; 13 Peters, 65, 78.) The case of Chapman v. Robinson (6 Paige, 630), which seems to lay down a different rule, is in many respects unlike the present case. In that case the contract was partly made in England and partly in this state, and the securities were actually executed in this state, and the money was payable generally. In this case, the contract was wholly made in England, the money was advanced in England and was to be repaid there, and the denomination of English money used in the contract stamps it as an English contract.
Although the contract for the sale of the four hundred and ninety-nine bonds is an English contract, it will be unnecessary for me, in consequence of the construction I havf given to the act of the 6th of April, 1850, to discuss the question whether the contract is usurious under the act of 12th Anne, ch. 16, or is taken,out of the operation of that act by the act of the 2d and 3d Victoria, ch. 37. The act of 1850 (Laws of 1850, 334, § 1) declares “ that no corporation shall hereafter interpose the defence of usury in any action.” The second section declares that the term corporation shall be construed to include all associations and joint-stock companies. The prohibition is, that no corporation shall, after the passage of the act, interpose the defence of usury in any action. This prohibition is not directed merely against pleading or proving the defence, but it is against interposing it; that is, either by plea or by proof, or by claiming the benefit of it at the trial or hearing. The statute was intended to embrace, in the prohibition, the setting up as a defence usurious agreements, made as well before as after the passage of the act. This intent is evident,
*229 from the omission to insert in the act a saving clause in favor of existing rights and remedies of persons having a right to set up the defence of usury, as was done in the act of 17 and 18 Victoria, ch. 90, repealing the English statutes of usury. The defence of usury is in the nature of a penalty or forfeiture, and may at any time be taken away by the legislature, in respect to previous as well as subsequent contracts, without trenching upon any vested right. A proposition that a party can have a vested right in enforcing a penalty or a forfeiture against which it is the office of a court of equity to relieve, is a legal solecism. Statutes of usury are highly penal in their character; and the defence of usury has always been regarded as an unconscientious defence; and has never received the favor of either courts of law or of equity.' (6 Hill, 224, 226; 23 Wend., 80; 1 John Ch. R., 439 ; 5 id., 143 ; 3 Barb. Ch. R., 640 ; 7 Hill, 391; 2 Comst., 131; 3 Paige, 528, 533, 534; 11 Wend., 330; 2 Barb. Ch. R., 371, 373.)
It is a settled principle that the repeal of a statute, imposing a penalty, instantly takes away the penalty, although a prosecution for it is pending; and if the repeal takes place after conviction, it arrests the judgment. (Butler v. Palmer, 1 Hill, 330; 11 Pick., 350.) No penalty can be enforced after the repeal of the law imposing it, unless saved by express words in the repealing act. (5-Cranch, 181, 283; 6 id., 329.) The repealing statute “ obliterates the statute repealed, as completely as if it had not been passed, and it must be considered as a law that never existed, except for the purpose of those actions which were commenced, prosecuted and concluded while it was an existing law.” (Per Lord Ch. J. Tindal, Key v. Goodwin, 4 Moore & Payne, 341, 351.) As soon as the statute imposing the penalty is repealed, the very foundation of the action to recover it is taken away, and the action must fall with the law. The act of 1850 is in substance a repeal of the statutes of usury, so far as relates to corporations. The language as well as *230 the spirit of the act applies to antecedent as well as subse quent usurious agreements. The prohibition applies not only to the corporation, but also to all who claim under or through it. Thus, as the corporation is inhibited from interposing the defence of usury, as against a usurious agreement, its creditors, who must claim through it in order to assail such agreement, are also inhibited. I conclude, therefore, that the act of 1850 has taken away from the receiver, as the representative of the corporation, and.of its stockholders and creditors, the right to interpose the defence of usury to the four hundred and ninety-nine bonds.
The next question to be considered is, whether the two hundred and seventy bonds delivered to the two Philadelphia banks, to secure certificates of deposit given upon the loan of $250,000, made by those banks to the company, or to secure the payment of such loan, are void, because delivered to secure a usurious loan, and because such certificates were prohibited by the act of 14th May, 1840. [The learned judge here states the facts substantially as stated on pp. 28— 32, ante, and then proceeds.] The provisions of the contract made it a Philadelphia contract, and the usury laws of that state must be applied to it. If, under the laws of that state, the contract was usurious, the two banks would nevertheless be entitled, under such laws, to recover the sum actually advanced, with six per cent interest, as the penalty in that state for usury is limited to the illegal excess of interest stipulated to be paid by the borrower. (Col. Act of Penn., 2 March, 1723 ; Laws of Penn., by Brown, ed. of 1803, 191, 192; 7 Paige, 636, 637.) I do not, however, think that the loan was usurious by the laws of either Pennsylvania or New-York. Where a bank discounts a note payable at its place of business, and at the request of the borrower, it advances him the proceeds at some distant place, it may deduct therefrom the difference in exchange between the two places. (10 Paige, 113; 2 Hill, 460 ; 13 Peters, 65, 76, 77; 9 Peters,. 378; 13 How. U. S. Pc, 152, 171, 172; 19 *231 John., 496 ; 10 Wend., 116.) But if the loan did violate the usury laws of either New-York or Pennsylvania, the act of 1850 has taken from the company and its representative the right to interpose a defence founded on such violation.
If the agreement for the loan had provided that the two hundred and seventy bonds should be delivered to the two Philadelphia banks, to be held by them as security for the payment of the loan, instead of being held as security for the payment of the twelve time certificates of deposit, no doubt could have been entertained in respect to the right of the two banks, under the contract of loan, to hold the bonds as valid securities, with all the rights of purchasers for a valuable consideration, secured by the first half million trust need, and accompanying assignments, unaffected by the act of May 14, 1840, inasmuch as these bonds had been issued and pledged to the Palmers, and, therefore, had a legal existence prior to the 3d of June, 1840. But as the agree ment declares that the company had directed their agents ¿o deliver the bonds to the two banks, “to be held as collateral security for the payment of the certificates,” the question arises whether the pledge of the bonds to the banks is not invalid, within the decision in Leavitt v. Palmer (3 Comst., 19). My first impressions were very decided, that the pledge to the banks could not be sustained, if we adhered to that decision. Upon subsequent reflection, however, I have come to the conclusion, although with some hesitancy, that the case of the Philadelphia banks may be distinguished from that of Leavitt v. Palmer. Leavitt v. Palmer carried the doctrine of the strict interpretation of written instruments in opposition to the manifest intent of the parties, as far as the principles of law and equity will justify. In that case, the North American Trust and Banking Company, being under a contingent liability to the Palmers for their acceptance of the Davis bills, on the 30th of November, 1840, made forty-eight negotiable promissory notes, payable on time, aid delivered them to the Palmers, on account of such *232 liability; and, at the same time, and as part of the same transaction, executed a trust deed, and assigned certain stocks and bonds and mortgages, for the purpose of securing the payment of these notes. The Court of Appeals decided, that as the notes were illegal and void, the trust deed and assignments, being a part of the same transaction, and given to secure the payment of the illegal notes, were also illegal and void. The trust deed and accompanying assignments were held invalid, because they were executed and delivered at the same time, and as a part of the same transaction, as the giving of the illegal notes. Being thus united in their creation and object, it was held not to be possible to separate the trust deed, &c., from the fate of the notes, and that as the latter must fall, the former could not stand. This dis tinguishing feature of Leavitt v. Palmer, is not to be found in the case of the loan of the Philadelphia banks. Here the mortgage bonds in question were not executed at the time of the execution of the twelve time certificates of deposit, and did not with them form a part of one and the same transaction. These bonds had a legal existence, under the first half million trust deed, as valid securities in the hands of the Palmers, as pledgees of the same, prior to the loan by the banks to the company, and prior to the execution of the illegal certificates of deposit, and consequently their fate was not connected with the fate of the certificates. The voidness of the certificates could not avoid the bonds. They, while being independent valid securities in the hands of the Palmers, pledged to them for the payment of their debts, were delivered by them to the two banks, for the sole purpose of securing to them the payment of their loan to the company. It follows, from these facts, that if, in consequence of any illegality in the agreement between the banks and the company, the pledge of the bonds to the former was invalid, or if the purpose of their delivery has been in any way defeated, the bonds reverted to the Palmers, to be held by them under their original pledge. These *233 bonds could not, in the case supposed, revert to the company, as the interest of the Palmers therein had not been released to the company, and as the former had received no consideration from the latter to support a release of their interest.
If, then, as is insisted by the receiver, the pledge of the two hundred and seventy bonds to the two Philadelphia banks is invalid, the receiver has no interest in these bonds, except to the extent of any contingent surplus which may remain, after satisfying the entire indebtedness of the Palmers, for which the unsold bonds, including the two hundred and seventy, were pledged to them. As the evidence shows there will be no such surplus, the receiver has no such interest in these bonds as authorizes him to question the title of the two banks to them. The Palmers, who alone, in the case of the invalidity of the pledge to the two banks, can assert a claim to the two hundred and seventy bonds, having omitted to assert any claim thereto, I can see no objection to these banks retaining the bonds as a security for their loan, in accordance with the original intent of all the parties. The agreement in relation to the loan, consists of several distinct provisions. The provision as to the loan is separate and distinct from that in respect to the certificates. The latter were not received in payment of the money lent, but merely as security for its repayment. The two provisions can be separated ; the one in relation to the certificates may be void for illegality, while the other, in relation to the loan, may be sustained as legal and valid. As, then, the contract of loan is valid, and as the bonds were delivered to the two bank by the Palmers, for the purpose of securing the repayment of the loan, and as this was the object of the company in directing their delivery, I am not able to see why we cannot give effect to the substance of the agreement between the two banks and the company, and to the intent of all the parties to the same; and why, notwithstanding the illegality »f the certificates, we cannot adjudge that the two banks *234 have a right to hold the two hundred and seventy bonds as a security for the money lent by them to the company.
It was manifest, from the evidence, that the two Philadelphia banks made their loan upon the credit of the pledge of the two hundred and seventy bonds, as a security for its repayment, and that such was the agreement of both parties to the loan. This distinctly appears from two letters of Beers, one to the Palmers and the other to Murray, both of the date of the 1st of July, 1840, the day of the date of the written agreement for the loan. In Beers’ letter to Murray, he states that the company had made a loan of $250,000 from the Philadelphia banks, upon a pledge of the mortgage bonds; and in his letter to the Palmers, he says that the loan had been made upon a pledge of three hundred bonds, as collateral to the certificates of the company. The order of the company, of the 1st. of July, 1840, to the Palmers, to deliver to the agent of the two banks the two hundred, and seventy mortgage bonds, was a part of the original contract of the loan; but it contained no reference to the certificates, and was not so connected with them as to be tainted by their illegality. There is no evidence that the directors and officers of the two banks had any knowledge of the illegality of these certificates, and, as they were residents of another state, the presumption is that they had no such knowledge. They could not, therefore, have been guilty of any wilful cooperation with the company in the issuing of these certificates. Inasmuch, then, as the two banks were entirely free from guilt in this transaction with the company; and as the contract of loan, being separate and distinct from the agreement to deliver the illegal certificates to secure its payment, was legal and valid; and as the order upon the Palmers to deliver the bonds, and their delivery by them to the two banks, had no necessary connection with the certificates; and as the loan was made upon the credit of the bonds; and as the intention of all the parties Was that the mortgage bonds should be delivered to the two *235 banks, as their security for the repayment of the loan; and as such was the effect, substance and intent of the agreement between the banks and the company, I think that the bonds should be deemed to have been delivered as a direct security for the payment of the loan, instead of an ultimate security, for that purpose, through the medium of the illegal certificates. We may strike out the whole of the agreement which relates to the void certificates, as must be deemed to be done in consequence of the taint communicated to it by the illegal certificates, leaving nothing in the agreement but the contract of loan; and this contract, in connection with the order upon the Palmers for the delivery of the bonds, and their delivery in pursuance of the order, will entitle the two banks to hold the bonds as a security for their loan.
But if I am wrong in my conclusion as to the validity of tire pledge of the two hundred and seventy bonds as a security for the loan of the two Philadelphia banks, these banks have, nevertheless, .or rather those who now own their claims have, upon the principle settled in the Indiana case, a valid and meritorious debt against the company, to the extent of the sum advanced to the latter, with interest at the rate of six per cent, and are entitled to have such debt allowed as a claim against the company, to be paid ratably with the other creditors out of its assets.
It is claimed, on the part of the receiver, that the two Philadelphia banks have no valid debt against the company, because the loan on which it is founded is usurious; and because it was made upon an illegal agreement that the company issue and deliver to them, as a security for the payment of the loan, time certificates of deposit, prohibited by the act of 1840. The answer to this proposition is: First. That the loan was not in fact usurious; and if usurious, that the company and its receiver are prohibited by statute from interposing the usury as a defence; and Second. That the illegality of the time certificates is created by a statutory prohibition, which is malum prohibitum merely, and by the *236 imposition of a penalty, the former of which is directed against the company only, and' the latter is imposed upon its officers and members alone; being the precise case presented to this court in the matter of the Indiana claim. (Tracy v. Talmage, 4 Kern., 162.) In that case, the state stocks of Indiana had been sold to the North American Trust and Banking Company, under an agreement to receive in payment the time certificates of deposit of the company, conceded for the purposes of that case to be prohibited by law; and it was decided that the parties were neither in pari delicto, nor participes criminis, and that the State of Indiana was entitled to recover against the company, r.ot the price agreéd to be paid for the stocks upon the ex^ rass contract of sale, which was void, but their actual va'us upon an implied contract to pay, for the stockr transferred so much as they were reasonably worth. In. that case, the English and American authorities on the sr eject were carefully reviewed by Judges Selden and Co'jI'óvock, and the principle deduced by them from such authorities, and adopted by this court was the following, viz.: That in all cases of illegal contracts which are malum prohibitum merely, and where the prohibition and penalties are directed against one of the parties to the contract only, and the other party has advanced money or property upon the contract, relief will be granted to the latter, although he has participated in the transaction, if he is not in pari delicto with the party whom the statute has marked as the criminal by imposing upon him all the penalties. In all such cases, where them is no parity of guilt between the parties, the more innocent will be entitled to a remedy against the more guilty, for money or property advanced to the latter upon the illegal contract. Where the contract involves moral turpitude, the parties are in pari delicto, and neither will ho entvled to any relief as against the other.
The decision in the Indiana cz.aj mo As with my unqualified approval. It stands upon ih/. b/rpregnable foundation of *237 law, justice and equity. The principle of discrimination between the parties to an illegal transaction, which is merely malum prohibitum, and of examination into their relative guilt, which that decision embodies, will be eminently benign in its application in the daily administration of justice. The renunciation of this principle will leave the party whom the statute and morality alike mark as the criminal, to secure with impunity the fruits of an illegal transaction, and to appropriate to himself, without compensation, the property oi the comparatively innocent parties thereto. “Such a principle,” as is truly said by Judge Selden, “ would afford the strongest possible inducement for the banks to transgress the law. All that they could get into their hands, by persuading others to take their unauthorized paper, would be theirs.”
It is also insisted by the receiver, that the Palmers have no valid debt against the company, because the debt claimed by them arises, in part, out of an illegal sale of South Carolina state stocks to the company, and out of payments made to take up Murray debentures, time certificates of deposit, and time bills of exchange, all which were illegal; and because they cooperated with the company in conducting all the illegal transactions connected with these securities. The evidence, I think, shows that the South Carolina state stocks, purchased by Murray for the company, and pledged to Sanderson & Co., for a loan of money made by them and Samuel Mills to the company, belonged to L. M. Simon, and were sold by the Palmers to the company, as his agents. The Palmers advanced the purchase money for these stocks, being ¿£34,800, on a draft of Murray on them, and charged it in their general account as of the date of 13th August, 1840. The proceeds of the loan obtained by Murray, on the pledge of these stocks, and of ¿£40,000 of Indiana stocks, being ¿£52,187, were paid by Murray to the Palmers, and credited by them to the company. The South Carolina bonds, after the purchase by Murray, and after the loan *238 was negotiated by him, were, by virtue of an order from Murray,' delivered by the Palmers to Sanderson & Co., and at the tune' of such delivery it was understood between Murray and the Palmers that they were to receive the proceeds of the loan. The South Carolina stocks were subsequently sold, and the proceeds applied towards the liquidation of this loan.
I am inclined to believe that the condition of the Palmers, in respect to their relation to the alleged illegal purchase by the company of the South Carolina stocks, would have been substantially the same whether they sold the stocks as principals, or as agents of Simon. For if the sale was illegal, they, although making the sale as agents, would be parties to the illegality, in like manner as-if they had made the sale as principals. It is for this reason that if an agent is connected with an illegal transaction of his principal, and advances money for him in furtherance of such transaction, he cannot recover the money advanced from his principal. (Paley on Agency, 116, Dunlap’s ed., 102; Story on Agency, §§ 346, 347.)
The purchase of the South Carolina stocks by Murray, as agent of the company, for the purpose of pledging them for a loan of money, was, under the decision in Talmage v. Pell (3 Seld., 328, 348), ultra vires, being unauthorized by the general banking law, and the act of the 14th of May, 1840, amendatory of the same. The purchase of state stocks for the purpose of selling at a profit, or as a means of- raising money, except when received as security for a loan, or a debt due to the association, or when taken in payment of such loan or debt (3 Seld., 343, 348), is not expressly prohibited; but it is insisted that, being neither a power expressly granted, nor incidental to the business of banking, or, in other words, not necessary to the accomplishment of any of the purposes of the creation of a banking association, its exercise is ultra vires, an excess of corporate authority, and is therefore impliedly prohibited. (30 Eng. L. & Eq *239 R., 127, 129, 131, 137.) The powers of corporations are undoubtedly limited to the purposes of their creation. This proposition rests upon the soundest principles of reason and public policy. It is the only protection Of the public against corporate aggression. (30 Eng. L & Eq. R., 137 ; 7 id., 508; 16 id., 180.) But there is, in my judgment, a distinction between the acts of a corporation, innocent in themselves, which are illegal because expressly prohibited by some positive law, and similar acts which are void merely because they are beyond the corporate powers of the corporation. Illegality cannot, with grammatical propriety, be applied to the latter. Such acts are void, because unauthorized. They are not strictly illegal, because not expressly, prohibited by law. An instrument intended as a will, which is attested by only one witness, is not illegal; it is merely inoperative and void as a will; but a usurious loan of money is illegal, because expressly prohibited by law and punishable as a misdemeanor. Moral guilt never can be imputed to a party to a contract with a corporation, involving no moral turpitude, which is merely ultra vires as to such corporation. Par delictum and particcps criminis are not predicable of him in respect to his relation to such a contract. This is emphatically so, where he was ignorant of the excess of authority of the corporation in making the contract. It is conceded that such a contract is void, and cannot be enforced against the corporation. But it is not a legitimate result from this concession that the corporation, which has by means of an unauthorized exercise of power, obtained the possession of the property or money of the person dealing with it, can withhold it from him without compensation. The contract in all such cases will be regarded as void, and the party who delivered the property or advanced the money to such corporation will be entitled to Ms legal remedy, not founded upon the contract, but in repudiation of it, to recover the property or the money from the corporation, upon the principle that it had acquired no right or title to *240 either under the contract. These propositions accord with the views expressed by Judge Comstock, in the Indiana case. In his opinion in that case, he says: “ The maxim, in pari delicto potior est conditio defmdentis, has never been applied to the case of a person contracting with a corporation, simply beyond the powers of the latter.” And he further says: “It is admitted that the contract of a corporation, which it has no legal capacity to make, cannot in its terms be enforced. But it does not follow that the alleged transgressor may appropriate, without compensation, the money, the goods or the services of the person with whom it deals.”
The decisions in The East Anglian Railway Co. v. Eastern Counties R. R. (7 Eng. L. & Eq. R., 508); McGregor v. Manager of Deal & Dover R. R. Co. (16 id., 180); The Mayor of Norfolk v. The Norfolk R. R. Co. (30 id., 120), do not conflict with these view's. In all these cases the action was founded upon and was in affirmance of the unauthorized contract. And in the last cited case, the rule that no action can be sustained upon the contract of a corporation, which it had no authority to make, is applied only to cases where the excess of authority of the corporation was known to both parties, or at least to the party suing upon the contract, at the time of the making of the same. (30 Eng. L. & Eq. R., 128, per Erle, J.; id., 143, 144, per Lord Campbell, C. J.; Royal British Bank v. Turquand, 5 Ellis & Black., 260.) In the case of The Royal British Bank v. Turquand, Lord Campbell says: “A mere excess of authority by the directors, we think, of itself would not amount to a defenceand he also says, if no illegality is shown, as against the party with whom the directors contract under seal of the company, excess of authority is a matter only between the directors and shareholders. I am aware that in the cases in 7 Eng. L. & Eq. R., 508, and in 16 id., 180, it was held that the acts incorporating the railway companies which were parties in those suits were public acts, and that parties dealing with *241 them were presumed to have full knowledge of the extent of their corporate powers. It is evident, however, that such a presumption could not he justified as respects citizens of a foreign country. Upon the principles above stated, the purchase of the South Carolina stocks by the company, for the purpose of pledging the same for a loan of money, was a purchase which involved no moral turpitude, and was simply ultra vires; and the Palmers, if they were the vendors of the stocks, are entitled to be allowed their value; or if they sold the stock as agents merely of Simon, they can claim an allowance for the moneys loaned or advanced by them to the Company to enable it to pay Simon for the stock.
If the purchase of the stocks, for the purpose of pledging the same for a loan of money, is to be regarded as a purchase for an illegal purpose, questions might be raised, whether it was made a part of the contract of sale that the stocks should be so pledged, and whether the Palmers did anything in furtherance of such purpose. But the consideration of these questions; if they legitimately arise, is not important, as, if the charge of ¿£34,800, in the general account of the Palmers, for the advance for the company of the purchase money of these stocks, is rejected, an equivalent sum of the credit of ¿£52,187, the proceeds of the loan obtained on a pledge of these and of the Indiana stocks, must be stricken out of the same account; especially as the South Carolina stocks were subsequently sold, and the proceeds of such sale applied in liquidation of the loan. I may add that the evidence authorizes the inference that, at the time of the purchase of the South Carolina stocks (August 12, 1840), the Palmers had no knowledge of the passage of the act of 1840, limiting the deposit of state stocks with the comptroller to the stocks of this state (Laws of 1840, 306, § 1); and that they, at that time, had no knowledge that the company had no power to purchase state stocks for the purpose of selling for profit, or of pledging the same, as a means of raising money. The decision in Talmage y. Pell, establishing the non-exis *242 tence of this power, was not made until the year 1852. If this is a conclusion of fact, warranted by the evidence, the Palmers cannot be charged with a wilful complicity with the company in its illegal traffic in state stocks.
■Previous to the passage of the act of 1840, the company had an undoubted right to draw bills of exchange, either foreign or domestic, and payable either at sight or on time. This power is implied in the express power to buy and sell bills of exchange; it is at least incidental to the exercise of that power. This was decided in Safford v. Wyckoff (4 Hill, 462), and the existence of the power has, since the decision of that case, been expressly recognized by the Court of Appeals,in Leavitt v. De Laimy (4 Comst., 364). A bill of exchange may be drawn on funds in the hands of the drawee, or on the strength of the credit of the drawer, and it may be drawn on time in anticipation of funds at the place where the bill is payable. (3 Edw. Ch. R., 146; 2 Sandf Ch. R., 156 ; 15 John., 44.) The drawing, and buying and selling bills of exchange, is within the legitimate business of banking. It is one of the ordinary attributes of a bank of discount. (Beawes' Lex Mercaloria, 384, ed. of 1792.) The general power to draw, or buy and sell bills of exchange, implies the right to draw and buy and sell bills, payable either at sight or on time. The act of 1840 restricts the power to bills payable on demand, and the restraining act prohibits the issuing of bills for the purpose of loaning them and putting them in circulation 'as money, unless payable on demand, and countersigned by the comptroller. (Act of 1838, 246; 1 R. S., 712.)
The company, under the power to receive deposits, had the power to receive them under an agreement to repay them on time. This power is not prohibited by the general banking law. It does not violate any sound principle of banking, or any principle of public policy. It is a convenient . and useful power to the banks; it admonishes the managers when to provide means for repayment. It is a *243 power which has always been exercised without objection from any quarter. If a bank has a right to receive deposits, to be repaid at a future day, it certainly has a right to issue a certificate as evidence of the actual deposit, and of the time it is to be paid. The act of 1840 limits the power to issue these certificates to such as are payable on demand; although it does not prohibit the receiving of deposits payable on time. The right of banking associations to issue certificates on time, prior to 1840, was plainly conceded by Judge Bronson, in Leavitt v. Palmer (3 Comst., 33-35). The authority of the company to issue these certificates, either foreign or domestic, may be sustained under the general power of the company to borrow money. "Under this general power a bank may borow money and give any security for repayment not prohibited by law. ‘ (Beawes' Lex Mercatoria, 384, 398.)
The foreign bills of exchange, and foreign certificates of deposit, payable on time, issued prior to 1840 and taken up by the Palmers, were not, for the reasons before stated, violations of the restraining law. The moneys, therefore, advanced by the Palmers, at the request of the company, in paying or taking up these securities, constituted a valid debt against the company.
All the foreign time bills of exchange, except eight, were issued by the company prior to the 3d June, 1840. Seven of these were drawn upon the Palmers, by the company, on the 31st July, 1840, and one on the tenth day of August of the same year. These bills were drawn for the purpose of raising money to meet the liabilities of the company. The eight bills were paid by the Palmers at maturity. These bills of exchange, being payable on time, were prohibited by the act of 1840, and were therefore void. The officers of the company are presumed to have issued them with full knowledge that they were prohibited; but the Palmers, being residents of a foreign country, must be presumed, in absence of all evidence to the contrary, to have *244 had no notice of the act of 1840, and, therefore, no knowledge of the invalidity of these bills of exchange, and to have accepted and paid them in good faith. Here, not only is the prohibition directed against, and the penalty imposed upon the company alone, but the whole criminality of the transaction is imputable to the company. The Palmers, having no notice of the act of 1840, are entirely innocent of any wilful cooperation in its violation. Their claim, therefore, to recover the moneys advanced to the company in payment of the eight bills of exchange, issued after the 3d June, 1840, is manifestly just and legal. Judge Selden and the general term of the seventh district, came to a like conclusion, under similar circumstances, in the case of The Bank of Chilicothe v. Dodge (8 Barb., 235, 237.)
The same remarks will apply to all the Murray debentures, issued after the 3d June, 1840, which were endorsed or guaranteed by the Palmers.
All the foreign certificates of deposit, taken up by the Palmers at the' request of the company, were issued prior to the 3d June, 1840.
The Davis bills of exchange were drawn prior to June, 1840, and the Palmers, under the letter of credit of the company, accepted them, or agreed to accept them, before notice that they were drawn to pay for the stock of the company purchased by Davis for its benefit.
If any of the bills of exchange or certificates of deposit paid by the Palmers on the request of the company were founded upon or arose out of illegal stock or other transactions, the claim to recover the moneys advanced is, nevertheless, legal and valid, because it is not founded upon such transactions, but arose out of subsequent and totally distinct contracts, and is supported altogether by new considerations. The test, whether a demand connected with an illegal transaction is capable of being enforced at law, is whether the plaintiff requires any aid from the illegal transaction in establishing his case. (Chit, on Con., 657, and cases cited in *245 notes, Springfield ed. of 1848; Simpson v. Bloss, 7 Taunt., 246.) The leading case on this subject is that of Faikney v. Reynous (4 Burr., 2069.) In that case the plaintiff and one E. were jointly concerned in stockjobbing contracts prohibited by statute; and the plaintiff, contrary to the statute, gave to divers persons money for compounding differences, for not delivering stock, &c.; and the defendants gave the plaintiff a bond, as a security for the repayment by E. to him of one-half of his advances. The action was upon this bond, and the court of King’s Bench decided that the plaintiff was entitled to recover. Lord Mansfield, in that case, held that as the act prohibited was not malum in se, and the plaintiff had paid money for E. and upon his account, ha had a right to recover. He said, that if money be lent in order to pay a play-debt, or to pay off an usurious contract, and a bond be given to secure the repayment of the money lent, the bond is valid. This case establishes the principle, that if a person lends money to a party to an illegal contract, for the express purpose of paying a debt due by him upon such contract, the lender can recover from him the money lent; and the case goes even so far as to authorize a recovery, although the lender himself be one of the original parties to the illegal contract. The decision in this case was followed by the decision in Petrie v. Hannay (3 D. & E., 418, 423), where it was held .that if one of the parties to an illegal contract pay money, due on such contract by another party to the same, and upon his direction, the law gives the former the right to recover it from the latter. The principle of these cases was reaffirmed in Tenant v. Elliot (1 Bos. & Pul., 3); Farmer v. Russell (1 Bos. & Pul., 296); Pemberton v. Same (13 Ves., 290); Simpson v. Bloss (7 Taunt., 246); Armstrong v. Toler (11 Wheat., 258.) It was doubted in Aubert v. Maze (2 Bos. & Pul., 371); exparte Mather (3 Ves., 273); exparte Daniels (14 Ves., 191.) In Simpson v. Bloss (supra), GribbS, C. J., says “ that the court hf'ld in Faikney v. Renous, and in Petrie v.
*246 Hannay, that he who borrowed money to pay a debt which he owed upon an illegal transaction, not malum in se, might be sued for the repayment of the loan, although the lende" knew to what purpose the money was to be applied; because the lender’s right of action is founded altogether upon the contract of loan between him and the borrower, and derives no aid from the illegal transaction in which the borrower had been originally concerned, nor is it affected by it. The ground of the decision was, that the plaintiffs required no aid from the illegal transaction to estabish their case.” Ch. J. Marshall, in Armstrong v. Toler (supra), in reviewing the case of Failmey v. Renous, says : “ this is a strong case to show that a subsequent contract, not stipulating a prohibited act, although for money advanced in satisfaction of an unlawful transaction, may be sustained in a court of justice.” In such cases, the money is recoverable, although knowingly advanced in a matter collateral to, and remotely connected with, the illegal transaction, because it is one degree removed from such transaction, and is in itself perfectly legal in its consideration and formation as an independent contract. (Story on Agency, § 347; 2 Poth.. on Obli., 16, ed. of 1806, by Evans, App. No. 1.) Upon the principle of these authorities, all the advances made by the Palmers, upon the request of the company, in paying‘the time bills of exchange, the time certificates of deposit, the Murray debentures, the Davis bills, and any other of the debts of the company, are recoverable from the company, although such securities and debts grew out of and were founded upon illegal transactions. The money so advanced is recoverable, because the right of recovery is founded wholly upon a contract of loan, which is one degree removed from the illegal transaction, and is itself legal, in its consideration’ and formation as an independent contract, and in its establishment requires no aid from such transactions. I conclude, therefore, that the moneys advanced by the Palmers for the *247 company, and charged in their general account, constitute a valid debt against the company.